UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICK HEGARTY, MICHAEL MULRENAN, and GREG MULLER,<br>          Plaintiffs<br><br>v.<br><br>PAUL TORTOLANO, Individually and in his official capacity as Chief of the City of Woburn Fire Department, JOHN C. CURRAN, Individually and in his official capacity as Mayor of the City of Woburn, and CITY OF WOBURN, MASSACHUSETTS,<br>          Defendants | C.A. No. 04 11668 RWZ |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs Rick Hegarty ("Hegarty"), Michael Mulrenan ("Mulrenan") and Greg Muller ("Muller") (collectively, "Plaintiffs") are fire fighters in the City of Woburn's Fire Department ("Fire Department"). Plaintiffs have brought the present action against Defendants Paul Tortolano, the chief of the Fire Department ("Chief Tortolano"), John C. Curran, the Mayor of the City of Woburn ("Mayor Curran"), and the City of Woburn, Massachusetts ("City") after they were retaliated against solely because they signed a petition to Mayor Curran which addressed an issue of great public concern, the provision of advanced life support to the citizens of the City. As set forth below, Defendants retaliatory actions clearly violated Plaintiffs' First Amendment rights and, therefore, this Court should grant Plaintiffs' motion for summary judgment.

## PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

As set forth in the documents contained in the Appendix To Plaintiffs' Memorandum of Law In Support Of Their Motion For Summary Judgment, the following facts in this case are not in dispute:

1. Plaintiffs are all firefighters employed by the Woburn Fire Department. Plaintiff Hegarty has been a firefighter with the Department since 1989. Exhibit ("Ex.") 1, Deposition of Richard S. Hegarty, dated February 3, 2005 ("Hegarty Dep."), 9. Plaintiff Mulrenan has been a firefighter with the Department since 1988. Ex. 2, Deposition of Michael Mulrenan, dated February 15, 2005 ("Mulrenan Dep."), 6. Plaintiff Muller has been a firefighter with the Department since 1999. Ex. 3, Deposition of Gregory J. Muller, dated February 3, 2005 ("Muller Dep."), 7.

2. Defendant Chief Tortolano has been Chief of the Woburn Fire Department since approximately 1998. Ex. 4, Complaint, ¶5; Ex. 5, Answer, ¶5.

3. Defendant Mayor Curran is Mayor of the City of Woburn. Ex. 4 and 5, Complaint and Answer, ¶6.

4. Historically, the Fire Department has utilized the services of outside Advanced Life Support, or paramedic, ("ALS") companies to provide ALS service to the City. From approximately 1985 until on or about May 31, 2003, Armstrong Ambulance provided the ALS service to the City. On or about June 1, 2003 until the present, the City began using another company, Action Ambulance, to provide the ALS service to the City. Ex. 5, Answer, ¶8.

5. After Action began providing ALS service, Chief Tortolano instructed Captain Robert Mills, the Captain in charge of personnel and training, to monitor Action Ambulance's services to the City. Ex. 6, Deposition of Robert B. Mills, dated April 21, 2005 ("Mills Dep."),

2

18, 24. Captain Mills monitored Action's services by reviewing the "run reports" completed by the firefighters responding to calls and by monitoring the radio transmissions between Action and the Fire Department's dispatcher. In reviewing these run reports, Captain Mills immediately began observing problems with Action's response times (the time it takes from Action's receipt of a call from the Fire Department's dispatcher requesting their services to the time Action finally arrives at the scene of the emergency). Ex. 6, Mills Dep. 24-25. These response times continued for at least three to four months, or up until November, 2003. Ex. 6, Mills Dep., 26-31. Within a month of Action taking over the ALS service, on in approximately July, 2003, the overseer of the Lahey Clinic, Renee Lake, complained to Captain Mills that Action's response times were longer than normal. Ex. 6, Mills Dep., 22-23. Captain Mills informed Ms. Lake that he had already spoken to Action about the slow response times. Ex. 6, Mills Dep., 24.

6. In reviewing the radio transmissions, Captain Mills also observed that Action was providing ineffective service, namely, Action would first leave their facility after receiving the call from the Fire Department's dispatcher and then ask for the address of the emergency after they were already on the road. Captain Mills thought this practice was both ineffective and "unprofessional." Ex. 6, Mills Dep., 25-26.

7 Poor response times and/or inadequate ALS care can have a serious affect on the health and safety of the public. Prompt and adequate medical care after an accident or injury can be critical to saving a life or reducing the severity of the injury. See, Ex. 4 and 5, Complaint and Answer, ¶10; Ex. 6, Mills Dep., 39.

8. Normally, in the event of a medical aid call, the Fire Department responds by sending the rescue vehicle, a rescue ambulance, from Station 3 and a fire engine in the district nearest the emergency. The Fire Department's rescue ambulance is staffed by two firefighters

and the engine is manned by an officer and a fire fighter.[1] If the ALS provider arrives in a timely fashion, one of the ALS providers takes his equipment and joins the Fire Department's rescue ambulance. The rescue ambulance, along with the ALS provider, then transports the ill or injured individual to the hospital. However, if the ALS provider is late in responding to the emergency, the firefighters assigned to the rescue vehicle and one of the firefighters assigned to the fire engine that is also responding to the medical aid call are sometimes required to transport the ill or injured individual(s) to the hospital without the services of the ALS provider. This leaves only an officer on the fire engine and the entire operation may be jeopardized. See, Ex. 4 and 5, Complaint and Answer, ¶11.[2]

9.   On or about September 25, 2003, the Woburn Firefighters Union, Local 971 (the "Union"), held a meeting between the bargaining unit members and a candidate running for the office of Mayor in the upcoming election. Plaintiffs are all member of the Union, which represents the firefighters employed by the City. A firefighter, Kenneth Robishaw ("Robishaw"), spoke at this meeting about the benefits of having the Fire Department provide ALS services to the City rather than having an outside company provide these services. Chief Tortolano attended the meeting and observed Robishaw give his presentation. See, Ex. 4 and 5, Complaint and Answer, ¶12.

10.   In or around late September/early October, 2003, a petition was posted on a bulletin board located in the watch room at Station 3. See, Ex. 6, Mills Dep., 69; Ex. 7, Petition

---

[1] The Fire Department operates two rescue vehicles, or ambulances, out of Station 3. Firefighters employed by the Department (except two senior firefighters) are required to be Basic Life Support training (EMT Basic) certified, which permits them to respond to medical aid calls. In responding to medical aid calls, the firefighters are responsible for providing Basic Life Support and the ALS company is responsible for providing Advanced Life Support. The ambulance is staffed at all times with two firefighters. See, Ex. 4 and 5, Complaint and Answer, ¶20.

[2] In their Answer, Defendants admit the allegations contained in the first sentence of this paragraph and deny the remaining sentences. However, a careful scrutiny of this denial reveals that Defendants are not denying the responsibilities of the firefighters, as set in these sentences, but rather, only denying that these responsibilities have changed since the City began utilizing Action.

to the Mayor. The petition was addressed "PETITION TO THE MAYOR" and headed, "To change the ALS provider for the City of Woburn." See, Ex. 7. The petition criticized the service provided by the City's new ALS provider, stating that "we feel the service provided by this new ALS provider has not been to the caliber and level of our previous ALS provider." It further stated, "we are waiting longer for the ALS units to arrive, and we feel the quality of care is less than what the City has been accustomed to over the past many years." It stated, "[a]s the EMT's and First Responder's to the City, the undersigned Firefighters respectfully request the City change back to our previous ALS provider." The petition concluded that the undersigned "feel this change is in the best interest of the citizens of Woburn!." Ex. 7.

11. The bulletin board on which the petition was posted has historically been used by the Fire Department's fire fighters to publicize a variety of subjects, including Fire Department business, personal opinions on various subjects, newspaper articles on various issues, including fires in the City, thank you letters from the citizenry, cartoons and advertisements for events and merchandise. Ex. 6, Mills Dep., 69. Members of the public often come into the watch room where the bulletin board is posted. Ex. 6, Mills Dep., 71-73.

12. In or around late September/early October, 2003, Plaintiffs read and signed the petition prior to starting their respective work shifts. Ex. 7; Ex. 8, Affidavit of Michael Mulrenan ("Mulrenan Aff."), ¶6; Ex. 9, Affidavit of Greg Muller ("Muller Aff."), ¶6; Ex. 10, Affidavit of Greg Hegarty ("Hegarty Aff."), ¶6.

13. Plaintiffs signed the petition because they agreed with the contents of the petition. In particular, Plaintiffs had observed problems with the service being provided by Action and they believed that the former ALS provider, Armstrong, had provided better service. Ex. 8, Mulrenan Aff., ¶7; Ex. 9, Muller Aff., ¶7, Ex. 10, Hegarty Aff., ¶7. The problems observed by

Plaintiffs included slower response times, not showing up at emergencies, and difficulties with emergency medical procedures, such as putting in IVs and intubations. Ex. 1, Hegarty Dep., 32-33, 54; Ex. 2, Mulrenan Dep., 28-29; Ex. 3, Muller Dep., 25-26; Ex. 8, Mulrenan Aff., ¶¶4-5; Ex. 9, Muller Aff., ¶¶4-5; Ex. 10, Hegarty Aff., ¶¶4-5.

14. In or around October, 2003, Captain Mills became aware that the petition was posted on the bulletin board in the watch room at Station 3. Ex. 6, Mills Dep., 67. Mills informed Chief Tortolano of the petition and Chief Tortolano directed him to retrieve a copy of the petition. Captain Mills took down the petition and gave it to Chief Tortolano. Ex. 6, Mills Dep., 74-76.

15. A couple of days later, Chief Tortolano called all of the petition-signers, including Plaintiffs, to Captain Mills' office at Fire Department headquarters. Ex. 6, Mills Dep., 85-86. The first meeting was attended by Plaintiffs Mulrenan, Muller and Hegarty and Captain Mills. Ex. 6, Mills Dep., 86; Ex. 11, Deposition of Paul Tortolano, dated April 21, 2005 ("Tortolano Dep."), 57. Chief Tortolano asked each Plaintiff to identify their signature on the petition and they did. Ex. 6, Mills Dep., 86; Ex. 11, Tortolano Dep., 57; Ex. 8, Mulrenan Aff., ¶¶8-9; Ex. 9, Muller Aff., ¶¶8-9; Ex. 10, Hegarty Aff., ¶¶8-9.

16. Chief Tortolano asked each Plaintiff if they agreed with the petition and they all said that they did. Ex. 11, Tortolano Dep., 57. Chief Tortolano then asked each of them why they signed the petition. Ex. 6, Mills Dep., 86. According to Chief Tortolano and Captain Mills, Plaintiff Hegarty explained that Action had responded to a medical emergency concerning his wife's cousin and that they had provided substandard treatment, including being unable to get lines and a tube in him. Ex. 6, Mills Dep., 87; Ex. 11, Tortolano Dep., 57. Plaintiff Hegarty stated that Action's service was substandard and that the City should return to Armtrong. Ex. 6,

Mills Dep., 87; Ex. 11, Tortolano Dep., 58-59. Firefighter Muller stated that he had "been in this business a long time and these people are terrible." Ex. 6, Mills Dep., 88. He, too, stated that the City should return to Armstrong. Ex. 6, Mills Dep., 88. Chief Tortolano then looked at Mulrenan, who stated that he had heard stories that Action was not any good and he also thought the City should return to using Armstrong. Ex. 6, Mills Dep., 88.

17. Chief Tortolano then told the Plaintiffs that they had caught him "off guard." He stood up and said, "you know, you put me in a spot here, I'm going to have to see what I'm going to do about this." Ex. 6, Mills Dep., 88-89; Ex. 4 and 5, Complaint and Answer, ¶16; Ex. 11, Tortolano Dep., 60.[3]

18. The Fire Department operates 5 stations and bargaining unit members are assigned to one of four groups. Each group works the following eight-day schedule: one day on, one day off, one day on, five days off. See, Exhibits 4 and 5, Complaint and Answer, ¶17.

19. On October 25, 2003, Chief Tortolano issued a Department Order transferring Plaintiffs Hegarty and Muller to different groups. Ex. 12, October 25, 2003 Fire Department Order. The transfers were effective November 2, 2003. Ex. 12, October 25, 2003 Order. By making the transfers, the Chief distributed the petition signers to the four groups and assigned each of them to Station 3. Ex. 4 and 5, Complaint and Answer, ¶19.[4]

---

[3] The parties dispute the extent to which some or all of the plaintiffs gave specific examples to Chief Tortolano as to Action's deficient service. For example, Mulrenan explained in his deposition that some of the plaintiffs explained that the ambulance was waiting longer for Action to respond and the problem of having Action fail to intercept with the ambulance en route to the hospital. Ex. 2, Mulrenan Dep., 24-27, 34-35; Ex. 8, Mulrenan Aff., ¶10. However, for the purposes of this motion, Defendants' rendition of the meeting will be taken as true.

[4] Prior to November 2, 2003, all the Plaintiffs were assigned to Group 2, Station 3. The October 23, 2003 Order transferred the Plaintiffs to different groups, meaning they each worked a different schedule. Plaintiff Hegarty was transferred from Group 2 Station 3 to Group 1, Station 3. Muller was transferred from Group 2, Station 3 to Group 3, Station 3. Mulrenan remained assigned to Group 2, Station 3. Another fire fighter who had signed the petition, Mark Kichton, was transferred from Group 1, Station 1 to Group 4, Station 3. See, Ex. 12, October 25, 2003 Order; Exhibits 4 and 5, Complaint and Answer, ¶18.

7

20. On November 2, 2003, Chief Tortolano issued a "Notice/Order" stating that "due to ALS service quality concerns recently recognized by this office, the following is to take place beginning November 3, 2003 and continuing, with medications as seen beneficial, until further notice." Ex. 13, November 2, 2003 Order. The November 2, 2003 Order assigned Plaintiffs Hegarty, Mulrenan, Muller and the other firefighter who had signed the petition, Firefighter Kichton, "to the rescue ambulance on their respective work shifts." In addition, the firefighter who had advocated having the ALS service provided by the Fire Department rather than an outside company, Firefighter Robishaw, was "assigned to dispatch on his workshift." See, Ex. 13.

21. The November 2, 2003 Order then assigned Plaintiffs the additional duties of reporting by email "[c]oncerns, regarding, but not limited to, ALS response times, quality of care, etc.", with the report to include the "date and time of the incident, incident number, fire department work shift, ALS identifier . . . and a very brief description of the concern . . . ." These reports were to be delivered to the personnel officer. The other petition-signer, Lieutenant McDonough, was given the additional responsibility of maintaining "a running log of the information contained in the email." Ex. 13. None of these additional job duties had ever been assigned to any firefighters or officers.

22. Chief Tortolano admits that he assigned Plaintiffs to the four groups and the rescue ambulance so they would provide "24/7 coverage" on the rescue ambulance and, by assigning them the additional reporting requirement, they would have to report "any irregularities" in the ALS service. Ex. 11, Tortolano Dep., 64. Chief Tortolano admits that he decided to assign the three Plaintiffs to the rescue ambulance and give them the additional

reporting requirements because by signing the petition, the petition signers had raised the issue of ALS service but "they weren't being specific with the problem." Ex. 11, Tortolano Dep., 73.

23. It is undisputed that as of November 1, 2003, 47 of the 49 firefighters employed by the Department were EMT certified and, as such, could have been assigned to the rescue ambulance and reported on the quality of ALS service. Ex. 11, Tortolano Dep., 66; Ex. 6, Mills Dep., 109, 118-119. It is undisputed that none of the three Plaintiffs were any more qualified than the other Fire Department firefighters in the operation the rescue ambulance and in the ability to report ALS deficiencies. Ex. 11, Tortolano Dep., 68, 72-73.

24. Chief Tortolano admits that he never asked the Plaintiffs if they wished to be assigned to the rescue ambulance to monitor ALS quality of service. Ex. 11, Tortolano Dep., 77.

25. Chief Tortolano admits that he assigned Firefighter Robishaw to the dispatcher position because Firefighter Robishaw had spoken in favor of having the Fire Department providing ALS service during the meeting with candidate Melanson. Ex. 11, Tortolano Dep., 77-78.

26. Pursuant to Chief Tortolano's November 2, 2003 order, the Plaintiffs, as well as Firefighter Kichton, were prohibited from swapping assignments. Ex. 11, Tortolano Dep., 91; Ex. 6, Mills Dep., 125.[5] Chief Tortolano admits that the past practice has been to allow firefighters to swap their assignments during their shifts.[6] Ex. 11, Tortolano Dep., 95-96. Chief

---

[5] Chief Tortolano is unsure whether Plaintiffs were prohibited from swapping their shift assignments pursuant to his November 2, 2003 order or by some later communication he may have had with one or more captains. Ex. 11, Tortolano Dep., 99. However, regardless of how the order was communicated, it is undisputed that Plaintiffs were prevented from swapping shift assignments while they were assigned to the ambulance.

[6] A swap during a shift assignment occurs when two firefighters agree to temporarily swap their apparatus assignments during a shift. As a result, the firefighters respond to calls which require the apparatus they are temporarily assigned to. The reasons for these swaps vary. In some cases, the ambulance calls may be so numerous that the firefighter requests a temporary swap to take a break and rest.

Tortolano admits that this privilege continued for all of the firefighters except Plaintiffs and the other firefighter who had signed the petition, Firefighter Kichton. Ex. 11, Tortolano Dep., 96.

27.   Firefighters assigned to the rescue ambulance, including Plaintiffs, often swap their rescue ambulance assignment with another firefighter for one or more runs during a shift. This is because the rescue ambulance assignment is physically and emotionally exhausting due to the large volume of medical aid calls that the firefighter has to respond to and the nature of many of these calls. This is particularly true on shifts where the runs are numerous and/or emotionally or physically exhausting. Such swapping is critical to relieving the stress and burnout that can accompany the rescue ambulance assignment. Ex. 8, Mulrenan Aff., ¶¶15-16; Ex. 9, Muller Aff., ¶¶14-15; Ex. 10, Hegarty Aff., ¶¶15-16.

28.   Although the parties dispute the Fire Department's practice prior to Chief Tortolano with respect to making of making assignments to apparatus, including the rescue ambulance, they do not dispute the assignment practice under Chief Tortolano's tenure as Chief of the Fire Department.[7]

29.   It is undisputed in approximately 1999, or one year after Chief Tortolano became Chief of the Fire Department, Chief Tortolano changed the Fire Department's assignment practice. Ex. 4 and 5, Complaint and Answer, ¶22; Ex. 6, Mills Dep., 45-46; Ex. 11, Tortolano

---

Or, to take another example, a firefighter's family member may visit the firefighter during the shift and, if an ambulance call comes in, the firefighter may ask another firefighter to swap apparatus assignments for that time and the other firefighter will take the ambulance call. Ex. 2, Mulrenan Dep., 37-38.

[7]   Plaintiffs contend that prior to 1999, assignments to the ambulance were made on a one-year rotating basis whereby every firefighter EMT (except officers and specialist) took one-year turns on the ambulance. In any event, as explained above, because the parties do not dispute the assignment practice under Chief Tortolano, this disputed fact is irrelevant for the purposes of Plaintiffs' motion for summary judgment.

10

Dep., 28-29.[8]  Thereafter, he assigned 5-7 firefighters per group to Station 3 (where the rescue ambulance is stationed) and left it to the captain in charge of the group to determine the procedure for assigning firefighters to the apparatus at Station 3. Ex. 11, Tortolano Dep., 25-26; Ex. 6, Mills Dep., 46-47. In Chief Tortolano's words, under his practice, the captain "could assign them how he saw fit." Ex. 11, Tortolano Dep., 26.

30.  The captains in charge of the groups instituted different policies for making apparatus assignments. Three of the four captains chose to determine assignments based on firefighter seniority. Under the seniority system, the most senior firefighter choose his assignment first, the second most firefighter then selected his assignment from the remaining openings, and so on, until all of the positions were filled. Ex. 6, Mills Dep., 47-48. One captain, Captain Dennis Devine, instituted a practice in approximately early 2003 whereby he assigned firefighters in his group to the rescue ambulance on six-month rotating assignments.[9] All of the firefighters assigned to Station 3 except the Plaintiffs continued to be assigned pursuant to each captain's practice.

---

[8] Chief Tortolano does not dispute that he changed the policy but is unable to pinpoint the year in which he changed the practice but was unable to pinpoint the year in which he instituted this policy change. In any event, he admitted that the new practice, allowing the captains at Station 3 to decide how to assign firefighters to the apparatus at the station, was in effect for at least six months prior to prior to November 2, 2003. Ex. 11, Tortolano Dep., 28-29. However, Captain Mills, the Fire Department's Personnel Officer, testified that Chief Tortolano instituted his new policy approximately one year after becoming chief of the Department, or in approximately 2001, testimony which conforms to Plaintiffs' recollection. Ex. 6, Mills Dep., 45-46, 47. In any event, it is undisputed the new practice, permitting Captains to determine how assignments at Station 3 were made, was in effect prior to the November 2, 2003 order, and that this practice was changed, with respect to Plaintiffs as a result of their signing the petition.

[9] Chief Tortolano admits that he was aware that some captains used the seniority system in making assignments. Ex. 11, Tortolano Dep., 30. However, he could not identify which assignment system was used by each captain. Ex. 11, Tortolano Dep., 30-31. Captain Mills testified that all of the captains made assignments at station 3 based on seniority. Ex. 6, Mills Dep., 47.

11

31. It is undisputed that, in general, the dispatch assignment is the least desirable assignment at station 3 and, when the seniority system is used, the dispatch position is filled by the least senior fire fighter. Ex. 6, Mills Dep., 48.

32. It is undisputed that the two rescue ambulance assignments are generally considered the second and third least desirable assignments at station 3 and, when the seniority system has been used, and the second and third least senior fire fighters usually fill those positions. Ex. 6, Mills Dep, 48. In contrast, the two positions on the engine, the back step position and the driver position, are the most desirable positions at station 3 and, under the seniority system, usually filled the two most senior firefighters. Ex. 6, Mills Dep., 48-49.

33. Like the majority of firefighters in the Fire Department, Plaintiffs Hegarty and Muller prefer the engine assignment to the rescue ambulance assignment. Ex. 9, Muller Aff., ¶12; Ex. 10, Hegarty Aff., ¶18.

34. Prior to the November 2, 2003 order, Plaintiff Hegarty was assigned to Group 2, Station 3. When the seniority system was used for making assignments, Plaintiff Hegarty selected the back step of Engine 3 and preferred it over the rescue ambulance. However, when his captain, Captain Devine, began rotating the rescue ambulance assignments in early 2003, he was assigned to the rescue ambulance. Hegarty, 13-15; Ex. 10, Hegarty Aff., ¶17..

35. As a result of Chief Tortolano's October 25, 2003 order and November 2, 2003 Order, Plaintiff Hegarty was reassigned to Group 1, Station 3 and assigned to the rescue ambulance. Ex. 12; Ex. 13. The captain in charge of Group 1, Captain Kenton, used the seniority system in assigning firefighters to apparatus. Ex. 1, Hegarty Dep., 38. However, pursuant to Chief Tortolano's November 2, 2003 order, Firefighter Hegarty could not select his

assignment based on his seniority and, instead, he was assigned to the rescue ambulance at all times.[10] Ex. 10, Hegarty Aff., ¶19.

36.     Prior to the November 2, 2003 transfers and assignments, Plaintiff Mulrenan was assigned to Group 2, Station 3, and under the supervision of Captain Devine, the captain in charge of Group 2. When Captain Devine instituted the six-month rescue ambulance assignments, Plaintiff Mulrenan was assigned to the rescue ambulance. However, after his six-month stint ended, Plaintiff Mulrenan decided to stay on the rescue ambulance because he had personal conflicts with Captain Devine. By choosing to remain on the rescue ambulance, Plaintiff Mulrenan avoided having to work on the same apparatus, engine 3, as Captain Devine. However, Chief Tortolano's order deprived him of his ability to choose his assignment. Ex. 2, Mulrenan Dep., 20-21; Ex. 8, Mulrenan Aff., ¶13..

37.     Prior to November 2, 2003, Plaintiff Muller was assigned to Group 2, Station 3. Ex. 12. When Captain Devine began rotating the firefighters on 6-month rescue ambulance assignments, Muller was selected for the rescue ambulance assignment. However, Muller had completed this rescue ambulance assignment prior to November, 2003 and, as a result, he was scheduled to begin the more preferred assignment on the engine when he was transferred to Group 3 and assigned to the rescue ambulance. Ex. 3, Muller Dep., 51-52; Ex. 9, Muller Aff., ¶12.

---

[10]     By reassigning Hegarty to Group 1, Station 3, Hegarty became one of the more junior firefighters and, as a result, would have been assigned to the ambulance under Captain Kenton's seniority system. Ex. 1, Hegarty Dep., 38-39. However, there were occasions when more senior firefighters would be off and firefighters junior to Hegarty would fill the vacancy. On such occasions, Plaintiff Hegarty would rise on the seniority list and, as a result, but for the November 2, 2003, would have been able to select a more preferable assignment on the engine. Further, as set forth above, it is undisputed that the only reason Hegarty was transferred to Group 1 was to place him in the ambulance position. But for the transfer, Plaintiff Hegarty would have remained in 2 and only been assigned to the ambulance on six month rotations.

38. By having the Chief assign him to the rescue ambulance, Mulrenan lost his ability to choose his assignment as well as his ability to swap his rescue ambulance assignment during his shift. Ex. 2, Mulrenan Dep., 37-38; Ex. 8, Mulrenan Aff., ¶16.

39. Chief Tortolano's assignment of Plaintiffs to the rescue ambulance also increased their work load. This is because employees assigned to Rescue One are required to go on every medical aid and reported fire call whereas employees assigned to the engine in each of the five districts are only required to respond to the fire and medical aid calls in their district. As a result, employees assigned to Rescue One are required to go on five times as many medical aid calls as other bargaining unit members. The medical aid calls represent the vast majority of the emergency call responses, averaging approximately 3,200-3,600 per year. The remaining calls average approximately 2,000 per year. Thus, by assigning four of the petitioners permanently to Rescue One, he was requiring them to respond to 8 to 10 calls per day. Exhibits 4 and 5, Complaint and Answer, ¶25; Ex. 6, Mills Dep. 126-127; Ex. 8, Mulrenan Aff., ¶15; Ex. 9, Muller Aff., ¶14; Ex. 10, Hegarty Aff., ¶15.

40. In or around November 5, 2003, the Union filed grievances protesting the transfers and reassignments of Plaintiffs, as well as the other petition signers and Robishaw. See, Ex. 14.

41. On or about January 9, 2004, the then-Union President, John G. Nee, received a letter from the City's Solicitor, Thomas Lawton, stating that the City would settle the Union's grievances only if each of the petition-signers, including Plaintiffs, and firefighter Robishaw, signed a letter *repudiating* their concerns about the ALS service, stating that:

> We are pleased to report that the level of services being provided to the city is satisfactory.

> During the past several months we have had an opportunity to monitor the ALS provider first hand. We have collectively noted no deficiencies in the level of services, either in regard to response times or quality of care. It is our belief that the current provider of ALS services has met all of the contractual obligations in a timely and professional manner. Therefore, any and all concerns previously expressed regarding ALS services have been alleviated or never existed.

Ex. 15, Letter from City Solicitor Thomas W. Lawton, to John G. Nee, dated January 9, 2004; Exhibits 4 and 5, Complaint and Answer, ¶30.

42. Plaintiffs and the Union refused to agree to Defendants' demand to repudiate their ALS concerns.[11]

43. One of the petition signers, firefighter Kichton, came to Chief Tortolano some time after the November 2, 2003 Order and told Chief Tortolano that he had been rash in signing the petition and that the ALS service provided by Action was comparable to the service provided by Armstrong. Ex. 11, Tortolano Dep., 105. As a result of firefighter Kichton's statements, Chief Tortolano reassigned him away from the ambulance. Ex. 11, Tortolano Dep., 105.

44. Plaintiffs filed the instant complaint on or about July 27, 2004.

45. On or about October 9, 2004, Chief Tortolano issued a Notice/Order rescinding his November 2, 2003 order. See, Ex. 16, Tortolano Dep., Ex. 4, October 9, 2004 Notice/Order..

46. Defendants' actions toward Plaintiffs, including their permanent assignment to the ambulance, the prohibition on their swapping shift assignments, and their additional reporting duties, made Plaintiffs fearful that they would receive further discipline in the future if they

---

[11] Plaintiffs allege that in or around late January, 2004, the Union met with Defendant Mayor Curran and Defendant Chief Tortolano and voiced the Union's objection to Defendants' retaliation and discrimination against firefighters who had signed the petition and spoken at the mayoral candidate's meeting. The Union demanded that Defendants rescind the permanent assignments to the rescue vehicle and reassign the firefighters, including Plaintiffs, back to their original assignments. Defendant Mayor stated that the City would rescind the assignments only if the Union agreed to state that the Union did not have any problem with the ALS service. Defendants deny the alleged statements by the Mayor. See, Ex. 4 and 5, Complaint and Answer. Plaintiffs do not raise this dispute of fact for the purposes of their motion for summary judgment and reserve this allegation, if necessary, for trial.

spoke publicly about the lack of quality ALS service. Ex. 8, Mulrenan Aff., ¶18; Ex. 9, Muller Aff., ¶17; Ex. 10, Hegarty Aff., ¶21.

47.   As a result, although Plaintiffs continued to observe problems with the ALS service provided by Action, they did not report them because they were fearful of further retaliation. Ex. 8, Mulrenan Aff., ¶17; Ex. 9, Muller Aff., ¶16; Ex. 10, Hegarty Aff., ¶20.

48.   In addition, other members of the Fire Department are aware of Defendants retaliation against Plaintiffs and have expressed to Plaintiffs that they are fearful of making any public statements which are critical of the ALS service. Ex. 8, Mulrenan Aff., ¶19; Ex. 9, Muller Aff., ¶18; Ex. 10, Hegarty Aff., ¶22.[12]

## ARGUMENT

A.   **THIS COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE THE DEFENDANTS HAVE CLEARLY VIOLATED THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION BY RETALIATING AGAINST PLAINTIFFS FOR SIGNING A PETITION CRITICAL OF THE SERVICES PROVIDED BY THE CITY'S ALS PROVIDER.**

Public employees do not lose their rights guaranteed by the First Amendment to the United States Constitution during the term of their employment. See *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983); see also *Rankin v. McPherson*, 383 U.S. 378, 380 (1987); *Scott v. Meyers*, 191 F.3d 82 (2nd Cir. 1999); *Broderick v. Roache*, 767 F. Supp. 20 (D. Mass. 1991).

Plaintiffs must meet a three-part test, extracted from *Connick*, in order to prevail under 42 U.S.C. §1983. See *Mullin v. Town of Fairhaven*, 284 F.3d 31, 37-38 (1st Cir. 2002) (setting forth

---

[12] Defendants dispute Plaintiffs allegation that In or around the end of February, 2004, Defendants continued their campaign of harassment and discrimination against individuals, including Plaintiffs, who had signed the petition, by ordering the removal of the SCBA (or, "Scott") packs from the rescue vehicles. See, Ex. 4 and 5, ¶¶32, 33. Plaintiffs do not raise this dispute of fact for the purposes of the instant motion and reserve this allegation, if necessary, for trial.