three-part test). First, Plaintiffs must first show that the speech at issue involves "matters of public concern." *Id.* at 37 (quoting *Connick*, 461 U.S. at 147. Second, if the court concludes that the employee did speak out on a matter of public concern, the second step requires the court to "balance the strength of plaintiffs' and the public's First Amendment interests against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency must provide through" its employees. *Mullin*, 284 F.3d at 37 (internal quotation marks omitted). This evaluation of the employee's rights and the employer's interests is referred to as the "*Pickering* balancing" test. *See, id.,* (citing *Pickering*, 391 U.S. at 568).

Third, if the Court determines that the *Pickering* balance favors the employee's First Amendment rights over the efficiency interests of the government agency, the employee must next show that the "protected expression was a substantial motivating factor" in the adverse employment decision. *Mullin*, 284 F.3d at 38 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). If Plaintiffs make an adequate showing on this point, Defendants must counter by proving by a preponderance of the evidence that the governmental agency would have taken the same action against the employee "even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. If Defendants cannot adduce evidence of an alternative justification for the employment action, or if that evidence once adduced, does not suffice to prove the point, Plaintiffs have established a constitutional violation and summary judgment should be granted.

1. **The Petition Signed By The Plaintiffs Constituted Protected Speech About A Matter Of Public Concern.**

As set forth in *Connick*, the Court must decide whether Plaintiffs spoke on a matter of public concern by considering the "content, form, and the context of the contested statement.

*Connick v. Myers*, 461 U.S. 138, 147-148 (1983).  Of these three factors, the content of the speech is considered to be the most important. *See Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002).  Whether speech addresses a matter of public concern is a question of law. *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1532 (6th Cir. 1994).

Speech is on a matter of "public concern" when the speech relates to matters "of interest to the community whether for social, political, or other reasons." See *Erickson v. City of Topeka, Kansas*, 209 F. Supp.2d 1131 (D. Kan. 2002); see also *Dishnow v. School District of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996) (finding "public concern" to mean matters in which the public might be interested, as distinct from wholly personal grievances).  Thus, the courts have long held that when a governmental employee addresses issues of municipal public policy, the speech is protected, so long as the individual is not simply complaining about his own personal grievance. See, for example, *Cignetti v. Healy*, 967 F. Supp. 10 (D. Mass. 1997) (fire captain's public statements relating to extension of health care benefits to certain employees and development of a particular parcel of land constituted statements on issues of public concern); see also *Green v. Maine School Administrative District*, 52 F. Supp.2d 98 (D. Me. 1999) (statement of teacher which concerned alleged abuse of students by other teachers related to a matter of public concern); *Providence Fire Fighters, Local 799 v. City of Providence*, 26 F. Supp.2d 350 (D. R.I. 1998) (ban on fire fighters' speech which would implicate public health and safety issues are matters of public concern); *Brasslett v. Cota*, 761 F.2d 827, 844 n.14 (1st Cir. 1985) (fire department rules and safety procedures are "prototypical matters of public concern").

In particular, numerous courts have held that, as a matter of law, speech concerning the quality of the rescue ambulance service provided to the public is a quintessential matter of public

concern. *See, Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 (11th Cir. 1995) ("[f]ew subjects are of more public concern . . . than the provision of basic fire and rescue services."); *Chappel v. Montgomery County Fire Protection Dist.*, 131 F.3d 564 (6th Cir. 1997) (County employee's speech regarding need for standard operating procedures and improved training at rescue ambulance service constituted speech on matter of public concern, and thus triggered First Amendment protection from retaliation); *Zook v. Brown*, 865 F.2d 887 (C.A. Ill. 1989) (employee's letter praising rescue ambulance service constitutes speech on a matter of public concern); *Framsted v. Municipal Ambulance Service, Inc.*, 347 F. Supp. 2d 639 (W.D. Wis. 2004) (director's termination of emergency medical technician (EMT) he suspected of being under the influence involved "matter of public concern").

In the present case, it cannot be disputed that the form, the content and the context of the petition signed by Plaintiffs constituted protected speech about a matter of public concern. The petition (Exhibit 7),[13] addressed to the City's Mayor, sets forth concerns about the deficient quality of service provided by the City's ALS provider, Action.[14] The petition explicitly states that the undersigned firefighters "are waiting longer for the ALS units to arrive, and we feel the quality of care is less than what the City has been accustomed to over the past many years." It "respectfully request" that "the City change back to our previous ALS provider" and states that such a change would be "in the best interest of the citizens of Woburn."

---

[13] The circulation and signing of a petition "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. . . . Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421-422 (1988).

[14] Constitutional protection of speech is not premised on the communication of that speech to the public. *See, O'Connor v. Steeves*, 994 F.2d 905, 916-917 (1st Cir. 1993) (public employee's decision to disclose allegations of misconduct to Board of Selectmen, rather than community at large, did not eliminate employee's First Amendment interest in speaking out); *Chappel*, 131 F.3d at 579 (employee's private communication to members of the boards concerning the ambulance district's collection problems and misappropriations protected speech); .

Clearly, the petition's focus on the deficient quality of care provided by the ALS provider to the citizens of Woburn is a matter of public concern. It is undisputed that poor response times and/or inadequate ALS care can have a serious affect on the health and safety of the public. Prompt and adequate medical care after an accident or injury can be critical to saving a life or reducing the severity of the injury. Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Plaintiffs' SOF"), ¶7.

    2.    **Plaintiffs' And The Public's First Amendment Interests Far Outweigh Defendants' Interest In Promoting Efficient Performance Of Public Service.**

In applying the *Pickering* test, then the Court must consider a number of factors to determine whether the employer's interest in stifling speech outweighs the employee's right to speak out on an issue of public concern. Among the factors that should be considered are: (1) whether the statement would create problems in maintaining discipline; (2) whether the employees involved hold positions in which personal loyalty and confidence are necessary; (3) whether the speech has impeded the employee's ability to perform his daily responsibilities; (4) whether the time, place, and manner of the speech is particularly disruptive; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making by the public; and (7) whether the speaker was not only an employee, but should be regarded as a member of the general public. See generally, *Coady v. Steil*, 180 F.3d 727 (7th Cir. 1999); see also *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir. 1998).

Here, as set forth above, the Plaintiffs' and the public's First Amendment interests are profound. The public clearly has a strong interest in information concerning deficiencies in the City's ALS provider. In contrast, there is not a shred of evidence suggesting that the petition disrupted or interfered with the Fire Department's operations.

First, the petition was posted on a bulletin board in the fire station which is used by members of the Department to communicate various information and opinions, including newspaper articles concerning various subjects of concern to the department and the public. Plaintiffs' SOF, ¶¶10-11. There is no evidence that the manner in which the petition was displayed in any way impeded Department operations.

Second, it is undisputed that the signing petition did not cause any disruption to the operations of the Fire Department. Rather, Plaintiffs each read the petition, agreed with its contents, and signed it prior to the start of their respective shifts. Plaintiffs' SOF, ¶¶12, 13. No operations were in anyway impacted. There is no evidence whatsoever that their signing of the petition in anyway interfered with their work or the work of other employees.

Third, the petition's contents had no impact on the Fire Department's operations. Indeed, the petition concerned the operations of the City's ALS provider, not the Fire Department. Nothing in the petition criticized the Fire Department's operations. Further, the petition was addressed to the Mayor, not the Fire Chief or any other Fire Department official. The only reason Chief Tortolano became involved was because he directed his personnel Captain to retrieve the petition from the bulletin board and then decided to hold meetings with the signatories. Plaintiffs' SOF, ¶¶14-15. Finally, nothing in the petition in anyway criticized either the Chief of the Fire Department or any other City officials for deciding to use another ALS service. Rather, the petition simply stated that the undersigned had concerns with the service provided by the current ALS provider and that the undersigned "respectfully request the City change back to our previous ALS provider." In sum, nothing in the petition can be considered comments on the Fire Department's performance.

Fourth, the petition in no way suggested that the signatories were representing Fire Department official policy. Rather, the petition set forth explicitly that the signatories were "firefighters to the City of Woburn" and that the views expressed in the petition were the views of the signatories rather than the views of the City's Fire Department or any other entity.

Fifth, the petition did not raise any issues that were only personal to the firefighters in general or the Plaintiffs' in particular. On the contrary, the petition directly relates to deficient ALS service and its effect on public health. The petition broadly states that the current ALS provider "has not been of the caliber and level of our previous ALS provider." The petition states that "[w]e are waiting longer for the ALS units to arrive" and that the "quality of care is less than what the City has been accustomed to over the past many years." No personal issues relating only to firefighters or to the signatories are set forth in the petition. No personal gain is either explicitly or implicitly suggested by the petition.[15]

### 3. The Undisputed Evidence Demonstrates That Defendants' Reassigned Plaintiffs To The Rescue Ambulance, Prohibited Them From Swapping Shifts And Gave Them Additional Job Duties Because They Had Signed The Petition.

---

[15] Plaintiffs anticipate that Defendants will try to suggest that Plaintiff Hegarty was motivated to sign the petition because of an earlier personal tragedy involving his wife's cousin and his belief that Action's deficient ALS service was the cause of his wife's cousin's death after a motorcycle accident. However, as Plaintiff Hegarty explained in his deposition, his motivation to sign the petition was based on both this event as well as his own personal observations of Action's deficient ALS service. Plaintiffs' SOF, ¶13. Further, even assuming that Plaintiff Hegarty signed the petition because of the tragedy involving his wife's cousin, such a motivation does not remove the petition from the scope of public concern. The fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove it from the scope of public concern. In *Connick*, a public employee disseminated a questionnaire "to gather ammunition for another round of controversy with her superiors" because she was "dissatisfy[ied] with a transfer." *Connick*, 461 U.S. at 148. Notwithstanding the fact that this personal grievance motivated the entire questionnaire, the Court concluded that "[o]ne question in [the] questionnaire ... touch[ed] upon a matter of public concern." *Id.* at 149. See also, *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 410 (7th Cir. 1994). The critical determination is whether the individual was speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest." *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 585 (7th Cir. 1992). Here, Plaintiff Hegarty was clearly not speaking as a disgruntled employee. Rather, the petition spoke broadly of deficient service and not of incident involving his wife's cousin. Indeed, Plaintiff Hegarty did not speak about that tragedy until he was questioned by the Chief to provide specific examples of deficient ALS service. Accordingly, his signing of the petition falls clearly within speech as a citizen.

The Court must next consider whether the undisputed evidence requires a finding that Plaintiffs' participation in the protected activity of signing the petition was a substantial or motivating factor behind the adverse employment action. *Mt. Healthy*, 429 U.S. at 287.

    a.    **Plaintiffs Were Deprived Of Valuable Employment Benefits And Given Additional Duties.**

As an initial matter, there can be no doubt that Defendants actions against Plaintiffs – permanently reassigning them to the rescue ambulance, prohibiting them from swapping assignments during their shifts, and ordering them to complete additional paperwork – constituted a deprivation of valuable employment benefits.

It is well-established that, as a matter of law, changes in shift schedules, less favorable assignments, and the deprivation of similar job benefits constitute adverse employment actions for First Amendment purposes. *See, Spiegla v. Hull*, 371 F.3d 928, 940-941 (7th Cir. 2004) (change in shift schedule and less favorable assignment constitute adverse employment action even though both actions may be permissible under terms of plaintiff's employment); *Allen v. Scribner*, 812 F.2d 426, 434-35 (9th Cir. 1987) (transfer to less desirable job assignment constitutes adverse employment action); see also, *Smith v. Fruin*, 28 F.3d 646, 649 n. 3 (7th Cir. 1994) (noting that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures."); *Fletcher v. Szostkiewicz*, 190 F. Supp. 2d 217, 227 (D. Mass. 2002) ("even a reprimand can be considered a deprivation, particularly where, as here, Defendant's actions may have chilled the future exercise of Plaintiff's first amendment rights.").

First, there is no dispute that Chief Tortolano only assigned the petition-signers, including Plaintiffs, to a permanent rescue ambulance assignment. Plaintiffs' SOF, ¶20. In contrast, all of the other firefighters in the Fire Department assigned to station 3 (approximately 16-24

firefighters), all of whom did not sign the petition, continued to have their assignments determined pursuant to their group captain's practice. This practice of allowing each group captain to determine assignments had been instituted by Chief Tortolano in approximately 1999 and continued in practice for all firefighters, *except* the petition-signers, whom Chief Tortolano singled out and specifically assigned to the ambulance. Three of the four captains determined assignments by seniority and the fourth captain, Captain Devine, chose to rotate the firefighters in his group on six-month assignments to the rescue ambulance. Plaintiffs' SOF, ¶¶28-30.

Second, Chief Tortolano's assignment of Plaintiffs to the ambulance represented an adverse employment action because the rescue ambulance requires the assigned firefighters to go on far more runs each day and Plaintiffs, like the majority of firefighters in the Fire Department, preferred the engine assignment. It is undisputed that the majority of the firefighters in the Department, and the Plaintiffs Hegarty and Muller in particular, consider the rescue ambulance assignment the less-preferred assignment. In part, this is due to the far greater workload of the rescue ambulance assignment. Employees assigned to the rescue ambulance are required to go on approximately five times as many medical aid calls as other firefighters in the department. Plaintiffs' SOF, ¶39. Accordingly, Firefighters assigned to station 3 (where the rescue ambulance is stationed) generally prefer the two engine assignments over the rescue ambulance assignments. The evidence of this preference is demonstrated by the fact that when seniority is used to determine assignments, the most senior firefighters generally select the engine assignments rather than the rescue ambulance assignments.[16] Plaintiffs' SOF, ¶¶31-33.

---

[16] Indeed, the clear preference of the engine assignment over the ambulance assignment is underscored by the fact that, pursuant to the collective bargaining agreement, firefighters assigned to the ambulance actually receive a shift differential whereas firefighters assigned to the engine do not. Yet, despite this additional compensation, the ambulance assignment remains generally less preferred.

Third, even if Defendants dispute that the rescue ambulance assignment is generally a less preferred assignment, there is no dispute that two of the three Plaintiffs, Hegarty and Muller, found the engine assignment preferable to the rescue ambulance assignment and that they would have been assigned to the engine in or around November, 2003 but for Chief Tortolano's decision to reassign them to the rescue ambulance. Thus, prior to his reassignment Plaintiff Hegarty was assigned to Group 2 and, as such, was subject to a six-month rescue ambulance assignment, which was rotated among all the Group 2 firefighters assigned to station 3. Chief Tortolano's permanent assignment of Firefighter Hegarty to the rescue ambulance deprived Firefighter Hegarty of only having to work on the rescue ambulance for six-month periods. Indeed, Firefighter Hegarty was assigned to the rescue ambulance for over a year before Chief Tortolano rescinded the November 2, 2003 order. Plaintiffs' SOF, ¶¶34-35. Similarly, Plaintiff Muller also worked in Group 2 and, as such, was subject to the same 6-month rotating rescue ambulance assignment. Indeed, Plaintiff Muller was just completing his 6-month rotation on the rescue ambulance on or about November, 2003 and, as a result, would have been eligible for the engine assignment for the next six months. Instead, Chief Tortolano's November 2, 2003 Order permanently assigned him to the rescue ambulance. Plaintiffs' SOF, ¶37.

Plaintiffs expect that Defendants will point to Plaintiff Mulrenan's decision to remain on the rescue ambulance assignment prior to November, 2003 as evidence of his preference for the rescue ambulance. However, as Plaintiff Mulrenan testified, his decision to remain on the rescue ambulance was not based on his preference for the rescue ambulance but, rather, his wish to avoid working on the same apparatus (the engine) as his captain. Plaintiffs' SOF, ¶36. Thus, it is undisputed that Chief Tortolano's November 2, 2003 Order deprived him of this ability to choose his assignment. Plaintiffs' SOF, ¶38.

Fourth, even if the Court somehow finds that there is a dispute of fact as to whether Plaintiffs' permanent assignment to the rescue ambulance deprived them of a valuable employment benefit, there is no dispute that Chief Tortolano deprived Plaintiffs of their right to swap their rescue ambulance assignment during their work shifts. Plaintiffs' SOF, ¶26. Thus, it is undisputed that the Fire Department's long-standing past practice has been to allow firefighters to swap their assignments, including the rescue ambulance assignment, during their work shifts. Plaintiffs' SOF, ¶26. This assignment swapping is done for a number of reasons, including personal reasons (such as when a family member is visiting the station) or to relieve the firefighter from the stress associated with a particular apparatus. In particular, all of the Plaintiffs testified that this swapping privilege was particularly useful in relieving the stress and "burnout" associated with the rescue ambulance assignment, with its heavier workload. Plaintiffs' SOF, ¶27. However, Chief Tortolano took this valuable employment benefit away from only the Plaintiffs, the other firefighter who signed the petition (Kichton) and the firefighter who spoke out in favor of an internal ALS service (Robishaw).

Fifth, it is undisputed that Chief Tortolano's November 2, 2003 Order gave the Plaintiffs and the other petition-signer (Kichton) the additional duty of completing reports concerning ALS service. This increase in workload constituted a clear adverse employment action that no other firefighter in the Department was subject to. Plaintiffs' SOF, ¶21.

Finally, it is undisputed that Defendants' adverse actions against Plaintiffs had a chilling affect on Plaintiffs' exercise of their First Amendment rights. Plaintiffs became fearful that they would receive further discipline in the future if they spoke publicly about the lack of quality ALS service or reported problems with the service. Plaintiffs' SOF, ¶¶46-47. In addition, other members of the Fire Department were more than aware of Defendants' actions against Plaintiffs

26

and they expressed to Plaintiffs that they were fearful of making any public statements that were critical of the ALS service. Plaintiffs' SOF, ¶48.

### b. The Undisputed Facts Demonstrate That Plaintiffs Were Deprived Of Valuable Employment Benefits And Subject To Adverse Action Because They Exercised Their First Amendment Right By Signing The Petition.

Plaintiffs must demonstrate that their petition-signing was a substantial and motivating factor behind Defendants' adverse employment actions. *Mt. Healthy*, 429 U.S. at 287. The inquiry is whether these adverse employment actions were attributable to their exercise of First Amendment rights or to some other reason unrelated to their petition-signing. *See id.*

Here, there is overwhelming direct evidence that Defendants deprived Plaintiffs of valuable employment benefits because they signed the petition.[17] First, Chief Tortolano admits that he assigned Plaintiffs to the rescue ambulance, took away their right to swap shift assignments, and gave them additional reporting duties *because* they had signed the petition. See, SOF, ¶¶22. Further, it is undisputed that he took these actions only after being apprised of the petition, calling Plaintiffs to meet with him, getting their admission that they signed the petition and then stating to Plaintiffs that they had caught him "off guard," they had "put him in a spot," and he was going to "see what I'm going to do about this." Within weeks, if not days, his November 2, 2003 Order was promulgated. SOF, ¶¶16-17. Further, none of the Department's approximately 45 other firefighters, none of whom had signed the petition, were subject to similar treatment.

Second, Defendants' unlawful motivation can be found in their subsequent undisputed actions. Thus, Chief Tortolano admits that he rescinded Firefighter Kichton's assignment to the

---

[17] *But see, Brasslett*, 761 F.2d at 846 (plaintiffs need not produce direct evidence of Defendants' motivation).

ambulance after Firefighter Kichton came to him, stated that he had been rash in signing petition and stated that, upon further reflection, he believed that the two ALS services were comparable. Plaintiffs' SOF, ¶43.

Third, after the Union had filed numerous grievances protesting Chief Tortolano's adverse actions against the petition-signers and Firefighter Robishaw, the City's solicitor sent a letter to the Union in early January, 2004, stating that the City would settle the Union's grievances concerning the assignments only if the petition signers, including Plaintiffs, repudiated the petition's claims and agreed that Action's ALS services were comparable to the former ALS provider. Plaintiffs' SOF, ¶¶40-42. The City's proposed letter, to be signed by the petition-signers, stated:

> We are pleased to report that the level of services being provided to the city is satisfactory.
>
> During the past several months we have had an opportunity to monitor the ALS provider first hand. We have collectively noted no deficiencies in the level of services, either in regard to response times or quality of care. It is our belief that the current provider of ALS services has met all of the contractual obligations in a timely and professional manner. Therefore, any and all concerns previously expressed regarding ALS services have been alleviated or never existed.

Of course, neither the Union, nor the petition-signers, agreed to the City's blackmail and, as a result, Plaintiffs remained assigned to the ambulance, prohibited from swapping, and assigned the additional reporting duties.[18] Plaintiffs' SOF, ¶42.

Fourth, Chief Tortolano admitted that he assigned Firefighter Robishaw to the dispatch position because Firefighter Robishaw had spoken out in favor of having the Fire Department, rather than Action, provide the ALS service at a mayoral candidate's meeting in September,

---

[18] Indeed, Chief Tortolano did not rescind his November 2, 2003 Order until October 9, 2004, approximately three months after Plaintiffs filed the instant lawsuit. Plaintiffs' SOF, ¶¶44-45.

28

2003. Plaintiffs' SOF, ¶¶19, 25. In sum, the undisputed evidence demonstrates that Defendants subjected Plaintiffs to the adverse employment actions because they had signed a petition critical of the City's ALS provider.

Plaintiffs expect Defendants will attempt to elude admitting Chief Tortolano's unlawful motivation by arguing that Chief Tortolano took the adverse actions against Plaintiffs because: (1) Plaintiffs allegedly failed to provide Chief Tortolano with any examples of deficient ALS service when he confronted them at the meeting held after they signed the petition; and/or (2) Plaintiffs' assertion of problems with the ALS service made Chief Tortolano wanted to document any problems with the ALS service. Both arguments are devoid of any legal or factual merit.[19]

First, it should be noted at the outset that Plaintiffs dispute any assertion by the Defendants that they failed to provide specific examples of deficient service. Defendants admit that Plaintiff Hegarty set forth a specific incident, the death of his wife's cousin, and a specific problem with the ALS service provided to his wife's cousin, at the meeting with Chief Tortolano. Further, Plaintiffs contend that they explained to Chief Tortolano that the problems with Action's service included: showing up to medical calls late, not showing up at all, and having problems performing medical procedures such as putting in IVs and intubations.

However, even accepting Defendants contention as true for the purposes of this motion, the alleged failure of Plaintiffs to provide specific examples of deficient ALS service does not permit Defendants to take adverse action against them. As a matter of law, public employees are free to engage in speech about matters of public concern without having an additional

---

[19] Defendants cannot argue that Chief Tortolano's decision to assign Plaintiffs to the ambulance was not unlawful because it fell within his managerial discretion. It is undisputed that Chief Tortolano had given captains the discretion in making assignments at Station 3 and that he veered from this practice only with respect to assigning the petition-signers to the ambulance and Robishaw to the dispatch position. *See, Speigla*, 371 F.3d at 943 (defendants' contention that reassignment of plaintiff part of normal variance in officers' post assignments rejected because plaintiff subjected to isolated treatment based on protected speech).

29

obligation of providing specific factual examples to bolster their statements. A public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment. *See Pickering*, 391 U.S. at 571-72. To the contrary, even a public employee's *factually erroneous* statements are still entitled to First Amendment protection unless the employer can show that the public employee knew that their speech was false or were recklessly indifferent to the fact that their speech was false. *Pickering*, 391 U.S. at 573-574; *Williams*, 24 F.3d at 1535-36. In sum, "absent proof of false statements knowingly or recklessly made" by the them, the Plaintiffs' exercise of their right to speak on issues of public importance may not furnish the basis for an adverse employment action. *Pickering*, 391 U.S. at 574.

Here, there is not a scintilla of evidence to suggest that Plaintiffs knew or were recklessly indifferent to the fact that their speech was false. On the contrary, by Defendants own admission, the officer in charge of monitoring Action's performance, Captain Mills, had observed problems with Action's quality of service right from the beginning. Plaintiffs' SOF, ¶¶5-7. These problems included slow response times and "unprofessional" operating procedures (Action's EMTs were responding to calls by first leaving their facility and *then* calling the dispatcher to find out where they were going). In addition, Captain Mills received complaints from a hospital liaison about Action's ALS service. These problems were severe enough that Captain Mills repeatedly spoke to both Action's director. Further, Captain Mills admits that these problems continued for at least through November, 2003. *Id.* Accordingly, there is no evidence that Plaintiffs signed the petition either knowing that the statements contained therein were false or with reckless indifference to the fact that the petition's allegations were false.

Second, Defendants' allegation, that Plaintiffs' signatures on the petition raised questions in Chief Tortolano's mind as to potential problems with the ALS service, even if true, does not

30

justify Chief Tortolano's adverse employment actions against Plaintiffs. Thus, if Chief Tortolano was really concerned about Action's service, he could have simply required *all* of the firefighters assigned to the rescue ambulance to document any observed problems. It is undisputed that all except two of the Department's approximately 49 firefighters were equally trained[20] and skilled at observing the ALS service and documenting any problems. It is undisputed that none of the Plaintiffs possessed any additional qualifications for the assignment. Plaintiffs' SOF, ¶23. Thus, even if Defendants' assertion of Chief Tortolano's concern is accepted as true for the purposes of Plaintiffs' motion, it is undisputed that he could have addressed his concern without singling out the Plaintiffs for the permanent rescue ambulance assignment and prohibiting them from swapping this assignment. Rather, Chief Tortolano could have either: (1) left the current system of rescue ambulance assignments in place, and required those individuals assigned to the rescue ambulance to document any ALS problems; or (2) rotated the rescue ambulance assignment among the 47 firefighters in the Department who were all equally qualified for the rescue ambulance assignment and documentation the Chief desired. Chief Tortolano took neither step and, instead, singled out Plaintiffs for discriminatory treatment. In sum, the undisputed evidence demonstrates that Chief Tortolano chose the Plaintiffs and firefighter Kichton for the permanent rescue ambulance assignment was because Plaintiffs and firefighter Kichton had signed the petition.

Finally, in the face of this undisputed evidence that Plaintiffs' petition signing was a substantial and motivating factor in Defendants' adverse employment decisions, Defendants have no evidence to counter with proof by a preponderance of the evidence that Chief Tortolano would have taken the same action against Plaintiffs "even in the absence of the protected

---

[20] Two of the Department's 49 firefighters were not trained in BLS and, therefore, unable to take the ambulance as an assignment.

31

activity." *Mt. Healthy*, 429 U.S. at 287. Rather, as set forth above, Chief Tortolano admits that Plaintiffs would not have been permanently assigned to the rescue ambulance, deprived of their right to swap assignments and given the additional reporting duties but for their signing the petition. Even if this Court accepts Chief Tortolano's professed concern about the ALS service as true for the purposes of this motion, such evidence does not prove that Chief Tortolano would have taken these actions against Plaintiffs in the absence of their signing the petition. Rather, regardless of his alleged "concern," the Plaintiffs were isolated out for specific adverse treatment only because they had signed the petition. Accordingly, based on the aforementioned undisputed facts, Plaintiffs have established that Defendants violated their First Amendment rights.

## CONCLUSION

For the reasons stated herein, this Court should grant Plaintiffs' motion for summary judgment and enter an order:

(1) ordering Defendants to return Plaintiffs to their pre-November 2, 2003 group;

(2) barring Defendants from retaliating against or in any way disciplining any firefighters who elect to sign petitions relating to matters of public concern;

(3) barring Defendants from taking any further action against Plaintiffs for engaging in protected speech;

Respectfully submitted,

RICK HEGARTY, MICHAEL MULRENAN, and GREG MULLER,
By their attorneys,

Dated: 5/31/05

Terence E. Coles, BBO #600084
Nicole Horberg Decter, BBO #658268
Pyle, Rome, Lichten, Ehrenberg &
     Liss-Riordan, PC.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

32

## CERTIFICATE OF SERVICE

This is to certify that on ___5/31/05___, a copy of the foregoing document was served upon all counsel of record in the above captioned matter by HAND DELIVERY.

_____
Terence E. Coles