UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICK HEGARTY, MICHAEL MULRENAN )
AND GREG MULLER )
          Plaintiffs, )
 )
VS. )
 )
 )
 ) C.A. No.04 11668 RWZ
PAUL TORTOLANO, individually and in his official )
Capacity as Chief of the City of Woburn Fire )
Department, JOHN C. CURRAN, Individually )
And in his official capacity as Mayor of the City of )
Woburn, and CITY OF WOBURN, MASSACHUSETTS )
          Defendants )
 )

## DEFENDANTS' OPPOSITION
## TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND CROSS-MOTION FOR SUMMARY JUDGMENT

The defendants, Paul Tortolano, Chief of the City of Woburn Fire Department,
John Curran, Mayor of the City, and City of Woburn, submit this memorandum of law
in opposition to the plaintiffs' motion for summary judgment and in support of their
cross-motion for summary judgment. For the reasons set forth below and in the
attacments hereto, the defendants ask that the plaintiffs' motion be denied and that,
instead, the Court enter summary judgment in their favor on the plaintiffs' complaint.
They have submitted herewith a cross-motion for summary judgment and submit the
statement of facts and arguments herein and attachments hereto as support.

### INTRODUCTION.

The defendants dispute certain characterizations contained in the "Introduction"
section of the plaintiffs' memorandum, i.e. that they "retaliated against" the plaintiffs or
that they in any way violated their First Amendment rights. Accordingly, the Court
should deny the plaintiffs' motion for summary judgment. Rather, the evidence reveals

that the defendants did not violate the plaintiffs' First Amendment in any respect and, as such, they are entitled to summary judgment in their favor in this case.

## II. Factual Background

### A. Defendants' Response to Plaintiffs' Statement of Facts.

1.      The defendants admit the statements in this paragraph.

2.      The defendants admit the statement in this paragraph.

3.      The defendants admit the statement in this paragraph.

4.      The defendants admit the statement in this paragraph.

5.      The defendants admit the first and second sentences of this paragraph and further respond that Chief Tortolano had asked Captain Mills to monitor Action Ambulance because it was a new provider. Mills Depo, **Exhibit A**, p. 24. They deny the third sentence because Captain Mills did not testify that he "immediately began observing problems," but only that the "times were a little long." Mills Depo, p. 24. The defendants also deny the fourth sentence of this paragraph because Captain Mills testified that he spoke to Action about the response times in July 2003 and that the matter cleared up and everything was going well. Mills Depo, pp. 26-31. He testified it was not a problem after that. Mills Depo, p. 29. He'd occasionally speak with Action thereafter to clarify a response time issue and still does. Mills Depo, pp. 29, 31-32. The defendants deny the fifth sentence and its characterization of Ms. Lake's comments as a complaint; she simply asked Captain Mills if he had "noticed that anything was taking a little longer for the ALS people to arrive." Mills Depo, p. 23. The defendants admit the sixth sentence and further respond that Captain Mills told Ms. Lake they had come up with a policy to rectify the situation. Mills Depo, p. 24.

6.      The defendants deny that Captain Mills testified that he considered the service or practice "ineffective" and further respond that, in fact, Captain Mills testified that he

saw Action Ambulance was getting out the door faster because of it. Mills Depo, p. 27. The defendants otherwise admit the statements in this paragraph, but further respond that, after Captain Mills spoke with Action in July 2003, everything was going well. Mills Depo, p. 27.

7.      The defendants admit the statements in this paragraph as general statements but further respond that there is no evidence that such statements pertain in any way in this case.  See, e.g. Muller Depo, **Exhibit B**, p. 57.

8.      The defendants admit the first sentence of this paragraph.  They deny the remaining allegations, as they did in their answer to the complaint. See Exhibit 5 to Plaintiffs' Memorandum.  The plaintiffs cite to that answer as support for this paragraph, but it offers none.[1]  Further responding, the defendants state, as they did in their answer, that the City changed ALS providers in June 2003 but it did not change any policy with regard to the method and means by which ALS services would be provided.  Id.  Accordingly, the duties and responsibilities of firefighters responding to medical aid calls remained the same.  Tortolano Affidavit, ¶ 5, **Exhibit C.**

9.      The defendants admit that a meeting occurred on September 25, 2003, between bargaining unit members and a mayoral candidate.  The plaintiffs cite no support for the second sentence of this paragraph, and defendants are without knowledge as to the same.  The defendants admit the remaining sentences of this paragraph.

---

[1]      In their answer, the defendants admit the first sentence of the paragraph in the complaint and then  "deny the remaining allegations contained in this paragraph." Yet, the plaintiffs, in note 2 of their memorandum, state that "careful scrutiny" reveals the defendants have not denied such allegations.  It is unclear how they arrived at this conclusion given the defendants' express denial of the remaining allegations.  Upon "further answer" following that denial, the defendants explained that the responsibilities that were in place remained unchanged after the change in providers, but that "further answer" in no way altered defendants' denial of plaintiffs' allegations characterizations regarding the same in this paragraph.

10.     Regarding the first sentence of this paragraph, the defendants admit a petition was posted on a bulletin board in the dispatch room of Station 3, but further respond that there is nothing cited to support the plaintiffs' contention that this petition was posted in September.[2]  As for the remaining allegations of this paragraph, the defendants respond that the petition is a written document that speaks for itself. See Exhibit 7 to Plaintiffs' Memorandum.

11.     The defendants deny the first sentence this paragraph inasmuch as the single source cited, Captain Mills' deposition testimony, does not state that items of "Fire Department business" or "personal opinions on various subjects" were posted on the bulletin board.  The defendants deny the second sentence and respond that it was members of firefighters' families who were observed in the dispatch room and they were not supposed to be in there.  Mills Depo, pp. 71-72.

12.     The defendants admit this paragraph only to the extent that it states that the plaintiffs signed the petition.  They deny the remainder of the paragraph and state that it rests on the plaintiffs' affidavits which contain an improper expression of opinion or understanding and which defendants have moved to strike.

13.     The defendants deny this paragraph and state that it rests on the plaintiffs' affidavits which contain an improper expression of opinion or understanding and which defendants have moved to strike.  Further responding, the defendants submit that the plaintiffs have failed to identify and document instances in which the ALS services provided by Action Ambulance were inferior to those previously provided by Armstrong Ambulance. See, e.g. Muller Depo, pp. 26-28.

---

[2]     The petition is undated and the deposition testimony of Captain Mills, the only other source cited by the plaintiff, says only it "could have been" October 2003.  Mills Depo, p. 69.  There is nothing cited to support the plaintiffs' contention that this petition was posted in September.

14.    The defendants admit that Captain Miller became aware of the petition on the bulletin board.  As for the remaining statements in this paragraph, the defendants respond, by way of clarification, that Captain Mill provided the Chief with a copy of the petition but the second page was missing.  He then brought the petition to his office to copy and, at that point, gave it to the Chief.  Mills Depo, pp. 74-81.

15.    The defendants admit the first two sentences to the extent that, over the course of a few days, the Chief and Captain Mills met with the five firefighters who signed the petition, including the plaintiffs.[3]  The defendants admit the remaining sentence.

16.    The defendants deny the first two sentences of this paragraph and, by way of clarification, respond that the Chief had not been aware of any problem with the ALS service provider and asked the plaintiffs for specific information about their concerns with the new provider.  Tortolano Depo, p. 57, **Exhibit D**; Mills Depo, p. 87; Tortolano Affidavit, ¶ 7.  They deny sentences three and four inasmuch as Plaintiff Hegarty did "explain" that Action "provided substandard treatment" to his wife's cousin and they further submit that this hearsay allegation was without support.  Defendants' Statement of Additional Material Facts, ¶ 14.  Regarding the last two sentences of this paragraph, the defendants cannot admit any exact quote, but admit that Captain Mills testified that Mulrenan and Muller made generalized comments about the ALS service.  They respond that Captain Mills' testimony was that these firefighters didn't proffer any specifics.  Mills Depo, p. 88.

17.    The defendants do not admit the exact quote attributed to Chief Tortolano, but admit that he advised the plaintiffs that he intended to investigate and address their concerns regarding the quality of ALS services delivered by Action Ambulance.  They

---

[3]    The Department did not interview the following, whose names appeared on the petition: Red Buttons, Grady Little League, Nelson Mendella [sic] and the Pope.

deny the statement in note 3 attached to this paragraph inasmuch as it is undisputed that the only "specific example" provided at the meeting was that pertaining to the motorcycle incident. See, e.g., Mulrenan Depo, p. 35, **Exhibit E**. Indeed, Muller testified at his deposition that he did not remember any specific instances where any problems had happened. Muller Depo, p. 27.

18.    The defendants admit the statement in this paragraph.

19.    The defendants admit that the Chief issued an order on October 25 that instituted a series of transfers, including that of plaintiffs Hegarty and Muller, and further respond that the order speaks for itself. They admit the remaining statements in this paragraph, but note that the plaintiffs had already been assigned to Station 3.

20.    The defendants respond that this paragraph discusses a written notice/order which document speaks for itself and further that that the plaintiffs misquote the word "modifications" as "medications" from that document. The defendants admit as much of sentence three as alleges that Firefighter Robishaw was assigned to the Dispatch desk on his work shift.

21.    The defendants respond that this paragraph discusses a written notice/order which document speaks for itself and submit that the plaintiffs have not correctly characterized the document. The plaintiffs offer no support for the final sentence of this paragraph and defendants dispute it.

22.    The defendants deny the Chief made any "admissions" as indicated in this paragraph. They respond that the Chief actually testified that (1) he "assigned people to the ambulance on each of the four shifts so that I'd have 24/7 coverage at least when they were on duty and a process for them to follow to report to Lieutenant McDonough any irregularities right away so that we could look into them ..." Tortolano Depo, p. 64, and (2) he wanted direct oversight and wanted direct reporting of instances to someone

6

so they could look into them and rectify them. "I wanted to get specific and get to the bottom of the problem." Id., pp. 72-73.

23.    The defendants admit the statement in the first sentence to the extent it asserts that some 47 of the 49 firefighters were EMT certified and could serve on the rescue ambulance. The defendants deny the statement in the second sentence to the extent it references qualifications of firefighters "in the operation of the rescue ambulance," and they submit that the cited testimony does not support that assertion.

24.    The defendants admit only that the Chief never asked the plaintiffs if they wanted to be assigned to the ambulance.

25.    The defendants deny this paragraph. They further respond that the Chief made this assignment because Firefighter Robishaw did not have a full understanding of how the ALS system worked, and he believed this assignment would aid him in that respect. Tortolano Depo, pp. 78-79.

26.    The defendants deny this paragraph, including the footnotes attached to it, because it mischaracterizes the Chief's testimony. Chief Tortolano did not testify as to a "past practice" regarding allowing firefighters to swap assignments, as stated in the second sentence and referenced in the third sentence.[4] He likewise did not testify to or admit to any "privilege" to swap assignments belonging to other firefighters.

27.    The defendants deny this paragraph and state that it rests solely on the plaintiffs' affidavits which contain improper expressions of opinion or understanding and assertions for which no basis for personal knowledge has been established or which are

---

[4]    The plaintiffs cast this "past practice" in terms of swapping during a shift, say for a run or two. But, the Chief's testimony at pp. 95-96, as cited by the plaintiffs, pertains to "changing assignments for the day" and there was confusion with the terminology on this point. Regardless, the Chief testified the idea of "allowing people to just randomly" change assignments during a shift was a new concept for him. Tortolano Depo, pp. 100-01.

based on hearsay, which affidavits defendants have moved to strike. The defendants further respond that the Chief testified the idea of "allowing people to just randomly" change assignments during a shift was a new concept for him and one that he was not aware of as of November 2003. Tortolano Depo, pp. 100-01.

28.    The defendants deny this paragraph and submit that, contrary to plaintiffs' statement in note 7 attached to this paragraph, such dispute as to prior practices for assignments and as to the Chief's practices are disputed facts that are relevant to this motion.

29.    The defendants deny the first sentence of this paragraph to the extent it attributes the date of any change in the method of assignments to "1999." The plaintiffs' own note 8 indicates a lack of support for the same.  As noted therein, the Chief testified he wasn't sure when he tried a different system of assignments, and he indicated it may have been in place for more than some six months prior to November 2003 but that he wasn't sure. Tortolano Depo, pp. 28-29.  See Defendants' Statement of Additional Material Facts, infra as well as paragraph 34. The defendants agree with the second and third sentences.  With respect to the footnote, the defendants dispute that any "new practice was changed" with respect to the plaintiffs and further respond that it had always remained the case that the Chief could assign employees to any group, station or apparatus. Tortolano Affidavit, ¶ 6.

30.    The defendants deny this paragraph inasmuch as the paragraph itself, including plaintiffs' own note 9, reveals there is differing testimony as to whether captains used different methods for making assignments. The plaintiffs offer no support for their assertion as to Captain Devine's practice.  Further, the defendants dispute the last sentence of the paragraph and submit there is testimony that the dispatcher on Captain Devine's shift assigned in a different manner as well. Hegarty Depo, p. 15, **Exhibit F**.

31.    The defendants deny this paragraph. They further respond that while some people found the dispatch assignment undesirable, others knew enjoyed it. Tortolano Depo, pp. 75-77.

32.    The defendants deny this paragraph. They further respond that the Chief expressly testified that he did not know where the ambulance assignment fell on the order of assignment in a seniority system and that he did not agree that the ambulance assignment generally was less desirable than others. Tortolano Depo, pp. 31-32.

33.    The defendants deny this paragraph inasmuch as it rests on the plaintiffs' affidavits which contain improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavits the defendants have moved to strike. The defendants further respond that plaintiff Mulrenan is not included in this paragraph, a point which undercuts the plaintiffs' assertion as to preferences between ambulance and engine in paragraphs 32 and 33.

34.    The defendants deny this paragraph to the extent it rests on the plaintiffs' affidavits which contain improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavits the defendants have moved to strike. The defendants admit the first sentence of this paragraph but deny the remainder of the paragraph inasmuch as it appears to be incomplete and misleading.  Firefighter Hegarty testified at the pages cited that when Chief Tortolano came on in 1999 he said no changes and no switches in assignments. Hegarty Depo, pp. 13-14. Hegarty testified that, as a result, he spent "two or three straight years on the ambulance when Tortolano came in power." Hegarty Depo, p. 14. Hegarty testified that he got off ambulance

when, in 2003, Captain Devine "took it upon himself to rotate his men to ambulance" on a six–month basis. Id., pp. 14-15.

35.    The defendants admit the first and second sentences of this paragraph, but deny the third sentence and the speculative and unsupported statements contained in note 10 attached to the same. [5] They further deny the paragraph to the extent it rests on the plaintiff's affidavit which contains improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike.

36.    The defendants admit the first sentences of this paragraph.  They deny the remainder, however, inasmuch as the testimony of the plaintiffs, all of whom had been in Group 2, Station 3, is contradictory on the subject of the assignment to the rescue ambulance prior to the November order. [6] They further deny the paragraph to the extent it rests on the plaintiff's affidavit which contains improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike.

37.    The defendants admit the first sentences of this paragraph.  They deny the remainder, however, inasmuch as the testimony of the plaintiffs, all of whom had been in Group 2, Station 3, is contradictory on the subject of the assignment to the rescue

---

[5]    In fact, the footnote itself undercuts the assertion in the third sentence inasmuch as Hegarty acknowledges that he would not have been allowed a selection under the seniority system, but would have been "assigned to the ambulance" anyway.

[6]    As noted, Firefighter Hegarty testified he didn't get off ambulance until Captain Devine implemented his six-month rotation. Firefighter Muller said he and Firefighter Fuchs were the first ones assigned to ambulance upon the implementation of that rotation. Muller Depo, pp. 51-54. Yet, Firefighter Mulrenan testified that he had been on ambulance since he started with the group a few years back, having volunteered to stay on. Mulrenan Depo, p. 21.

ambulance prior to the November order. See note 6. Also, while Firefighter Mulrenan attributes the decision to stay on ambulance to a personal conflict with Captain Devine, he had also volunteered to remain on ambulance under another Chief as well. Mulrenan Depo, p. 19. He acknowledges that he "had volunteered to be on the ambulance for many years" and that he enjoyed it. Mulrenan Depo, p. 48.[7]

38.     The defendants deny this paragraph and submit that the paragraph rests on the plaintiff's affidavit which contains improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike. They further respond that the Fire Chief always has the authority to make assignments and that the Chief testified that he was not aware at the time involved that firefighters were being permitted to change assignments during the shift and that it was a new concept to him. Tortolano Depo, pp. 95-97, 100.

39.     The defendants deny this paragraph and submit that assignment to ambulance was an assignment within the fire department and that such assignment thus cannot be said to "increase" anyone's "workload".[8]  It was part of the workload of the department. The plaintiffs proffer no real support for the assertions contained in this paragraph but rest largely on their affidavits which contains improper expressions of opinion or understandings and assertions for which no basis for personal knowledge

---

[7]     They further deny the paragraph to the extent it rests on the plaintiff's affidavit which contains improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike.

[8]     As plaintiffs acknowledge, they were expected to be and were in fact assigned to the ambulance at various points aside from the 11/03 order. Indeed, Firefighter Hegarty testified he was on ambulance for some three years at one point. Hegarty Depo, p. 14. Meanwhile, a firefighter on ambulance does not go out on service calls such as smoke detector inspections or box plug outs. Muller Depo, p. 19.

has been established or which are based on hearsay, which affidavit the defendants have moved to strike.

40.     The defendants deny this paragraph as it mischaracterizes the written material at Exhibit 14 to the plaintiffs' memorandum. They respond that such written material speaks for itself and further respond that Exhibit 14 contains no materials regarding plaintiff Hegarty.

41.     The defendants deny this paragraph as it mischaracterizes the written material at Exhibit 15. They respond that such written material speaks for itself.

42.     The defendants deny this paragraph, including note 11 attached thereto, as it contains mischaracterizations and, notably, is unsupported by any document or testimony. The plaintiffs cite to the complaint and answer but, contrary to the plaintiffs' suggestion otherwise, the defendants' answer denied the plaintiffs' characterization of their meeting with the mayor including, but not limited to, alleged statements made by the mayor.

43.     The defendants admit the first sentence and clarify that Firefighter Kichton told the Chief that, upon observation, he believed that the service provided by Action Ambulance was comparable to that of the prior provider. Tortolano Depo, p. 105. The defendants dispute the second sentence. They respond that Kichton did not ask to be reassigned from ambulance, but the Chief did reassign him as he did the plaintiffs. Id., pp. 105-106.

44.     The defendants admit this paragraph.

45.     The defendants respond that the October 9, 2004 Notice/Order is a written document that speaks for itself.

46.     The defendants deny the statements in this paragraph. They further respond that the plaintiffs were not subject to "discipline" and, further, that the paragraph is

without support where it rests wholly on affidavits which contain speculative opinion and hearsay and which defendants have moved to strike.

47.    The defendants admit this paragraph only to the extent that the plaintiffs admit that they made no report of any problems with the ALS service provided by Action. They deny that there was any "retaliation" by the defendants and deny the remainder of this paragraph. The defendants submit that the paragraph rests wholly on affidavits which contain improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike.

48.    The defendants deny the statements in this paragraph. They further respond that it contains improper and erroneous legal conclusions and that it is without support where it rests wholly on affidavits which contain improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established or which are based on hearsay, which affidavit the defendants have moved to strike.[9]

**B. Defendants' Statement of Additional Material Facts**

In addition to the above facts as corrected and clarified by the defendants, the defendants state that the following are additional material facts relevant to the opposition and cross-motion:

---

[9]    According to the footnote attached to this paragraph, n. 12, the plaintiffs do not raise the matter of the Scott packs on this motion. The defendants deny, however, any "continued campaign of harassment" and further state that the Scott packs were to be off the vehicles where the state inspector had written the Department up for the packs bouncing around without proper brackets in the compartments. Tortolano Depo, pp. 102-103; Mills Depo, pp. 135-136. There was no place to properly secure them. Id.; Mills Depo, p. 129. Also, an earlier Chief, Perry, previously had told firefighters to take them off the ambulances. Mills Depo, pp. 129-130.

1.      The Fire Department has two rescue vehicles that are assigned to Station 3.
Tortolano Depo, pp. 18-19. There are 4 other outlying stations. Id., p. 15; Tortolano
Affidavit, ¶ 4.

2.      Ambulance One is manned full time with two firefighters on every shift.
Tortolano Depo, p. 67. Ambulance Two is a backup ambulance and it is only activated
if Ambulance One is on a call when a second medical aid call comes in. In that case,
two firefighters on the engine (who are also EMTs) would take Ambulance Two and
respond. Tortolano Depo, p. 19; Mills Depo, p. 17.

3.      Fire Chiefs have management authority for making assignments to stations,
groups and/or apparatus, including ambulance assignments. Tortolano Depo, pp. 13-
17; Mulrenan Depo, p. 19; Mills Depo, p. 14. There was no criteria for that assignment
and assignments were not always made on the basis of seniority. Mulrenan Depo, p. 19.
Nor was there any set time limits for assignment to a particular job. Indeed, Captain
Mills testified that, under Chief Doherty, he was on ambulance basically from 1981 until
1987. Mills Depo, p. 12. Rather, it rested in the discretion of the Fire Chiefs.

4.      At some point, perhaps some six months before November 2003, Chief Tortolano
began assigning a block of 5 to 7 people to the station, which was the most popular
station, and leaving it up to the captain to assign them to a job. Tortolano Depo, pp. 26-
27.

5.      Like any Fire Chief, Chief Tortolano had the right to assign employees to any
group, station or apparatus and he never relinquished that right. Tortolano Depo, p. 27-
28; Tortolano Affidavit, ¶ 6. Mills Depo, p. 49.

6.      In June 2003, the City changed ALS provider from Armstrong Ambulance to
Action Ambulance. Tortolano Depo, pp. 33-34, 39. Armstrong had been the provider

14

since 1985, but there had been several ongoing problems with it in terms of billing and reimbursement. Id., pp. 34-35, 39-40; Mills Depo, p. 34. Beyond that, there were normal concerns that the City would have with any provider, such as complaints about particular runs. Tortolano Depo, pp. 35-37.

7.     Other communities in the area had dropped Armstrong as provider, switching to Action. Muller Depo, p. 70; Tortolano Depo, p. 35, 41.

8.     In the first month of Action's service, Captain Mills, the ALS provider liaison, spoke with Action's facilities manager to smooth out some issues that had arisen during the transition period. Mills Depo, pp. 24-25, 28. The issues cleared up and the transitional bumps leveled out and things went well. Id., pp. 27-29.

9.     Any problems experienced with Action were no different than those experienced with Armstrong or any other provider, including those relating to response times. Tortolano Depo, pp. 44-45; Mills Depo, pp. 34-35; Hegarty Depo, p. 24. Mills, for example, had talked to Armstrong about their response times. Mills Depo, pp. 34-35.[10] Also, the Woburn Fire Ambulance usually arrives on scene before any ALS provider, whether Action or Armstrong. Mulrenan Depo, p. 25. Further, even with the old provider, the Fire Ambulance had to take a patient to the hospital when the provider didn't get there in time after they were called. Muller Depo, p. 66.

10.     Action was often manned by the same personnel as Armstrong because it is common for people who work on an ambulance to go back and forth between companies or work for two different companies at the same time. Muller Depo, p. 13;

---

[10]     There had been instances with the old provider that they didn't arrive on time after being called, causing the Fire Rescue had to take the patient to the hospital. Muller Depo, p. 66.

Mills Depo,pp. 35-36.[11] Indeed, there were firefighters in the Department that were working for Armstrong. Muller Depo, p. 25.

11.    At no time prior to his seeing the petition did anyone express concern to the Chief about Action's response time or service, and he was not aware of any talk criticizing the ALS service provided by Action. Tortolano Depo, pp. 45-48, 54.[12]

12.    On seeing the petition,[13] the Chief expressed concern to Captain Mills that there was a problem going on that they weren't aware of and that they should talk to the people who had signed it. Mills Depo, pp. 83-84.

13.    They met with the firefighters who had signed the petition to obtain more specific information about their concerns with the new ALS service provider. Tortolano Depo, p. 57; Tortolano Affidavit, ¶ 7.

14.    Firefighter Hegarty related to the Chief a response to a motorcycle accident involving his wife's cousin, but he was not on the ambulance that day. Mills Depo, pp. 52-54; Tortolano Depo, p. 70. The firefighters who were on the ambulance said that the motorcyclist was standing after the accident but then died, and that it was a shock. Mills Depo, p. 54. They did not say anything about the ALS provider. Id., pp. 54-55. Given the responding firefighters' upset upon their return to the station that day,

---

[11]    Muller worked for Action for a few years, as well as Armstrong. Muller Depo, pp. 10-11, 14-15. Firefigher Robishaw may also have worked for Action. Id., pp. 50-51. Hegarty worked for Armstrong at one point as well while a full-time firefighter. Hegarty Depo, pp. 8-9.

[12]    Muller acknowledged that he never reported any concerns to anyone and that he did nothing prior to signing the petition to express any concerns. Muller Depo, pp. 28-30, 34. Hegarty testified that he, too, did nothing with respect to any differences he noted in the quality of services. Hegarty Depo, p. 24.

[13]    Members of the public were not supposed to be in the dispatch room where the petition was posted pursuant to the privacy act HIPAA. Mills Depo, pp. 71-73. That Act went into full effect in April 2003. Id. Prior to the time of the petition, there was a sign saying that no unauthorized persons were to go into the dispatch room. Id.

Captain Mills had looked into the run and determined that it had gone as any other run and that there was nothing that sent up a red flag.  Id.[14]

15.    Firefighters Muller and Mulrenan could not provide any specifics or examples. Tortolano Depo, pp. 58-62, Mills Depo, p. 88; Muller Depo, pp. 26-27.  Indeed, Mulranan's comments about the ALS provider were based on his having heard stories that they were not that good but that he really didn't know anything about them. Mills Depo, p. 88.

16.    Meanwhile, Lieutenant McDonough, who had signed the petition, told the Chief he thought it was just prank.  Tortolano Depo, p. 61; Mills Depo, pp. 94-95.  Mulrenan said he didn't think the petition was going to go anywhere because of the joke signatures.  Mulrenan Depo, p. 29.

17.    The Chief formulated a plan to look into the matter by providing closer oversight of the ALS service provider.  Tortolano, pp. 63-64, Mills Depo, p. 89.  He assigned Hegarty, Muller, Mulrenan and Kichton to the ambulance on each of the four shifts "so that I'd have 24/7 coverage at least when they were on duty and a process for them to follow to report to Lieutenant McDonough any irregularities right away so that we could look into them ..." and (2) he wanted direct oversight and wanted direct reporting of instances to someone so they could look into them and rectify them. Tortolano Depo, pp. 64, 72-73.  He wanted to get specific and get to the bottom of the problem.  Id.; Mills Depo, p. 97.

---

[14]    Also, it appears that the basis of certain of plaintiff Hegarty's complaints about the handling of this incident are mistaken; i.e. he said the ambulance passed three hospitals to bring the victim to Mass. General.  Hegarty Depo, pp. 32-33, **Exhibit F.**  It appears, however, that they actually went to Winchester Hospital which was just over one mile from the accident scene.  Mills Depo, p. 55.

18.    Captain Mills agreed that this was a good way to get people out into the field to look at problems and bring them to their attention, particularly since the standard run reports were not showing any concerns on the comments section. Mills Depo, pp. 98-99.

19.    The Chief assigned Robishaw to dispatch so that Firefighter Robishaw could develop a better understanding of the entire ALS process and perhaps ultimately aid in implementing an in-house service. Tortolano Depo, pp. 78-79.[15]

20.    Other people, who had not signed the petition, were transferred as well at this time. Muller Depo, pp. 44, 57-58; Exhibit 12 to Plaintiffs' Memorandum.

21.    According the Chief, prior to November 2, 2003, firefighters could not swap assignments during a shift. Tortolano Depo, pp. 88-90.

22.    The Chief testified that he was not aware that captains were allowing people to change assignments after the new system of assignments was implemented. Tortolano Depo, pp. 90-91, 95-97.

23.    At some point during his assignment to the ambulance, Firefighter Kichton told the Chief that, upon observation, Action's provision of service was comparable to that of Armstrong. Tortolano Depo, pp. 104-05.

24.    Plaintiff Muller couldn't recall any call that he felt that the patient's health was actually harmed. Muller Depo, p. 67. So, too, Plaintiff Hegarty testified that he didn't see any immediate danger or threat presented by the ALS service provider. Hegarty Depo, pp. 48-49. Meanwhile, Mulrenan testified that Action got better on response times within six months of petition. Mulrenan Depo, p. 68.

---

[15]    At the time Firefighter Robishaw made his remarks about ALS service to the mayor, the Chief was exploring the pros and cons of bring the ALS service into the fire department. Tortolano Depo, p. 50.

25.     No reports having been made regarding Action's services, the Chief determined it was no longer necessary that the plaintiffs be assigned to the ambulance. Tortolano Depo, pp. 106-110.  They came off or had the opportunity to come off somewhere around and between March and May of 2004. Mills Depo,pp. 138-140. Some of them stayed on ambulance anyway. Id., p. 110-111;. Mulrenan Depo, p. 37.[16]

26.     Muller never filled out any of the reports to Lt. McDonough, only run reports. Muller Depo, p. 61. He does not recall documenting in any run report any instances of problems with the ALS, even though he claims to have observed some. Muller Depo, pp. 62, 77.

27.     Firefighters assigned to the ambulance receive additional compensation. Mulrenan Depo, pp. 21-22. Further, they do not go out on service calls, such as smoke detector inspections and box plug outs. Muller Depo, p. 19.

28.     There are firefighters who like being on ambulance and who have asked to be assigned to it. Tortolano Depo, pp. 31-32; Mills Depo, pp. 42, 127. Some have wanted to stay on ambulance even after anticipated transfers were coming out. Id.

29.     Plaintiff Mulrenan likes being on the ambulance, and often volunteered to remain on it. Mulrenan Depo, pp. 37, 48; Mills Depo, p. 108.

30.     Muller likely would have been on the ambulance anyway under seniority system. Muller, pp. 51-55; 75, 84-85, 90. So, too, would have Hegarty. Plaintiff's Memorandum, p. 10. Even under his prior group, he would have to be assigned to the ambulance on a six-month rotation, which is about the same length he had to serve under the Chief's assignment here. Plaintiffs' Memorandum p. 10.; Mills Depo, p. 138 (Hegarty had the opportunity to come off ambulance in March 2004).

---

[16]     Firefighter Mulranan had volunteered to remain on ambulance under an earlier Chief as well.  Mulrenan Depo,p. 19

31.    Some of the plaintiffs filed grievances regarding the assignment to ambulance which are still pending.  Muller Depo, p. 59-60.

## ARGUMENT

### I.    Summary Judgment Standard

In seeking summary judgment, the burden is on the moving party to establish that there is no genuine issue about any material fact, and that the moving party is entitled to judgment as a matter of law.  The matters presented in connection with the motion, however, must be construed most favorably to the party opposing the motion.  See Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 666 (1st Cir. 1996).  See also 20 Federal Practice and Procedure § 105 (party opposing motion is to be given benefit of all reasonable doubts in determining whether genuine issue exists).

The plaintiffs have failed to meet their burden here and their motion for summary judgment should be denied.  Meanwhile, the defendants' cross-motion should be allowed.

### II.    The Plaintiffs Are Not Entitled to Summary Judgment on Their First Amendment Claim Because They Have Failed to Establish that the Defendants Violated the First Amendment.

The plaintiffs allege that the defendants violated the First Amendment. The Supreme Court has recognized that the government's interest as an employer in regulating employee speech differs from its interest in regulating the speech of the general citizenry.  Accordingly, the Court formulated a three-part test to determine whether such a public employee has an actionable First Amendment freedom of speech claim.  Thus, to prevail on their claim, the plaintiffs, as public employees, must establish that: (1) their expression was made as citizens upon a matter of public concern; (2) the interests of the plaintiffs "as citizens in commenting upon the matters of public concern"

are outweighed by "the interest of the state, as an employer, in promoting the efficiency

of the public services it performs through its employees;" and (3) the protected speech

was a substantial or motivating factor in adverse employment action. See Connick v.

Myers, 461 U.S. 138, 147, 103 S.Ct. 1684 (1983); Pickering v. Board of Educ., 391 U.S. 563,

568, 88 S.Ct. 1731, 20 (1968); Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir.

2002). The first two prongs are questions of law, whereas the third prong is generally

for the fact finder to decide. O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir. 1993).

###### A.    The Signing of the Petition Did not Constitute Protected Speech About a Matter of Public Concern.

The plaintiffs' claims fail at the first step because they have not demonstrated

that the signing of the petition constituted protected speech about a matter of public

concern. In a footnote, the plaintiffs assert that the "circulation and signing of a

petition" constitutes "core political speech," citing to Meyer v. Grant, 486 U.S. 414, 108

S.Ct. 1886 (1988). However, Meyer referenced only the circulation of a petition, not the

signing of one. The Meyer Court noted the circulating of an initiative petition "involves

both the expression of a desire for political change and a discussion of the merits of the

proposed change." Id. at 421, 108 S.Ct. at 1891. The Court stated that:

> "Although petition circulator may not have to persuade potential signatories that
> a particular proposal should prevail to capture their signatures, he or she will at
> least have to persuade them that the matter is one deserving of the public
> scrutiny and debate that would attend its consideration by the whole electorate.
> This will in almost every case involved an explanation of the nature of the
> proposal and why its advocates support it. Thus, the circulation of a petition
> involves the type of interactive communication concerning political change that
> is appropriately described as 'core political speech.' "

Id. at 421-22, 108 S.Ct. at 1892. See also Schaumburg v. Citizens for a Better

Environment, 444 U.S. 620, 632, 100 S.Ct. 826, 833 (1980) (solicitation is characteristically

intertwined with informative and perhaps persuasive speech seeking support for causes or views).

The signing of a name to a petition does not involve the type of interactive or persuasive communication discussed in <u>Meyer</u> in terms of the circulation of a petition and plaintiffs' reliance on that single case fails. They have cited to no case in which the signing of a name constituted speech let alone protected speech. <u>See</u> <u>Taxpayers United for Assessment Cuts v. Austin</u>, 994 F.2d 291, 296 (6th Cir. 1993) (plaintiffs failed to cite case and research did not identify any decision holding that signing of petition to initiate legislation was entitled to same protection as exercising right to vote). For this reason, the plaintiffs' claims against the defendants fail at this juncture and the defendants are entitled to summary judgment.[17]

Even if the signing of a petition constituted speech, the question of whether a public employee's speech is constitutionally protected turns upon the "public" or "private" nature of such speech. <u>Connick</u>, 461 U.S. at 146-48, 103 S.Ct. at 1684. In assessing whether the plaintiffs' alleged speech implicates public as opposed to private concerns, this Court should analyze "the content, form, and context of [the speech], as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147-48, 103 S.Ct. 1684. For example, issues achieve the protected status of "public concern" if the speech at issue is conveyed

---

[17]    Where the plaintiffs have failed to state an actionable wrong in the first instance,, there is no need to reach the issue of qualified immunity. <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001) (holding that before determining whether a right was clearly established, courts must first determine whether, taking the facts in the light most favorable to the plaintiff, the official violated a constitutional right). The defense of qualified immunity "is designed to protect government agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " <u>Knox v. Smith</u>, 342 F.3d 651, 657 (7th Cir. 2003) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982); 13B <u>Federal Practice and Procedure</u> § 3573.3. There was no clearly established right here.

by the public employee in his role as a citizen and not in his role as an employee. Kirkland v. Northside Indep. School Dist., 890 F.2d 794, 799 (5th Cir. 1989). Otherwise, "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark ... would plant the seed of a constitutional case." Connick, 461 U.S. at 149, 103 S. Ct. at 1691.

Here, the plaintiffs signed the petition expressly in their roles "[a]s Firefighters to the City of Woburn" and as "EMT's and First Responder's to the City." Petition, Exhibit 7 to Plaintiffs' Memorandum. There is no evidence that any plaintiff at any time spoke out at any public meeting or forum to register any complaint about the new ALS provider. They didn't even raise any concerns at the meeting with the mayoral candidate where the subject of the provision of ALS services was specifically discussed. Moreover, none of the plaintiffs ever reported any such concerns to anyone, including the Chief who was unaware of any such claimed concerns with the provider prior to seeing the petition. Instead, the plaintiffs simply signed a petition that was located in the dispatch room of a fire station, a room to which the public was not to be permitted access. There is no evidence that the plaintiffs or anyone else ever posted the petition elsewhere in a spot with actual and greater public access. Further, although the petition is alleged to have been directed to the mayor, there is no evidence that the plaintiffs or anyone actually ever presented any complaint to the mayor regarding the quality of the ALS provider's service.

Although private communication of protected speech may not cause forfeiture of First Amendment protections, the private context of the petition here reinforces the conclusion that the matter at hand simply involved an internal controversy or gripe about the switch and transition from a familiar ALS provider that had been working with the department for many years, and one with whom many of the firefighters had

developed a relationship, to a new provider. <u>See, e.g.</u> Hegarty Depo, p. 18; Mills Depo,
p. 34. <u>See</u> <u>Vincent v. City of Talladega, Ala.</u>, 980 F.Supp. 410 (1997) (while it is true that
public has an interest in having quality fire protection, it is also true that public has an
interest in good government, and an internal controversy over firefighting policy and
procedures within a fire department cannot be protected speech). Indeed, the petition
expressly references that the signatories "we were not part of this decision process" and
calls for a return to the old provider. Exhibit 7 to Plaintiffs' Memorandum.

That the plaintiffs' signing of the petition was never intended to achieve any
legitimate public purpose, but was simply part of an internal gripe, is likewise indicated
by the fact that members of the department placed joke signatures on it and that one of
the signatories, Lt. McDonough, signed it in the belief that it was a prank. Indeed, even
one of the plaintiffs testified that he didn't think the petition was really going to go
anywhere given the joke signatures. Mulrenan Depo, p. 2 9.

That the signing of the petition was just a complaint about the switch and the
transition of providers is also indicated by the fact that the plaintiffs have not identified
or documented any actual instances in which the ALS services provided by Action
Ambulance were inferior to those previously provided by Armstrong Ambulance. As
discussed at length above, they have provided no factual basis for the statements in the
petition other than uninvestigated generalized hearsay statements. For example,
although plaintiff Hegarty expressed issues about Action's handling of the motorcycle
accident involving his wife's cousin, he had not been present at the scene of that
accident. The firefighters who were on the ambulance said that the motorcyclist was
standing after the accident but then died, and that it was a shock. Mills Depo p. 54.
They did not say anything about the ALS provider. <u>Id.</u>, pp. 54-55. Moreover, Captain

Mills had already looked into the run and determined that it had gone as any other run and that there was nothing that sent up a red flag.  Id.

Firefighters Muller and Mulrenan could not provide any specifics of any instances in which Action's services has been less effective than the prior provider. Moreover, Muller testified that he did not recall any call in which he felt that the patient's health was actually in harm, Muller Depo, p. 67, while plaintiff Hegarty testified that he didn't see any immediate danger or threat presented by the ALS service provider. Hegarty Depo, pp. 48-49.  Rather, as indicated above, the evidence clearly indicates that any problems experienced with Action were no different than those experienced with Armstrong, or any other provider.  This confirms that the issue was really one simply regarding the transition from familiar provider to a new provider, and the signers' exclusion from that decision, and not actually about the quality of service.  The signing of the petition then did not constitute a matter of public concern.

Moreover, it would seem that, if the signing truly was a mater of public concern, as opposed to personal or internal issues issues, the plaintiffs would have appreciated of the fact that these "public concerns" had been heard and would have applauded the Chief's efforts to uncover, investigate and rectify any problems with the provider.  They did not.  The Chief sought their assistance in identifying, documenting and addressing what they deemed was "quality of care less than what the City has been accustomed," but the plaintiffs were not interested.   They refused to file any reports with Lt. McDonough regarding Action's services as the Chief's plan had contemplated.

Suffice it to say that, contrary to plaintiffs' assertion, this case fails to present a matter of public concern and the signing of the petition simply is not protected speech. The defendants thus are entitled to summary judgment in their favor.[18]

### B.    The Defendants' Interest Promoting the Efficiency of Public Services Outweighs Any Interest of the Plaintiffs.

In any event, the plaintiffs likewise cannot establish the second prong of the Connick-Pickering analysis – that their interest in exercising their alleged rights outweighed the government's interest "in promoting the efficiency of its public services." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. The plaintiffs recite various factors to be considered with this balancing test in their memorandum, but then fail to really apply them. When those factors truly are considered, it is clear that the balance lies in the defendants' favor.

First, it bears note that public employees, and firefighters in particular, face certain limitations upon their right to speak freely in the first instance simply because they are public employees. Indeed, "[b]ecause of the nature of firefighting, and its high stakes, operational efficiency and harmony among co-workers are critical." Bickel v. Burkhart, 632 F.2d 1251, 1257 (5th Cir. 1980), citing Ianusaitis v. Middlebury Volunteer Fire Dept., 607 F.2d 17 (2d Cir. 1979). With this backdrop in mind, the defendants address the following factors, set out by the First Circuit as applying to the balancing test:  (1) whether the allegedly protected expression was directed against those with whom the plaintiffs are in regular contact such that it might impede harmony among co-workers or the ability of supervisors to maintain discipline; (2) whether plaintiffs' expression has a detrimental impact on those with whom they must maintain personal

---

[18]    Again, alternatively and at a minimum, they are entitled to the defense of qualified immunity.

loyalty and confidence for the fulfillment of his job responsibilities; and (3) with regard to erroneous statements concerning matters of public concern, whether such statement impedes plaintiff's performance of his daily duties or the regular operation of the governmental unit generally. McDonough v. Trustees of the University of New Hampshire, 704 F.2d 780, 784 (1st Cir.1983), citing Pickering, 391 U.S. at 569-73, 88 S.Ct. at 1735-37. Also, in assessing this balancing, focus should be upon the manner, time, and place of the employee's expression, as well as the context in which the dispute arose. Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2898 (1987)

Here, it is undeniable that the allegedly protected expression was directed against those with whom the plaintiffs are in regular contact such that it might impede harmony among co-workers or the ability of supervisors to maintain discipline. The firefighters undisputedly were in regular contact with the new ALS provider, Action. The petition itself acknowledges as much, stating "we have worked closely with our new ALS provider since June 1, 2003." Exhibit 7 to plaintiffs' memorandum. The assertion that "the service provided by this new ALS provider has not been to the caliber and level of our previous ALS provider" and that the "quality of care is less" clearly was directed at Action and was such that it might impede harmony with that provider. Clearly, too, it would have a detrimental impact on Action, with whom the firefighters must maintain personal loyalty and confidence for the fulfillment of job responsibilities in responding to medical aid calls, particularly where the petition called for the return of the old provider.

As for the third factor, both the character and effect of the public employee's speech are relevant considerations. For example, that a statement is recklessly false may well create a presumption that the employee's interest in uttering it is subordinate to the government's interest in suppressing it. Santos v. Miami Region, U.S. Customs

Serv., 642 F.2d 21, 25 (1st Cir. 1981) ( "Criticisms made with malice or with knowledge that they contained falsehoods may not be protected.")

That the plaintiffs signed the petition without regard for its truth or falsity is evidenced by the lack of any evidence or support for the statements in the petition, as discussed above. The plaintiffs could not identify actual, specific instances of any problems with Action such as would support the petition's assertions. That the plaintiffs never reported any problems with Action's services to anyone, including the Chief, at any time prior to signing the petition evidences that the assertions therein were without support in reality. The truth was that any problems with Action were the same as existed with any other provider, including Armstrong.

Further, the erroneous "statement" impeded plaintiffs' performance of daily activities and the regular operation of the governmental unit generally. Their signing of the petition created a circumstance that required prompt action. It disrupted the regular operation of the Department in that, the matter having been raised, it could not be ignored. The defendants had to take action. A plan was formulated so as to identify any problems with the ALS provider so that the defendants could address and rectify the same. That plan involved the transfers of firefighters, including the plaintiffs.

Lastly, contrary to plaintiffs' assertion and as discussed above, the plaintiffs' signing of the petition was in the nature of a private, internal gripe about the change in the ALS provider, a decision that the signatories complained in the petition they were not part of. Thus, contrary to plaintiffs' assertion, personal issues relating only to the firefighters or signatories are suggested in the petition.[19]

---

[19]    The plaintiffs also reference the fact that plaintiff Hegarty was motivated to sign the petition because of the earlier accident involving his wife's relation. Plaintiffs' Memorandum, n. 15. As discussed above, however, there was no indication that Action

Clearly then, the <u>Pickering</u> balance here falls in favor of the defendants. The plaintiffs' signing of the petition simply is not constitutionally protected, and there thus was no violation of the First Amendment. Summary judgment should enter in favor of the defendants on the plaintiffs' count against them.[20] As such, it is unnecessary for this Court to proceed to the third prong and scrutinize whether there was any adverse action. Regardless, as discussed below, it remains that there was no adverse action taken in this case.

### C. There was No Adverse Employment Action As Necessary to Establish the Third Prong of the <u>Connick</u>-<u>Pickering</u> Test.

A plaintiff may prove "adverse employment action" either by presenting evidence of the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand or by showing that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002). The plaintiffs cannot satisfy this standard. The defendants deny the plaintiffs' claim that they deprived them of "valuable employment benefits" or otherwise subjected them to adverse employment action. Plaintiffs' Memo, p. 23. The fact is that the plaintiffs simply were assigned to the ambulance. This assignment was one of various assignment within the fire department. It was part of the workload of the department. As the plaintiffs acknowledge, they were expected to be and were, in fact, assigned to

---

had done anything wrong on this call and Hegarty was not even on the scene of the response. So, this personal motivation, too, was an erroneous and false basis upon which to sign the petition.

[20]    It should clearly enter in favor of the Mayor inasmuch as there are truly no allegations or arguments indicating that he violated the plaintiffs' First Amendment rights.

the ambulance at various points, apart from the November 2003 order. Statement of Facts, ¶ 39, n. 8. There were no restrictions or time limits on such an assignment; i.e. no bargaining agreement provided that a firefighter could serve on ambulance for only six months at a time. Indeed, such assignments have been for periods of time much longer than those involved here.[21] The plaintiffs thus simply cannot contend that the particular assignment in this instance was "unreasonably inferior and adverse."

In light of the above, the plaintiffs' argument that the assignment was adverse because the ambulance went on more runs each day and because plaintiffs Hegarty and Muller preferred the engine assignment simply do not state an adverse employment action. If they did, the floodgates would be open to a vast variety of such federal claims. As it stands, the plaintiffs have challenged the transfers and assignments by filing grievances, an avenue of administrative relief and remedy available to them. Those are still pending. The defendants submit that an avenue of judicial relief sought by the plaintiffs is not necessary or warranted on the facts of this case.

The evidence shows that some firefighters liked the ambulance and sought it out as an assignment, a point that undercuts the plaintiffs' argument here. Indeed, plaintiff Mulrenan is one firefighter who enjoyed the ambulance assignment and has volunteered for it at various times in his career.[22] Clearly then, the plaintiffs' argument

---

[21]    As noted, plaintiff Hegarty testified that he was on ambulance for some two or three years straight and Captain Mills who testified that he was on ambulance from about 1981 to 1987.

[22]    The plaintiffs assert that Mulrenan decided to remain on the ambulance because of a conflict with Captain Devine, but this doesn't change the fact that he testified that he enjoyed working on the ambulance and had volunteered to work that assignment at various times in his career, including under other Chiefs. Further, contrary to plaintiffs' assertion, the November 2003 order did not "deprive him of his ability to choose his assignment." The evidences shows that the Fire Chief always has the authority to make assignments, and that Chief Tortolano permitted the Captains to make assignments as well; not that firefighters could "choose" assignments.

fails to take into account the subjective nature of the assignment and the individual preferences of each firefighter in the Department. Additionally, their argument fails to account for the fact that firefighters who are on the ambulance are exempt from performing certain other duties. Statement of Facts, ¶ 39, n. 8.

The nub of the plaintiffs' complaint, particularly Hegarty and Muller, appears to be is that they were "deprived" of being assigned to a six month rotation to ambulance under Captain Devine. Addressing the plaintiffs' contentions on this respect, the defendants note first that there is a dispute that "all others firefighters in the Fire Department assigned to station 3 ... continued to have their assignments determined pursuant to their groups practice." Under Captain Devine's six-month rotation system, it appears that the dispatcher also was not included in the rotation. Hegarty Depo, p. 15. In any event, the matter of being assigned by the captain cannot be considered a "valuable employment benefit" of which the plaintiffs were deprived. It was simply a method of assignment to a job, and one that had been implemented only some six months or so prior to the November 2003 order. Indeed, other firefighters in that same station were being assigned on the basis of seniority and Muller and Hegarty likely would have been on the ambulance anyway under seniority system. Defendants Statement of Additional Material Facts, ¶ 30. It remains that the Chief could and did assign the plaintiffs to the ambulance, as was his managerial right.

As to the plaintiffs' "Fourth" assertion, the testimony of the Chief disputes that plaintiffs' contention that they could swap their rescue ambulance assignment "during their work shift." The Chief expressly testified that, prior to November 2, 2003, firefighters could not swap assignments during a shift. Tortolano Depo, pp. 88-90. He testified that "this allowing people to just randomly [swap during a shift] is a whole new concept to me". Id., at 90, 100-01. The ability to make such swaps then is in

dispute and it then certainly does not rise to the level of a right or privilege or "valuable employment benefit" as the plaintiffs argue.[23]

Fifth, it is also disputed that the November 2003 assignment constituted an "increase in workload" because they were to submit reports about the ALS service. Firefighers assigned to the ambulance were already required to submit run reports on which they were supposed to include comments about the service. Muller Depo, p. 61. Simply having to send that information onto Lt. McDonough cannot be characterized as an "increase in the workload." In any event, it appears that the plaintiffs did not even comply with the part of the assignment. Hegarty Depo, p. 42.

Finally, it is disputed that the defendants' actions had a "chilling" effect on the plaintiffs' or others' First Amendment rights. The plaintiffs' contention in this respect rests wholly on their affidavits which hearsay and speculative opinion or understanding, and does not rest upon personal knowledge. They had not received any "discipline" in the first instance such that they would be "fearful" of "further discipline" if they spoke about the ALS service.

Rather, the evidence shows that the plaintiff firefighters had expressed concern about the quality of the ALS service and thereby required that the Chief take action. He asked the plaintiffs to specify and confirm their concerns and they could not. The chief was presented with a situation in which he had to determine if standard of care issues existed with the ALS service provider. Tortolano Affidavit, ¶ 9. The Chief took prompt action in an effort to investigate, document and address the situation.. In sum, a reasonable juror certainly could not find that the defendants' actions, when considered

---

[23]    Further, the plaintiffs' assertions as to the reasons warranting such swapping are based solely on their affidavits which contain speculation and opinion and hearsay and which defendants have moved to strike.

together and in combination with the "classic examples" using the *Phillips* standard,
constituted an adverse employment action.

As such, the plaintiffs' attempt to case a nefarious motive over their assignment
to the ambulance necessarily fails and need not even be discussed.  The issue simply is
not reached in the absence of any adverse employment action in the first instance.
Even in a case where the issue would be reached, it is a jury that should decide
questions of motive and intent behind a government employment decision.  See Bryson
v. City of Waycross, 888 F.2d 1562, 1566 n. 2 (11th Cir.1989); Sykes v. McDowell, 786
F.2d 1098, 1104-05 (11th Cir. 1986).  It would not be a matter for summary judgment.
Further, in making such case, a plaintiff may not rely on conclusory assertions of
retaliatory motive, but must offer instead some tangible proof to demonstrate their
version of what occurred.  See Morris v. Landau, 196 F.3d 102, 110-111 (2d Cir. 1999).
The plaintiffs cannot do so here.

Rather, as discussed, the evidence shows that Chief Tortolano, in his discretion
and acting within his rights, determined that departmental action was imperative in the
wake of the petition and he formulated a plan to get at the specifics of any concerns
with the provider so as to rectify any problems.  He spoke with the plaintiffs about their
concerns with the ALS service provider, but they could not provide any specifics. The
Chief wanted to obtain specifics by providing closer oversight of the ALS service
provider and so he assigned Hegarty, Muller, Mulrenan and Kichton to the ambulance
on each of the four shifts so they could aid him in assessing and addressing the nature
and scope of any such concerns.  Defendants' Statement of Additional Facts, ¶¶ 12-18 .
The November 2003 notice made clear that ALS quality will be an "ongoing effort and
will surely evolve over time…"  It also stated that "the input of all members is sought
and appreciated" and it invited others to take a "proactive role."

The plaintiffs' reference to the Chief taking Firefighter Kichton off ambulance is not tangible proof of any nefarious motive.[24] The plaintiffs were removed from ambulance as well. Tortolano Depo, pp. 105-106. Contrary to the plaintiffs' contentions, the evidence indicates that this occurred well prior to the official rescinding of the order in October 2004. Defendants' Statement of Additional Facts, ¶ 25.

The plaintiffs' reference to City solicitor's letter likewise is not tangible proof of an unlawful motivation and it certainly does not constitute "blackmail" as plaintiffs assertion in conclusory fashion. Again, it must be remembered that the Department had been placed in an impossible position where concerns had been raised about the quality of the ALS service provider. It undertook efforts to investigate and monitor the same. The plaintiffs refused to assist in the Chief's efforts to identify and document the concerns, and no concerns had come to light during this period. Tortolano Affidavit.

Contrary to plaintiffs' assertion otherwise at n. 19, the decision to assign the plaintiffs did fall within the Chief's managerial discretion, as discussed above, and was not unlawful. He did not "veer from his practice" of permitting the Captains to make assignments. Indeed, there was no such "practice" but simply an attempt at a different method of assignment and, further, the Captains' involvement had begun only a short time prior to the events at hand. In making such assignments the Chief did not "veer from" anything but acted in accordance with his managerial right and discretion.

The plaintiffs acknowledge that factually erroneous statements are not entitled to First Amendment protection if they are knowingly or recklessly made. Such was the

---

[24]   The plaintiffs' reference to Firefighter Robishaw is similarly unavailing. He is not a plaintiff here and he did not sign the petition. Further, the defendants dispute that the Chief assigned Robishaw to dispatch "because he had spoken out in favor of the Fire Department" provide the ALS service. Defendants' Statement of Additional Material Facts, ¶ 19.

case here. Plaintiffs' memorandum confirms that they could not provide specific examples of deficient service by Action. They reference only that involving Hegarty's relation but, again, that example was based on erroneous hearsay information. The incident had been investigated and no red flags were raised as to Action's service.

Further, the defendants submit that there is nothing to indicate that Action was not up to the "caliber and level" of Armstrong, that they were waiting any longer or that "the quality of care was less" as the petition stated. Rather, the evidence shows that any problems with Action's services were no different than those experienced with Armstrong. Defendants' Statement of Additional Material Facts, ¶ 9. Captain Mills discussed these issues with Action, just as he had with Armstrong. At a minimum then, the evidence indicates that the plaintiffs signed the petition with reckless indifference to the fact its assertions were false.

Lastly, the plaintiffs criticize the method the Chief chose to use to investigate and monitor the ALS service provider. Again, however, this clearly rested within his managerial discretion. As discussed above, the Chief faced a very difficult situation. The petition that the plaintiffs had signed raised concerns about the quality of the ALS provider' service, but the plaintiffs could not provide any specifics regarding the same. Action had to be taken, and the Chief formulated a plan that he thought would best address this situation. Notably, the November 2003 notice made clear that ALS quality will be an "ongoing effort and will surely evolve over time…" and that it would continue "with modifications as seen beneficial…." It also stated that "the input of all members is sought and appreciated" and it invited other members of the department to take a "proactive role." This simply is not a situation that involved adverse employment action at all in the first instance, let alone ones attributable to unlawful or nefarious motives.

## CONCLUSION

Based on the reasons set forth herein, and the attachments hereto, this Court should deny the plaintiffs' motion for summary judgment. The defendants respectfully submit that, instead, this Court allow their cross-motion and enter summary judgment in favor of the defendants.

Respectfully submitted,

/s/ Leonard H. Kesten
Leonard H. Kesten,  BBO# 542042
Deidre Brennan Regan, BBO #552432
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated: June 30, 2005