Exhibit A

O'BRIEN & LEVINE

Court Reporting Services

YOUR BOSTON CONNECTION...WORLDWIDE

# Rick Hegarty, et al. v. Paul Tortolano, et al.

**Transcript of the Testimony of:**

## Robert B. Mills

## April 21, 2005

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130 888.825.DEPO(3376)

Cindy M. Falcon 1-14589

10

Q What were you doing there?
A Driver's education.
Q Anything else?
A Well, I've worked construction jobs, part-time construction jobs, plowing snow. Basically that's it other than just -- kept pretty busy.
Q Other than the barber shop work, did any of that work continue after you became a firefighter?
A No, sir.
Q You at some point were promoted in rank in the department?
A Yes, sir.
Q When was that?
A I became a lieutenant in March of '87.
Q And at that time was the Woburn Fire Department civil service?
A Yes, sir.
Q And at some point did you receive a rank higher than lieutenant?
A Yes, sir. I made captain in February of 2003.
Q And during your time as a firefighter, were you ever assigned to the ambulance?
A As a firefighter?
Q Yes.

11

A Yes, sir.
Q When was the first time?
A The first time would have been in January of 1981.
Q Prior to January of 1981, did the fire department have an ambulance?
A Yes, sir.
Q Do you know when the fire department first got an ambulance?
A To the best of my knowledge, it was in 1976.
Q And how did it come about that you were assigned to the ambulance in January 1981?
A When I first got on to the job, I was assigned to a ladder company for three months, then I was assigned to the desk, and then the ambulance. Being new, the chief at that time, it was volunteer, but he did recommend that we went to school to become EMTs to maintain the manpower in the ambulance.
So I did, and when I graduated or finished the EMT school, he assigned me to the ambulance.
Q Okay. And was there one ambulance at that time?
A No, there's been two ambulances since I've been there.
Q Where are the two stationed?

12

A Station 3. That's at 654 Main Street.
Q They've always been stationed there?
A Yes.
Q During the normal operations, are both ambulances staffed by firefighters?
A Yes.
Q And how long did you remain assigned to the ambulance after your first assignment in January of 1981?
A Other than three months, I was assigned until I made lieutenant.
Q So that was in March of 1987?
A Yes.
Q Did you ever ask to not be assigned to the ambulance during that time from 1981 to 1987?
A I may have put in a request, but at that time the chief said I was doing such a good job and the hospital liked me, why would I want to get off it. That was Chief Doherty at the time. I did like it, so there wasn't any question of getting off.
Q At that time were there other firefighters trained in EMT, as EMTs?
A Yes, there were.

13

Q And were those firefighters assigned to the ambulance, any of those firefighters assigned?
A They were all assigned. We were assigned, at that time you were assigned to the ambulance. It was just by the chief who put out an order and assigned you to the ambulance.
Q And after you made lieutenant, how did your responsibilities change or how did your assignment change?
A I was assigned to an engine company out of the North Woburn station. I believe it's 971 Main Street, I believe that's right. In around there, best of my knowledge. I was assigned to that station.
Q And how long did you remain there?
A I stayed there until September of that same year, and I was moved to another station, Station 4, which is on 38 Central Street.
Q What were your duties and responsibilities as a lieutenant assigned to the outlying station?
A I was in charge of the station. I was in charge of the companies that were assigned.
In Station 4 there was Engine 4 and Ladder 2. I was in charge of the personnel in the

14

station, you know, for their duties and responsibilities that they were assigned to for the day. And then when we'd go out in the engine, I was the supervisor for the engine.
Q Did you report to anybody as a lieutenant in one of the outlying stations?
A I reported to the Station 3, which was where the captain is assigned. That's who I reported to any problems.
Q There's a captain assigned to each shift; is that right?
A Yes, sir.
Q And there's a lieutenant assigned to each station on each shift?
A Yes.
Q Has that been the case since you became a lieutenant?
A Yes, sir.
Q And you said that Chief Doherty would make the assignments to the ambulance?
A Yes.
Q And do you know what system he used, if any, in deciding who would be assigned to the ambulance?
A I couldn't say. I don't know why he did. He

15

would just assign you and you did your job.
Q Other than you, did other firefighters during the 1980s get assigned to the ambulance for longer than one year?
A Yes.
Q During that time, approximately how many firefighters do you think were assigned to the ambulance for periods longer than a year?
A I really couldn't say. Eight assigned because of the four-shift system we have, there'd be eight.
But I would say that on the average of probably 50 percent of them would be assigned for more than one year.
Q Do you know if any of the firefighters during that time ever requested to be not assigned to the ambulance?
A Truthfully, I'd say yes.
Q Do you know who they were?
A Not off the top of my head, I couldn't say, but you know, there were several people that wanted to be on engines, you know, the fire side of the job.
Q Do you know if the chief ever acceded to those requests?
A Fifty percent of the time he'd say he liked you

16

where you were or he liked -- or he'd let you be moved.
Q During that time, in the 1980s, were firefighters assigned to the ambulance, were they allowed to swap ambulance assignments both -- let's start with during a shift. Let me give you an example.
If a firefighter such as yourself was assigned to the ambulance on a particular shift and a call came in requiring an ambulance to respond, did you have the ability to swap the assignment on the ambulance and have another firefighter go out and respond to that call on the ambulance if there was one with the qualifications to do so?
A I'd say yes.
Q Do you know if that was ever written in an order or a regulation or a rule, some sort of document, allowing for such swaps?
A No.
Q And was it something that you just learned from practice that you were allowed to do that?
A It was a courtesy.
Q But it was --
A Among each other.

17

Q It was a courtesy that was known within the department as far as you know?
A Yes, sir.
Q And after 1987, was there ever a time that you were reassigned to the ambulance?
A Officers weren't assigned to the ambulance.
Q That's been the case since you've been in the fire department?
A Assigned, yes, sir, there are times when the officers do go on the ambulance.
Q Is that through a swap?
A No, it would be at Station 3, the setup for the ambulance at Station 3, the backup ambulance. The front-line ambulance, which is Rescue 1, there's two people assigned to that ambulance all the time. That runs full time.
The second ambulance, Rescue 2, is assigned to the engine company. So if there's a need for a second ambulance, the people assigned to the engine company would go out on the ambulance; and in that case the officer is one of the people that could go out on the ambulance.
Q Normally how many people are assigned to the engine company?

34

Q Okay. Was that because you had used them for a long time?
A I had worked with them since 1985.
Q And had you observed any problems with Armstrong's response times?
A We would have the same problems with them also. I don't know if you understand how the system is set up when we use an ALS provider.
Q Probably not.
A Could I just --
Q Yes, please.
A What happens is we have one truck that's assigned to the city by the ALS provider. Now, when that truck is out of service, they go to satellite trucks. That means they bring another truck to another area closer to your city.

And what happens is then they're your ALS provider, so the truck that would be there immediate, which could be one or two minutes on a response time. It would now open up response a little longer because they'd have to go out to an outside truck. Instead of just covering one town, the truck would start covering two towns or three towns.

35

That would again bring up an issue of time. You know, you'd listen and say: Wow, it took them an awful long time.
Q During the six months you were monitoring Armstrong, to the extent you were, did you notice any problems with response time?
A If I did, it was basically, as I explained to you, I'd call them and just mention to them, gee, it took a little longer. Most of the time we did this at the consortium meeting, we'd just mention it.

They'd say: Hey, the other night we got pretty tied up and that we did, you know, our truck had to come from say Arlington instead of from the Burlington quarters, which would make it a little longer.
Q After Action became the ALS provider, did you notice any problems with respect to them providing medical functions such as putting in IVs?
A Being with any ALS provider for as long as I had, the same problems existed with both people, and an ALS or paramedic is a paramedic is a paramedic.

Most of them worked for different companies anyway. You could have one today working for

36

Armstrong and tomorrow they'd be working for Action.
Q Did you notice problems with Action in terms of performing medical procedures?
A Not to my knowledge. There was none.
Q You didn't notice any?
A No.
Q Or none came to your attention?
A None came to my attention, yes.
Q You had said Ms. Lake had raised a few issues. Some of them at least were dealing with how people talked once they got to the emergency room?
A In the emergency room or if there was a problem out in the street, as we call the street, out an at a scene, you know, there was a little bickering between the ALS. And this is on both sides, I mean, this is with Action or Armstrong. She just mentioned to me they didn't get along or --
Q Who didn't get along?
A The ALS provider with the BLS people. There might be an argument or somebody didn't think what was going on was right or whatever.
Q Did she ever say what any of the arguments between, any of the problems between Action and

37

the BLS providers were -- what the arguments were about?
A Most of the time it was personality.
Q Did she say that?
A Some people didn't like the change.
Q What did she say about that?
A Well, she just said that, you know, some of them were real comfortable with, you know, you work with people since 1985 and here almost 20 years later or whatever, 15 years later and you change to another company, you don't meet the same friends that you meet.
Q Did she say whether any of the firefighters, any of the BLS providers -- by BLS you mean --
A Basic life support EMT.
Q That's what the firefighters at the Woburn Fire Department provide, correct?
A Yes, sir.
Q Did she ever say whether the BLS providers had raised issues about the ability of the Action Ambulance employees to perform medical services?
A Never to her.
Q Were you involved in the decision to switch ALS providers?

Q Okay. So three or four months after you had that first meeting?
A Yes, sir.
Q So fair to say that if Action took over in June, you had the first meeting somewhere around July?
A Yes, sir.
Q And for three or four months after that, you at least a few times went to Mr. Raymond to find out why a run had taken so long?
A Yes, sir. I'd do that today again.
Q You'd still do it today if you saw a problem?
A Yes, I would.
Q Is it your testimony that you haven't done that since approximately, what was it, October, the last -- October of 2003, the last time you went to see Mr. Raymond about a question about a run?
A I would say -- for the ALS provider or for our side?
Q For the ALS provider.
A For the ALS provider, I hadn't had any other problems that were brought to my attention.
Q Since when?
A Since, with this time frame, you know, that was something that was instituted by myself. But I

have never had anybody come to me and say: I don't like, you know, what was going on or --
Q Let me just make sure you understand my question. What I'm asking you is -- you said you had a meeting with Mr. Raymond sometime around July 2003.
A Yes, sir.
Q And then you said there were a few other occasions where you observed a problem with response times that you went to Mr. Raymond?
A Yes, sir.
Q Were those response times related to the ALS provider's response times?
A Yes, sir.
Q And those few times that you went to Mr. Raymond occurred I think you said three or four months after that first meeting?
A Yes, sir.
Q So if the first meeting happened in July, August, September, October, November, was it around November 2003 the last time you went to see Mr. Raymond about a response-time issue?
A No, because I still do it now.
Q Okay. There's still times that you will go to him

to try and clarify a response-time issue?
A Yes, sir.
Q So is it the case that that has continued up to the present; occasionally you'd go to see if there's a response-time issue?
A Sometimes I talk to him every day, not only on that issue.
Q On other issues as well?
A Yes, sir.
Q What types of issues?
A Well, if something didn't go right at a run, that somebody didn't like on a run or if it's something that they didn't like on a run or if Renee Lake calls me and says that something happened and, you know, you should look into this, you should look into this situation, I go to everybody, you know, I'll go to my men or the people involved.
And I will go to Rich, Mr. Raymond, before I approach his people and say: Rich, can you get me some information on why this happened or what didn't happen? We have continual times that we meet.
Q Were you monitoring Armstrong before Action came on board?

A If you call my wife now she gets very upset. My radio never goes off at home, I mean, I just love the job, so I listen and I educate myself from the radio.
Q Your wife should talk to my wife.
My question is: Were you monitoring Armstrong before Action became the ALS provider?
A I would have to say not as diligent because I wasn't in the position.
Q Of monitoring?
A I wasn't in my position at the time. I was only there for a short time when the Armstrong -- when Action took over with the ambulance.
Q And the position you're talking about is personnel and training?
A Right.
Q How long had Armstrong been performing the ALS service while you were the personnel and training captain?
A I would have to say six months.
Q During those six months, were you monitoring Armstrong as carefully as you monitored Action?
A I would say no because I was comfortable with Armstrong.

Robert B. Mills 4-21-2005
Rick Hegarty, et al. v. Paul Tortolano, et al.

22

Q Lake?
A L-A-K-E.
Q She is at Lahey?
A Lahey Clinic.
Q Is she at any particular location for Lahey?
A She is at the building next door to the Lahey Clinic. I want to say it's Mall Road. I'd be giving you the wrong address if I gave you 34, but it's in around that, 34 Mall Road. Do you know where the Lahey Clinic is?
Q I do. Which town is that?
A That would be Burlington.
Q When has she brought several things to your attention?
When did it first begin that she, Ms. Lake, brought things to your attention concerning ALS reports?
A We were having people go in and they have a problem with the nurses in the emergency room, you know, they might have a spat or an argument or --
Q Let me make sure I understand. You are saying an ALS provider or employee of the ALS provider?
A Them and us both. Maybe I got off -- maybe you were saying what her role is with us and the ALS.

23

It's both, BLS and ALS, she would bring to my attention, both sides.
Q Just focusing on ALS right now, when was the first time she brought a problem or a concern about the ALS service to your attention and what was it?
A I believe the only time she really brought was the times, we have times that they leave, we have a certain parameter of time that they should arrive on scene, and she just asked me if I noticed that anything was taking a little longer for the ALS people to arrive on scene.
Q When did she raise this issue with you?
A It was probably within a month or so after the new provider, we went to a new provider for ALS service.
Q This was when the city changed ALS providers from Armstrong to Action?
A Yes, sir.
Q That was in approximately June 2003?
A Yes, sir.
Q So you think it was about a month after that?
A Yes.
Q And she asked you whether you had noticed a problem with Action's response time to a scene?

24

A Yes, sir.
Q What did you say?
A I told her that I had been monitoring that and that I had already spoken to them, to the director of services at Action Ambulance, and that we had come up with a policy to try to rectify the situation.
Q How did it come about that you were already monitoring that?
A The chief had asked me, when we bring in somebody new, even though it was new to me, you know, into that job, he asked me if I would kind of monitor or keep an eye on what's going on.
And I do read all the medical reports, they do go through my office, and I take a look for anything that might be a flag or something that I should direct my attention to.
And the times were a little long at that particular time. So what we did is we -- I went to them and we straightened out the situation. And it did work because within several weeks it started to clear up, the problem of the times.
Q So who did you go to at Action?
A Richard Raymond. He is the facilities manager.

25

Q How do you spell the last name?
A R-A-Y-M-O-N-D.
Q He's the facilities manager at Action?
A Yes, sir.
Q And you told him that you had concerns about their response time?
A Yes, sir.
Q And you had seen this in documentation, in other words, this concern had arisen because you had reviewed documentation?
A Listened to them and looked at some of the run reports, yes, sir.
Q That was going to be my question. The documentation you were using to determine the quality of the service was in part the run reports?
A Yes, sir.
Q Anything else that you were looking at?
A No, because that's basically what you gear everything on. I'd look at the log report from the day before for the dispatch, and then after they did their reports they'd come down to me and I'd file them all.
And I have a file for every run they do, and

7 (Pages 22 to 25)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

there.
Q During the 1990s, can you identify any firefighters that were assigned to the ambulance for a period of longer than one year during Chief Doherty's reign?
A I really can't say, you know, on the record I couldn't say. I know guys that wanted to stay there.
There were people that go to the chief and say: I like my partner, can I stay, would you assign me for another year, because they liked the people they were with. They'd stay two, three years at a time together.
Q Those were people who wanted to be on the ambulance?
A Yes.
Q Are you aware of people who didn't want to be on the ambulance that were assigned to the ambulance for more than --
A I would have to say yes.
Q Who were they?
A I couldn't really come up with a name. You hear so many stories that I really couldn't give you someone's name.

Q Do you know of any records that exist with respect to your earlier assignments from say 1990 through 1998?
A There could be some around. Some of the stations do have -- some people save them and other people kind of make room, and there are some that you could probably obtain that assign people to certain positions. There are some orders that are out to that effect.
MR. KESTEN: Those are some of the things I gave you.
MR. COLES: Are you representing that that's a complete list of all the assignments orders?
MR. KESTEN: You can ask the captain. He's spent the last two days looking for them.
A I had to do some real digging to find them. Mr. Kesten asked me to find some that moved the ambulance people around, and that's basically two or three hours of work trying to dig through every station and go through their past files.
Q Do you know if there's anywhere else you could look to find such records of ambulance assignments?

A I tried as hard as could I, and that's the best I could come up with. If you needed more, I'd see what I could find, but --
Q All right. Once I get a chance -- I got those documents this morning so I haven't had a chance to review them, but once I have a chance to review them I'll let you know or I'll let Mr. Kesten know, more appropriately.
At some point, Chief Tortolano became chief?
A Yes.
Q When was that?
A I believe he became an actor in '99 and then at the end of '99 he was appointed. I'm not really sure of the days, but that's basically the time frame, around '99.
Q When you say actor, you mean an acting chief?
A Yes. The chief that was in place had left and there was no existing list, so Captain Tortolano at the time was appointed as the acting chief.
Q Captain Tortolano followed Chief Doherty? There wasn't an interim?
A No, there was an interim acting chief, Ray Mooney, M-O-O-N-E-Y.
Q When was he chief?

A Just for one year, from Chief Doherty's departure, I think in -- could either be '98 or '99, but he just stayed for the year and then the present chief was made acting and then he became permanent chief to present.
Q While Chief Mooney was chief, did he have any rule or procedure for making assignments in the department?
A He just continued on with Chief Doherty's. When the time came and he felt as though he wanted to make an assignment, he'd just make an assignment.
Q Did Chief Doherty have a habit of reassigning people once a year?
A You could be changed at any time, but a lot of the time it did go on a yearly basis.
Q Did Chief Mooney also do that?
A Yes. There was very little movement with Chief Mooney, but he would, if it came up that something came up or somebody needed to be moved, he would just, you know, he'd move them.
Q Once Chief Tortolano became chief, what was his procedure or rules with respect to assignments?
A I believe that he stayed the same for about a year and then he had a change the policy. I don't know

if it was because of a meeting with several of the captains or however. I wasn't really involved in that part of the job. So he did come out with a different policy.
Q What was the now policy?
A His policy was that he was going to assign the people to the outside stations, he would -- and then what he would do as appoint -- we have a captain that stays at the station, Station 3, at all times.
And what he would do is he would assign X amount of men to that station, and it would be up to the captain to assign them people on a daily basis to where he'd want them.
Q Okay. If I understand you right, Chief Tortolano's new policy, after approximately being in the position for a year, was for the outlying stations, he assigned the men or firefighters to the outlying stations?
A Yes.
Q Did he assign them to specific positions on the outlying stations?
A Yes.
Q Station 3, central station, his policy was to

assign the men to Station 3 but allow the captain to decide which specific equipment assignments or apparatus assignments the men would be placed on?
A Yes, sir.
Q And there's a captain for each shift, so how many captains?
A There's four.
Q Do you know how the captains decided on assignments at Station 3?
A Some of the captains went by seniority.
Q Who were they? Which captains went by seniority?
A Captain Devine and Captain Kenton.
Q Yes.
A And actually I'd have to say all of them. I was trying to see -- I thought one of them may not have, but basically that's how they did it. They left it up to seniority.
Q So it was based on seniority whether you would be assigned to the ambulance or not?
A Unless you requested it.
Q Okay. And this started approximately in 2001 to the best of your recollection?
A I would say, yes, sir.
Q And so how was the apparatus ranked?

In other words, if it's going by seniority, the least senior person would get assigned to what piece of apparatus?
A They'd ride the desk.
Q That's dispatch job?
A Dispatch, yes, sir.
Q And then the next least senior person would be assigned to what apparatus?
A Rescue.
Q The ambulance?
A Yes, sir.
Q And then the next least senior person would be assigned to what position?
A Back step on, what we call back step, we can't use it, back seat of Station 3.
Q Just so I'm clear, there were two assignments to the ambulance, correct?
A Yes, sir.
Q After you assigned the least junior person to the dispatch, the next two least senior people would be assigned to the ambulance?
A Yes, sir.
Q Then you'd do the back step?
A Of Engine 3.

Q Of Engine 3?
A Yes.
Q What's the next position?
A Driver of Engine 3.
Q Now we've got five, and then is that it?
A Then we have, well, the captain, he sits in the riding seat.
Q Was that procedure, that is, allowing the captains to decide how to assign people at Station 3, was that followed until November of 2003?
A No. It was always a time, if there was a need for someone to be moved, the chief would assign you for something else.
Q Okay.
A Inside that station, I mean, he has assigned people to the desk.
Q When, after he gave the captains this discretion sometime around 2001, when did he assign people to the specific positions within Station 3?
A If somebody was injured and they came back and they would ask him if they could go to Station 3, and he'd just make an assignment and say so and so is going to be assigned to the desk until further notice, or he might change someone because of two

50

people being injured in the same group. He might move someone to another group at Station 3 to work the desk or --
Q So injury cases?
A Injury cases.
Q So I'm clear, this is a case where someone is able to do light duty?
A Yes, sir.
Q And the chief would make the decision to assign them to the dispatch desk?
A Yes, sir.
Q You are familiar with the collective bargaining agreement between the union, the firefighters union and the city?
A Yes, sir.
Q And you're aware that the collective bargaining agreement allows for a light-duty assignment to the desk as one of the light-duty assignments?
A Yes, sir.
Q Any other circumstances that you can recall where the chief made specific assignments to Station 3 apparatus or positions other than the injury situations?
A Prior to --

51

Q Prior to November 2003.
A Not to my knowledge.
Q So after Action became the ALS provider, did you ever hear any firefighters complaining, any of the city's firefighters complaining about Action's abilities to perform ALS services?
A I had one, a rumor that one person was complaining about a run.
Q So can you describe how you heard this rumor and what it consisted of?
A It was a firefighter that was upset because of a fatal at a car accident, person on a motorcycle, that had passed away.
Q Was this Firefighter Hegarty?
A Yes, sir.
Q When did you hear this rumor?
A Probably about two or three days before we had him into the office.
Q Okay. And by "we had him into the office" --
A Where the chief had asked him to come down and see him.
Q We'll get to that in a minute.
What's your best recollection of when that meeting was at the office?

52

A Late October, early November.
Q And you think it was a few days before that you heard a rumor about Firefighter Hegarty being upset?
A The first rumbling, there was no rumbling -- I had checked into that run, okay, because I was also involved in the critical incident stress debriefings, if I can give you a little history.
Q Sure.
A The morning that that happened, I happened to be working at Station 1 at a fire prevention open house. And the ambulance people came back and they had, they were kind of, you know, most of them do, they get very upset when they lose somebody at a scene. And they said to me that they had lost somebody, you know, who was walking around and they expired, you know.
So I just checked in on the run, you know, because they had just -- it was just because they were upset, and I offered them this service, which they refused. And eventually it turned out that it happened to be an alleged relative of Firefighter Hegarty's.
Q Who came back to the station who was upset? Who

53

were those individuals?
A The two people were -- I think I did give the run to -- I really don't know right offhand who it was. I had the paperwork, but I don't have it with me.
(Discussion off the record.)
Q So who was involved, who was it that came back to the station that was -- you don't recall the firefighters who were involved?
A No. I did know --
MR. KESTEN: Let me tell you from the document.
MR. COLES: You have it with you?
MR. KESTEN: I do. I'm not going to produce it for the same concerns, but the document, which the captain tells me is the run, involves Dooley and Lynch.
Q What's the date of the document?
A October 4, '03.
Q Dooley?
MR. KESTEN: And T. Lynch.
THE WITNESS: Timothy Lynch.
Q These were both firefighters, yes?
A Firefighter EMS, they were assigned to the

54

ambulance.
Q The department's ambulance?
A Yes, sir.
Q And they were, to the best of your knowledge, involved in responding to this run in which the motorcycle accident occurred?
A Yes, sir.
Q And they came back to the station and they were upset?
A Yes, sir.
Q What did they say?
A They just said: We just had a guy that was standing there and the next thing you know he died on us.
Q Did they say anything else?
A No. They just, you know, it was just a shock to them that somebody could be standing there and talking to them, and then the next minute they're gone.
Q Did they say anything about the ALS service providers?
A No.
Q Did she say whether the ALS service had responded?
A Yes, they did.

55

Q Did they say anything about it other than the fact that ALS had responded?
A Well, they worked on him and took him to the Winchester Hospital which was about a mile, a mile and a quarter from the scene.
Q And so you offered like counseling services?
A Yes, sir.
Q And they refused that?
A Yes, sir.
Q And did you then perform any investigation as to that call and the ALS response to that call?
A I just looked into it and seemed as though it went according to the way any run would have gone. There was nothing that really sent up a red flag any different than anything else.
Q At some point you heard a rumor that Firefighter Hegarty was upset?
A Yes, sir.
Q When did you hear this rumor?
A Probably a week and a half to two weeks later.
Q Who told you this rumor?
A The rumor mill. I couldn't, you know --
Q Does he or she have a name?
A No, sir.

56

Q You don't remember who it was?
A No. Just sitting around having coffee, and you know how firefighters talk. It just comes out.
Q So what was said?
A It was just said that Rick's cousin --
Q Rick Hegarty?
A Yes, sir -- cousin was on that run and he was very upset of what happened.
Q Anything else other than that he was upset at what happened?
A No, nothing else.
Q Anything about -- was there any discussion about specifically what he was upset about?
A He just said he was upset with the ALS service.
Q But not why he was upset with the ALS service?
A No, not specifics. They only give you enough to tease you.
MR. KESTEN: Those are your clients.
MR. COLES: I've got a number of responses I could give to that, but I'm going to exercise restraint.
Q Did you hear anything else more about Firefighter Hegarty being upset other than that rumor?
A No, sir.

57

Q Was there talk on more than one occasion about him being upset?
A I probably heard it a couple of times, yes.
Q And this was a couple of times before the meeting with the chief and the petition signers?
A Yes, sir.
Q You didn't hear anything else other than that he was upset with the ALS service?
A Yes, sir.
Q You didn't hear anything else, correct?
A Exactly. Rick was the only one that I heard was upset about it.
Q Did you contact Firefighter Hegarty to find out why he was upset?
A No, because before I could, the petition started, so it had taken its own course, I believe, if I have my time frames right. Days go into weeks.
(Exhibit No. 2 marked for identification.)
Q Sir, I'm showing you a document that's been marked as Mills Exhibit No. 2. If you could take a look at that for a minute, my question will be whether you recognize that document.
A I believe so, that I've seen this document.
Q Do you remember where you saw it?

in the rumor mill asked you that question?
Wait, I'm sorry, I misspoke. You said the rumor mill had told you what happened at the meeting?
A Yes, sir.
Q Do you remember who told you about happened at the meeting?
A No, sir.
Q Did you have any other conversations about Firefighter Robishaw making this presentation at the meeting with anyone else?
A Probably talked to the chief about it.
Q When was that?
A Probably later on in the day on that Monday.
Q What did you say and what did he say?
A The chief just said to me that Kenny had presented to Mr. Melanson about the department going ALS, and Mr. Melanson said that he didn't feel as though this was the right place or he didn't have enough information and, you know, it wasn't something he really wanted to discuss at that time.
Q Did the chief say anything else?
A Not to me as far as the ALS. I mean, we all know

that the chief, you know, has his thoughts on ALS.
Q What is your understanding of the chief's thoughts on ALS?
A He doesn't know if we're ready for it or not.
Q You mean bringing it into the department?
A Yes, sir.
Q He's told you that?
A Yes.
Q Did he say anything else about Mr. Robishaw making that presentation or making those statements at the meeting other than what you just testified to?
A Not any different than just mentioning to me that Kenny had brought that to the meeting, and he wasn't aware that Kenny was going to bring that up at the meeting.
We just thought it was a political meeting that Mr. Melanson was going to come speak to the men. He didn't realize there was an agenda.
Q An agenda?
A You know, for what to present to Mr. Melanson. He thought it was going to be informal, Mr. Melanson, I'm running for mayor, I'd like your support. I think that's what the chief thought was going to take place.

Q Did you say anything to the effect that Firefighter Robishaw had acted improperly at that meeting?
A He said he kind of caught him off guard.
Q Anything other than that?
A No, not anything that would, I mean, just that he wished Kenny said something to him that he was going to do that or whatever. The venue of the meeting wasn't what he thought it was going to be.
Q You had this discussion with the chief when?
A Probably the Monday after the meeting.
Q And after that Monday -- well, let me ask you, do you recall anything else that was said between you and the chief other than what you've already testified to with respect to that meeting?
A No.
Q And after that meeting with the chief on the Monday after the meeting with Melanson, did you have any further discussion with him about Firefighter Robishaw giving that presentation?
A We talked about it. We wanted to talk to Kenny about his information, where he got some of the information, and show us, you know, show the chief some views that may sway him a little more to

Kenny's side or to the ALS side.
Q When did you have that discussion with the chief?
A Several, maybe several hundred times.
Q Okay. You talked about that several hundred times that you wanted Kenny to --
A Every time you ran into Kenny.
Q Let me finish the question.
You talked to him several hundred times that you wanted Kenny to present evidence as to why ALS should come into the department?
A Every time you went into, ran into Kenny.
Q I'm talking about the chief.
A Am I missing something here? Do you want to persuade me? Do you think I did something wrong with the ALS?
Q I'm going to ask a much narrower question. I'm only focused on Firefighter Robishaw giving that presentation or making those statements to Candidate Melanson.
You testified that there was a meeting with the chief on the following Monday where he explained that Firefighter Robishaw made the statements, he said he had been caught off guard, wished he had brought it to his attention.

58

A This document was brought to me on, if you don't mind me reading date of here, on Thursday, September 25, in the morning; and it was asked of me if this was legal that this was taking place.
Q Who brought it to you?
A The captain. I believe Captain Kenton.
Q And did you give an opinion as to the legality?
A No, sir.
Q Did you see this document anywhere else other than when it was delivered to you by Captain Kenton?
A No, sir.
Q Is there a place where union documents are posted in any of the fire stations?
A Yes, sir.
Q Where is that?
A They have their own union bulletin board.
Q Where is that?
A Each station usually has them in their kitchen area.
Q Did you see this posted on any of the union bulletin boards?
A I never saw this posted, sir.
Q Wait until I finish the question.
A I'm sorry.

59

Q Did you go to this meeting?
A No, sir.
Q You did not?
A No.
Q Were you aware -- did anybody inform you as to what was said at this meeting?
A Rumor mill.
Q The old rumor mill?
A Yes, sir.
Q When did the rumor mill start talking about what was said at this meeting?
A The next morning.
Q The 26th?
A It would have been the following Monday. I don't work on Friday, so I wouldn't have heard anything until Monday.
Q What did the rumor mill say?
A It just said what had taken place is that Mr. Melanson came to speak to the gentlemen about the election and that Firefighter Robishaw, during the course of the meeting, stood up and presented some documents in support of ALS.
Q In support of ALS?
A Yes, sir.

60

Q What does that mean? Did you know what it meant --
A Well, we all know what support ALS -- that means he wanted it to come to the fire department, for us to run our own ALS service.
Q Had you been aware of any firefighters advocating for having the ALS service brought into the fire department prior to hearing this, what Firefighter Robishaw had done?
A Yes, sir.
Q When did you first hear about that as a suggestion?
A When Firefighter Robishaw came to the department.
Q When was that?
A Maybe a year or two before this, he came with that intent to start ALS in Woburn because he is a paramedic.
Q Had he talked about it at the station at various times?
A All the time.
Q All the time. It was kind of his thing?
A That is his thing.
Q That is his thing, okay.
Had the fire department ever asked him to

61

perform an investigation as to the viability of such a change that you're aware of?
A The fire department or the union?
Q Anybody in the fire department.
A I have no knowledge of anybody ever asking him to do anything.
Q How about within the union; are you aware if the union, anybody in the union or the union itself, asking him to perform such a study?
A I believe that they told him at a union meeting if you want to do it, you can pursue it.
Q If you want to do what?
A Study of the feasibility of bringing it to the department. If you're willing to do the legwork, go to it.
Q And do you know if he did that?
A As I tell you, he doesn't stop. It's 24 hours a day.
Q Has he presented you with documents or argument for such a change?
A No, sir.
Q And just so I cross all my T's and dot my I's, the rumor mill that told you about the meeting and asked you whether it was legal, do you recall who

66

After that, after that Monday meeting, did you have any further discussions with the chief about Firefighter Robishaw's presentation or statements at the Melanson meeting?
A No.
Q After that Melanson meeting, did the chief ever say he was going to discipline Firefighter Robishaw for making statements at the Melanson meeting?
A No, sir.
(Recess.)
Q Captain, let me ask you some questions concerning the petition.
MR. KESTEN: To get to the case.
(Exhibit No. 3 marked for identification.)
MR. COLES: Is that different from yours?
MR. KESTEN: It is. Only that the words "Petition to Mayor" are handwritten.
MR. COLES: Yes. I don't know who wrote that.
MR. KESTEN: The handwritten words "Petition to Mayor" are on yours. I believe the typed words "Petition to Mayor" are above on both

67

of ours.
MR. COLES: Right, and cut off on both of ours.
Q Let me show you what's been marked as Exhibit 3. Have you seen that document before?
A This one right here?
Q Yes.
A Yes.
Q When did you first see it?
A When it was brought to my attention that it was hanging up on the bulletin board in the fire station.
Q And who brought it to your attention that it was hanging up on the bulletin board in the fire station?
A Captain at Engine 3.
Q Who was that?
A Captain Kenton.
Q Do you recall when that was?
A The day?
Q Yes.
A No, I can't give you the exact date.
Q Do you recall how long after -- do you recall if it was in October of 2003?

68

A Could have been.
Q We were a moment ago talking about this meeting that Candidate Melanson had had with the union.
Do you recall if Captain Kenton brought it to your attention after that meeting?
A Oh, yes. It was after that meeting, yeah.
Q Do you recall how many weeks after or days?
A Not truthfully, I couldn't say, but it was probably weeks.
Q And what did Captain Kenton say to you?
A Captain Kenton just said that if I was aware that there was a petition hanging up on the bulletin board at Station 3.
Q What did you say?
A I said, "What petition?" He just said there was something about the ALS provider and he thought I should probably have a look at it.
Q Anything else said between the two of you about that?
A No, that was basically all he said, I should probably have a look at it.
Q Where were you when he raised this?
A In my office.
Q Where was that?

69

A Station 1, 124 Main Street.
Q What did you do if anything after that with regard to the petition?
A I got in my car and I drove to the station and went into the watch room and I saw the petition on the wall.
Q The watch room?
A That's the desk. We call it the watch room.
Q The desk is the dispatch desk?
A Yes, all the same room, yes.
Q There is a bulletin board in that room?
A Yes, sir.
Q This is at Station 3?
A Yes, sir.
Q And you saw the petition on the bulletin board?
A Yes, sir.
Q Did you see anything else on the bulletin board?
A There's all kinds of notices, you know, like a bicycle race or a weekend away or pictures of someone or thank you letters from, you know, families that you did a good job for or cartoons.
Q Ever have newspaper articles up on that?
A Yes, sir.
Q Do you ever have newspaper articles say about like

Robert B. Mills 4-21-2005
Rick Hegarty, et al. v. Paul Tortolano, et al.

70

if it's a fire and the newspaper publishes an article about it, does that ever get put up on the board?
A Yes.
Q This is located -- I'm not familiar with Station 3, so I'm going to ask you a couple --
A That's in Central Square.
Q Let me just ask questions and wait till I finish and we'll hopefully --
A Get this over.
Q Well, not give her high blood pressure. You walk into Station 3. Is there a front door?
A Yes, sir.
Q And when you walk in the front door, do you then -- are you in the dispatch room?
A No, sir.
Q What do you walk into?
A To a window and a corridor to the side.
Q So there's a window in front of you. Behind the window, is that where the dispatch desk is?
A Yes, that's where the dispatch, the whole room, the desk is off to the side a little bit, but there's a window, so if you come in for directions they can open the window and talk to you.

71

Q There is a corridor?
A To the left, yes.
Q The corridor leads into the dispatch room?
A You go down the corridor, you have to take a right and another right into the room.
Q Into the dispatch room?
A Dispatch room, yes.
Q The bulletin board is located on which wall?
A When you walk into the room, it would be on your right.
Q If you walk into the station, can you see the bulletin board from the window?
A You could.
Q Have you ever observed members of the public come into Station 3?
A Come into the station?
Q Yes.
A They come in there all day long.
Q Have you ever observed members of the public come into the dispatch room?
A Yes, I have.
Q And can you give me some examples of that?
A People's family come to visit them.
Q You mean firefighters' families?

72

A Firefighters' families or people have friends who come to visit them and they go into the room.
Q Any other examples you can think of?
A They're not supposed to, but they do.
Q What do you mean?
A They're supposed to not be in there.
Q But people do anyway?
A Yes.
Q Is there a rule or regulation or order that says that they aren't supposed to be in there?
A Under HIPAA.
Q When did that come out?
A When we enacted the HIPAA two years ago in April of 2003.
Q April of 2003?
A Yes.
Q Was there an order sent out saying that members --
A There were classes, gave classes to every firefighter.
Q Was there an order that came out that said members of the public couldn't be in the dispatch room?
A We posted a sign saying no unauthorized persons can go in the room.
Q Was that before you became aware of this petition?

73

A I'm trying of it think now. Times are getting kind of -- this is when I first started, first year I was there, so it would definitely have been before the petition.
Q It would definitely have been before the petition?
A I'm pretty sure, yes.
Q So there is an order somewhere that -- is there an order saying that members -- you said there's a sign posted?
A Yes.
Q Is there an order that came out saying that members of the public shouldn't be in the dispatch --
A I can't say if there was an order. I never posted one.
Q And did you have occasion to observe members of the public in the dispatch room after that sign was posted?
A All the time.
Q When you saw the petition, you'll see that there is a series -- it's a two-page document?
A Yes.
Q Was it a two-page document or was it a one-page double-sided document when you saw it?

19 (Pages 70 to 73)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

74

A The original was -- this is only a copy of the original.
Q Yes.
A The original I saw was two pages.
Q So in other words, this was the first page and the second page attached to this exhibit was the second page?
A Yes, sir.
Q Were all the signatures on this copy -- were they on the petition that you observed?
A Yes, sir.
Q And were they in the order that you see them here, to the best of your knowledge?
A Best of my recollection, yes, sir.
Q What did you do after you observed the petition on the bulletin board?
A I asked the dispatcher if he'd make a copy or if I could make a copy on the copy machine.
Q Who was the dispatcher?
A I believe the dispatcher was Firefighter Dowd.
Q What's his first name?
A Michael.
Q Why did you ask him if you could make a copy?
A Because he was standing in my way and he was

75

six-two.
Q Standing in your way between --
A Me and the copy machine, yeah, he was standing there doing something. I asked if I could make a copy at the machine.
There was several people in the room, bunch of people talking, firefighters.
Q You had taken the petition down?
A I just took it down and went to make a copy because I wanted to show the chief what was hanging. I just wanted to let him know what was hanging there.
Q Did you talk to anybody about the petition while you were in the dispatch room?
A No. I just asked what this was, and he said, "I don't know." I just took it, copied the front page.
Q Then what did you do with that?
A Left.
Q Did you take the petition with you?
A No, I hung it back up.
Q Same place?
A Yes, sir.
Q You copied the front page?

76

A Yes, sir.
Q The first page of this exhibit?
A Yes, sir.
Q Is there any reason why you didn't copy the second page?
A The reason I didn't, I didn't know if it was all right to have it hanging there or not. I didn't think it was my decision to demand to take it down, so I wanted to check it out.
Q Is there any reason why you didn't copy the second page?
A I just wanted the petition.
Q Okay. What did you do next?
A Brought it back to the chief.
Q Up to this point, the only person that you had talked to about the petition was Captain Kenton?
A Kenton, yes.
Q You didn't talk to any of the firefighters about the petition?
A No, sir, because this was the first time I saw it.
Q Where was the chief when you brought it to him? Where did you go?
A Station 1 in his office.
Q What happened next?

77

A I said: Chief, this petition was hanging down at Station 3 and the captain brought it to my attention, where I'm involved with the ALS as a liaison, and did I think it was proper to have it hanging up.
And I said to him: I'm just giving it to you to look at to see if you think it was, what you thought about it, and I just handed it to him.
Q You said: Do you think it's proper to have hanging up?
A Did he, the chief, think it was proper to have hanging up.
I was still kind of new at the job, so you know, I didn't want to be doing things I shouldn't have done. If it was all right to have it there, I just wanted to make sure it was -- I didn't want to take it or do something with it and have myself in a problem.
Q I know you told me this, but when did you become the personnel training captain?
A 2003.
Q Do you recall when?
A Actually, I went into the position on December 27 of 2002, and I was appointed permanent in February

of 2003.
Q And what did he say when you presented this?
A He said: Let me have a look at it, and he went back in his office.
Q Did you go with him?
A No.
Q What was the next thing you said or did or heard about the petition?
A He called me later on in the day and he says to me, before I could even talk about this, he said: Is this the whole petition? And I told him no, I said there was another page.
Q Then what happened?
A He asked me if I'd go back and get a copy of the other page.
Q Okay. What did you do?
A I went back. Firefighter Hegarty and his brother were in the room and --
Q Who was his brother?
A His brother was with him.
Q What's his name?
A I don't know.
Q Is his brother a firefighter?
A No, sir.

Q Okay.
A My first thought was to have Rick have them leave. I didn't want to get into a confrontation. I took it down and was going to bring it back to Station 1 to copy it and bring it back.
Q Why were you going to Station 1 to copy it?
A I didn't want to get into a confrontation with Firefighter Hegarty. There is a copier back at my office. I was going to go to my office, copy it, and bring it back.
Q Did he say anything while you were in that dispatch room?
A No, but I was going to ask him to have his brother leave, and I figured everything -- things would have just got out of hand, so I figured the better part of valor was go to Station 1, copy it, and bring it back.
Q Were they blocking the copying machine?
A No. They were just sitting in front of it, and I figured he'd probably say to me: What are you doing now? What are you up to, whatever.
Rather than get into a confrontation, I figured I'd take it and go copy it.

Q As I understand it, you took down the petition and left to go back to Station 1?
A Yes, sir.
Q You had no conversation with Mr. Hegarty, Firefighter Hegarty?
A No, sir.
Q You had no conversation with his brother?
A No, sir.
Q They said nothing to you at that time?
A No,. They were busy doing something.
Q Do you know what they were doing?
A No, sir.
Q Had you observed at that point -- were you aware that Firefighter Hegarty was the first signature on the petition?
A I had seen that the day before.
Q You were aware he was the first signature?
A Yes. I mean earlier in the morning, yes, sir.
Q This was also a point where you were aware at that point that he was upset about an ALS call earlier, in what was it, June, with the motorcycle accident?
A No, that was in October.
Q In October?

A Yes.
Q Was that before you found the petition or after?
A No, this was after. I found the petition after.
MR. KESTEN: He found the petition after the accident.
THE WITNESS: After the accident, yes, sir.
Q You found the petition after you heard the rumor that Firefighter Hegarty was upset?
A Yes, sir.
Q And so you go to Station 1, and do you copy the petition at that point?
A The chief was standing there, so I handed him the petition. I said this was the petition, to look at it.
Q The original?
A The original, yes, sir.
Q Where was he standing?
A Right by the copy machine where his office is. The copy machine is here and the office is right here.
Q No other conversations about the petition other than what you've already testified to up to that point?

82

A With the chief or anybody else?
Q Anybody.
A No, sir.
Q Anybody other than the chief?
A Just the chief.
Q Right. What was said or done at that point after you handed him the petition?
A He just took it and went into his office.
Q What happened next with respect to the petition?
A The next thing I knew, he said he was going to call these people down and he just wanted to talk to them; that he had some concerns that they had some concerns; that he was taking it very serious that somebody had a problem and it was his responsibility to the city to check with these people.
Q The petition that you took down, I understand that the exhibit I've given you, the copying cut off at the top some lettering; but the original you gave to the chief said "Petition to the Mayor" at the top, correct?
A Yes, sir.
Q And the handwriting below the copy that I've given you that says "Petition to the Mayor" in

83

handwriting, that wasn't on the original that you took down from the station?
A Correct, sir.
MR. KESTEN: Just so we're clear, the handwriting on this petition says "to Mayor," there is no "the."
Q The printed one said "Petition to the Mayor," correct?
A Yes, sir.
Q When the chief told you he wanted to call the firefighters down, was that the same day that you handed him the original?
A I believe so.
Q So how long after you had given him the original did he tell you that, that he wanted to call these guys down?
A Within an hour.
Q And you don't know what specific day that was, correct?
A Correct, sir.
Q Did he say anything else other than what you just testified to about, you know, meeting with these guys or the petition itself?
A Just his concerns that if there was a problem

84

going on that we weren't aware, and he took it very serious.
You know, being the chief, he's responsible, and he said we should bring these people in because if there is a serious problem, that we're missing it.
Q Okay. Anything else?
A No, just anything on them lines, that's all, until he said, till they brought it down, let's not say much until we bring them in and see what they had to say.
Q Was there any discussion between the two of you at that point about delivering the petition to the mayor?
A Us bringing it to the mayor?
Q Yes.
A Not to my knowledge about taking it to the mayor. I don't know if the mayor ever had it.
Q Okay. At that point, the chief had the original petition?
A Yes, sir.
Q And to your knowledge, did he continue to retain the original petition?
A As far as I know, he still has it.

85

Q And what happened after that, after he said: Let's bring these guys down?
A He had them come to the office.
Q How did you go about getting them down to the office?
A We called them and talked to their captain and had them meet us, I want to say around probably 4:30-ish, 5:00 in the afternoon.
Q Was this the same day that you discovered the petition? In other words, the meetings occurred on the same day you discovered the petition?
A I would say no because I think I got -- no, I wouldn't say the same day I discovered it.
MR. KESTEN: You are talking about -- there's a difference between the time he discovered it and when he brought the original to the chief.
Q How many days passed between the time you discovered it and the point you delivered the original to the chief?
A One day.
Q How many days passed between the time the original was delivered to the chief and the meetings with the firefighters occurred?

A Two or three maybe.
Q Two or three days?
A Yes.
Q And was there any discussion, are you aware of any discussion between yourself or the chief with any of these men before the meeting?
A There was no discussions with me and them at all.
Q Okay. And who was present at the first meeting?
A The chief, myself, Firefighter Hegarty, Firefighter Mulrenan and Firefighter Muller.
(Recess.)
(Discussion off the record.)
Q We were talking about the first meeting when you say it was yourself and Firefighters Hegarty, Mulrenan, and Muller. Anyone else?
A No, sir.
Q Where did this take place?
A My office.
Q What happened at the meeting?
A The chief showed this petition to the three people, three firefighters, and he asked them if that was their signature on the petition.
Q What did they say?
A They all said yes.

Q Okay. What happened next?
A So he says: You know, could you kind of -- I'm kind of lost here, this has caught us off guard. Is there something you could help me out with, tell me what you're upset about, what brought this about?
Firefighter Hegarty said that --
Q The chief said that? The last thing you say, that's what the chief said, I'm kind of lost here?
A Yeah, this is new, I hadn't seen this, I wasn't aware that any of this was happening, asking them why they signed it.
Firefighter Hegarty says: Well, they killed my cousin, and he says: That's it, I'm taking it all the way. He says: They don't know how to get lines in and they couldn't tube him and that's it. I'm just going all the way with this.
Q Okay. What happened then?
A Then he finished --
Q Did he say anything else?
A Not at that time, you know, he was just saying how he didn't think it was a good service and that, you know, we should go back to the old service.
Q Okay.

A Then he looked at Firefighter Muller. Firefighter Muller said: I've been in this business a long time, and these people are terrible. They're not any good. And again, he just said that we should go back, these people don't know what they're doing.
Q Okay.
A Then he looked over at Firefighter Mulrenan. Firefighter Mulrenan didn't really go to specifics. He said: I've heard stories that they're not good and I really don't know anything about them. It's just that I don't think they're good, and I think we should go back to the other provider.
Q Do you recall anything else these three firefighters said up to that point other than what you just testified to?
A Not to the best of my knowledge. That's basically what was said.
Q What happened next?
A The chief kind of said: Gee, this is kind of serious. You guys, you know, you kind of caught me off guard, he says.
So then he just asked them if there was

anything else that they wanted to say, and they said no. So he stood up and said to them, he says: You know, you put me in a spot here. I'm going to have to see what I'm going to do about this.
(Discussion off the record.)
Q I'm going to have to see what I'm going do about this. Anything else said after he said that, after the chief said that?
A They all just said thank you. He says: Thank you, guys, and they all just walked out.
Q Okay. And did you have any discussion with the chief thereafter about the petition?
A Again, the chief was very taken back by the whole petition and that we hadn't been made aware that there was this kind of problem going on, you know, that nobody was happy with the service. And that's basically what our conversation was, you know, then.
And several times after that we spoke about this petition, let's look into what the problem is. And he said he was going to have to come up with some kind of solution to look into the problem.

98

a weekly basis and explain to me if there were any problems with the ALS service and, you know, we'd probably be able to get a good grip or a handle on if there was a problem.
Q And do you recall when that was that he made those statements?
A I would probably say within a week of the time we met with these people or until that order came out, you know, from the time we met with them till the time the order came out to placing them on the various groups.
Q Okay. And did you say anything in response to his making those statements about what he was going to do?
A No. I kind of said to him it's probably going to be the only way that we can -- we're going to have to have someone in the field. We are not really in the field every day to look at any problems that are out there, you know, unless they bring it to us.
And surely their run reports weren't showing any concerns on the comments section. There was no comments of any problems that were out there.
Q And did you say anything else to the chief at that

99

time?
A Probably not, to my recollection, of saying anything other than it's probably going to be the only way we can, unless we had a better way, but there isn't a better way other than one of us out there riding on the ambulance every day with them; and that's prohibitive with the work we have to do ourselves.
Other than someone giving us feedback, going through their reports, that's all we have, or if I get a complaint from, you know, the overseer, like I say, she doesn't hesitate to call me when there's a problem.
Q Okay. And up to this point you had gotten calls from the overseer with problems concerning Action, correct?
A I still do. I mean, you know, as with our own BLS service.
Q Okay. What happened next with respect to the ALS, monitoring the ALS provider?
A The order went out and they were put onto their separate groups, and every week I would call Lieutenant McDonough and ask him if they turned anything in to him.

100

You know, he was going to be the -- he's out there, he works the job, and they'd be able to tell him if there was any problems with the service. And he'd say: Zero, nothing this week, I haven't heard anything this week.
(Exhibit No. 4 marked for identification.)
Q Showing you what's been marked as Mills Exhibit 4, take a look at that. You had previously spoken about an order for the transfers.
This is the order that you were speaking about?
A Yes, sir.
Q Okay. And so the conversation that you had with the chief that you were just relating, did that occur on or about October 25th, 2003?
A Several days before.
Q Did you have any other conversations with the chief about this system of monitoring after that conversation and prior to this coming out?
A No, he just said to me that you're, you know, I'm going to want you to call Lieutenant McDonough and I want to make sure that you call him every week to make sure there isn't a problem.
Q Was that a different conversation than the one you

101

just related?
A He probably told me that several times.
(Exhibit No. 5 marked for identification.)
Q Showing you what's been marked as Exhibit No. 5, can you take a look at that?
Before I ask you questions about that, let me ask you a couple of follow-up questions about the members of the public coming into a dispatch room.
A Yes, sir.
Q You said after the HIPAA order came out or after a sign was posted that no members of the public are allowed in this dispatch room, you did observe members of the public allowed in the dispatch room?
A Yes, sir.
Q Did you ever tell those people to leave or did you ever direct firefighters to make them leave?
A I've told them they don't belong in here, asked them to leave.
I wouldn't embarrass them in front of the people. I would say to them: You're going to have to ask these people to leave.
Q The period I'm talking about now is after that sign was put up and before that order, November

way they
re they revived a
ɔed and left the
.LS people
ıappy with the
ı meeting?
ɨft he came back,
ıht, and asked me
ː and if he
, myself, the
ː says that he
ɘ'd like to
sorry he had said
ː it out. He
ıe had said to
ː wished he
with Firefighter
ɟoing to look
ɔing to have to
ɘ process;
ɔther members on
ʋe to take some
ı to their
irefighter
ɟ other than
f in any way
people. The
was
of the air and
ody had this
ʋider and that
hat was on the
lark came to
ıe second

meeting.
Q The next day?
A No, that night, same night. We met with him in the morning, and he came back around 5:00 the same day.
As I testified, he wanted to recant. He thought he had hastily said what he said, and he wanted to say: I wish now I could take my name off the petition. I'm really not, you know, I wish I hadn't signed it.
Q Okay. And what happened after that meeting? What next happened after that meeting?
A The chief called in the next person on the list, who was Stephen McDonough. I want to believe it was the next day.
Q Okay. What happened at that meeting?
A He said to Stephen: Did you sign the petition? And Stephen said: You didn't take that serious, he says, that was only a joke. He said: That's why you noticed I signed next to Nelson Mandela and everything. I didn't really sign that. I thought it was just a joke, so I just signed it.
The chief said: Well, it's a serious, could be a serious problem here, Stephen. We're trying

to straighten it out.
Stephen just said: Well, you know, I really didn't think that there was anything, you know, with the names that were on it, I didn't take it serious.
So he says: Well, Stephen, you know, it's kind of a petition to the mayor about the ALS service and that he would have to take it serious because --
Q He meaning the chief?
A The chief would have to take it seriously because, you know, it's signed by some people, and that he was going to have to look into it. And we thanked Stephen for coming up and Stephen left.
Q Okay. What happened next? Did you have any discussion after that with the chief about what to do?
A Yes, we did, we just -- well, he said to me: What do you think? I said: Well, we are going to have to look into the runs, and I says: You know, I'm not aware of any of this stuff, as he was, I mean, we had discussed the run with Kichton and I said that nobody was on that run -- everybody was kind of high-fiving it. When somebody expires, you

bring them back and they're walking out of the hospital days later, everybody is on a high note.
I couldn't believe Mark would be down on something like that. Of the several people that were there, Mark was the only one that was down on it. I couldn't believe he would sign a petition because of that run.
He says: Yeah, but we do have a problem here. It seems like we have a problem, and we are going to have to, you know, do something to see if we can kind of guide ourselves along or to see if there is a problem, you know, generating here that's getting bigger or out of our hands or getting out of control.
Q When did you have this conversation?
A I would say right after Stephen McDonough left the room, we sat down. We were still in the room together, so we discussed it.
Q So I'm clear, you are still uncertain as to the exact date of these meetings, any of the three meetings?
A Yes, sir. I would have to say I --
Q Okay. Anything else said at the meeting you had with the chief after the McDonough meeting?

A Just if I had some ideas or doing anything or how I could -- I just said to him: We'll have to look into it, we are going to have to speak to Rich Raymond and talk to Rene and check with the consortium to see if this is an ongoing problem with the cities and towns using Action Ambulance.
Q Okay. What happened next with respect to the petition and the concerns raised?
A To the best of my knowledge, the chief came in to me one morning and said to me that these five gentlemen have raised an issue of the ALS provider not being sufficient.
And he said to me that he thinks what he's going to do is thinking of assigning each one of them to a separate group and so that they could work closely with the service; and if there were any problems with the service, that they could bring it to our attention.
He said what he was going to do is he was going to make Lieutenant McDonough in charge of the group and that these people could, you know, talk to Lieutenant McDonough, you know, more openly on what they've seen as problems and that Lieutenant McDonough would directly come to me on

the week's notice, there would have been a grievance on the week's notice. I thought that was the point.
Q Do you know what the grievance is that the union has filed concerning what these cover?
A Basically, I've been updated on it. I've been to the some meetings with the chief and everything on them being assigned to these positions.
Q Is there any way to document this this notice was handed out, notice, the November 2nd notice, any way to document that this was handed out a week before?
A I would say the chief probably has this in his records with a date on the top. You know, that was issued on all the orders I put out. The originals I give to the chief. I usually write on the top "Issued." But other than that, I can't really say, sir.
(Discussion off the record.)
Q Sir, have you ever seen a version of Exhibit No. 5 that does have written on it some sort of documentation that it was handed out a week before?
A No, sir.

Q And where was this posted, this Exhibit No. 5?
A Those are handed out to every -- those are given to the captain. When the captain comes down in the morning for his paperwork, he is given one for each station.
If you notice, there's a 3 on this. That means that goes to Station 3. On some of your other documents, if you will notice, it will say "Dispatch."
What I do is -- apparently this isn't my 3, this is one the chief put up, but on the ones I do, I usually put Station 3, and we send one to each station, one to the captain's office, one goes to the union, and one goes to the dispatch office. And we mark the top of them so we know that they got them.
Q And prior to this order going out, do you know if anybody had ever spoken to Firefighters Hegarty, Mulrenan, Muller or Kichton to find out if they wished to be assigned to the ambulance?
A I don't think that took place, sir.
Q Now, were you aware at the time that this order went out if Firefighters Hegarty, Mulrenan, Muller or Kichton were already assigned to the ambulance?

A Mulrenan was working the ambulance. He wasn't assigned, but he worked it all the time.
Q Explain that. He worked it but he wasn't assigned?
A Well, go back to the system before where they were using the seniority and guys could bid off where they wanted to go. Firefighter Mulrenan likes being on the ambulance, as he still is.
Q And you ascertained that he liked being on the ambulance because you've heard that from him?
A Yeah. He loves it.
Q Do you know if there was any other reason why he was asking to be working the ambulance other than his liking to work the ambulance?
A No, he just likes being there.
Q Were you aware of any personality conflicts between Firefighters Hegarty, Mulrenan, Muller, Kichton and Captain Devine?
A Any conflicts?
Q Yeah.
A You put seven grown men in the same room, I guess we're all going to have a conflict, you know, other than you sit 24 hours, your hair is too long or your shirt looks unkempt, you know, that stuff.

Q I've already asked you to trim my hair.
A I know. I would if I had my stuff.
Q I'm trying to avoid a conflict on that.
My question is: Do you know if any of them had -- well, do you know if Firefighter Mulrenan had asked to be assigned to the ambulance to not have to ride with Captain Devine?
A Not to my knowledge.
Q Now, Firefighters Hegarty, Mulrenan, Muller, and Kichton were not the only firefighters in the department who were qualified to be assigned to the ambulance at that time, correct?
A That's correct.
Q So as of November 2nd, 2003, do you have a general idea of how many firefighters in the department were qualified to be assigned to the ambulance?
A Let's see. There's 21 officers, so 21 from 70 would give us 48 or 49.
Q So all 49 firefighters could have been assigned to the ambulance?
A I take that back. There's two elderly firefighters that don't have an EMT card, so it would be 47.
Q Forty-seven would have been?

Robert B. Mills 4-21-2005
Rick Hegarty, et al. v. Paul Tortolano, et al.

130

A A walk around the back of a building and told to take them off and keep them off.
Q Did he ever make a written order saying --
A No, sir.
Q Let me just finish the question.
A I thought you did. I'm sorry, my error.
Q Did he ever make a written order saying no Scott packs on the ambulance?
A No. Verbally he would tell us if you were caught when we needed that ambulance and you were caught doing anything beyond the scope of EMS, you can work the outside of the fire, but if you were caught inside with your Scott tank, you will pay the penalty.
Q Inside a fire with a Scott tank?
A If you had a Scott tank, getting involved in an incident, your job as EMS is to protect our people, our people or the people that needed us to take them to the hospital.
Q So he told you he didn't want, if you're assigned to the ambulance, don't go into a fire with a Scott pack?
Did he ever say don't put the Scott packs on the ambulance?

131

A Nobody would ever say that.
Q Nobody would ever say that? Nobody would ever say don't put the Scott packs on the ambulance?
A Nobody would ever say don't put a Scott pack on.
MR. KESTEN: On the ambulance?
A It was an unwritten rule that if you took the chance you put it on -- there is one assigned for you on the engine.
Q There is a Scott pack assigned to the person assigned to the ambulance, that person has a Scott pack assigned on the engine?
A Yes, there's an extra supply, there's extra Scotts on the engines, Engine 3. So when they get to an incident, they can take it if they're in an atmosphere where they need the Scott tank.
Q Chief Perry was chief for how long?
A Three years.
Q Until when?
A He got on in January of 1980, and Chief Doherty took over in 1983.
Q And under Chief Doherty, was there any rule, either written or otherwise, as to whether ambulances should carry Scott packs?
A It was up to yourself. If you wanted to take them

132

you could. Again, you were told not to be tied up at a fire --
Q At a fire.
A -- or anything with the tank. You weren't supposed to go into the fire. You were supposed to stay to the perimeter of the fire.
Q And in practice, did people assigned to the ambulance take Scott packs with them during Chief Doherty's reign?
A Yes, we did.
Q Did anybody ever get disciplined for that?
A We got yelled at.
Q Chief Doherty yelled at you?
A When they're looking for the ambulance, and you're tied up around the corner, you are supposed to be at your ambulance.
Q Yelled at for doing what?
A Getting yourself too deep into the incident. You were there as EMS personnel.
Q That's not my question.
Did anybody ever get disciplined for merely taking a Scott pack with them on an ambulance run?
A No, sir.
Q And people did that?

133

A Yes, they did.
Q And the chief was aware that they did that, correct?
A Unofficially, yes.
Q Unofficially meaning --
A Grapevine.
Q Did that practice continue, that is, people would take Scott packs with them on the ambulance, once Chief Tortolano became chief?
A No, the chief made it known he didn't want Scott packs on the ambulance.
Q When did he make it known he didn't want the Scott packs on the ambulance?
A When he became chief.
Q And how did he make that known?
A He just told all the captains he didn't want the Scott tanks on the piece.
Q Any other way that he made it known?
A I really don't know, sir.
Q Are you aware -- well, let's do this.
Which captains did Chief Tortolano tell when he became chief, tell them that they shouldn't have Scott packs on the ambulance?
A He told all the captains because every day a

34 (Pages 130 to 133)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Robert B. Mills 4-21-2005
Rick Hegarty, et al. v. Paul Tortolano, et al.

126

firefighters couldn't swap ambulance assignments?
A I don't ever recall it. I told you, it was an unwritten law that we did it.
Q That you swap?
A Always did.
Q You don't recall that law ever being changed prior to Chief Tortolano saying these four guys can't do that?
A There was never anything in writing.
Q But what I'm saying it's an unwritten law and you are unaware of that law, that practice, being changed until Chief Tortolano said these four guys can't do that?
A Yes, sir.
Q Yes, sir, you don't remember any other occasion prior to that?
A Correct.
Q Now, you'd agree with me that some firefighters find ambulance work harder than other assignments in the fire department?
A It's busier.
Q It's busier. That's because you wind up going on more runs, correct?
A Yes, sir.

127

Q In addition, part of ambulance work is physical strength, would you say, correct?
A Yes, sir.
Q There are times when you actually have to remove people out of buildings on stretchers, correct?
A All the time sir,.
Q All the time. Is it fair to say that the ambulance assignment is one of the less desirable assignments in general within the department?
A To some people.
Q Well, you yourself said that the ambulance assignment comes, on the seniority list, comes second after dispatching, correct?
A Yes, sir.
Q So you'd agree with me that that's a reflection of how the ambulance assignment is viewed within the department?
A Again, by some people. Some people like being on it.
Q And what percentage of the department would you say likes being on the ambulance assignment?
A Thirty-five to 40 percent.
Q Okay. All of those people that like being on the ambulance assignment are allowed to swap their

128

ambulance assignments now and again, correct?
A Yes, sir.
Q And you'd agree with me that swapping the ambulance assignment can often lessen the stress that an ambulance assignment, that comes with an ambulance assignment, correct?
A Yes, sir.
Q Sometimes it's nice to swap a shift, take time off the ambulance because of the extra work involved?
A Yes, sir.
Q And other than your understanding that Mr. Mulrenan liked working the ambulance, you don't have any understanding that Firefighters Hegarty, Muller, and Kichton did, do you?
A Only that they work on the outside on ambulances.
Q But in terms of their work in the fire department, are you aware of them ever voicing or evidencing any desire to work, to be assigned on the ambulance in the fire department?
A They never came to me with a complaint that they didn't like being there; but, you know, when you become a firefighter, you want to be a firefighter.
Q Are you aware of them ever asking to be assigned

129

to the ambulance specifically?
A No.
Q The ambulances, prior to 2004, were assigned Scott packs?
A Yes, Scott air packs.
Q Prior to 2004, they were assigned or equipped with Scott air packs?
A They were never equipped. There was never a place for them on the ambulance.
Q Prior to 2004, did the ambulances carry Scott air packs on them?
A Unbeknownst to the higher authority.
Q Okay. Well, by the higher authority, I take it you're referring to Chief Tortolano?
A Yes, sir.
Q How long have ambulances carried, the ambulances in the department, carried Scott packs on them that you're aware of?
A Back in 1981 we were told to take them off, and we'd sneak them on at night.
Q Who told you to take them off?
A Chief Perry.
Q Did that come in the form of an order, a written order?

33 (Pages 126 to 129)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

134

different captain comes to the station to pick up paperwork and stuff, so he probably would have taken them to the side.
At that time I wasn't up in the office, and I was a lieutenant on an outside station, so the captain, he would have explained to the captain back then.
Q You keep saying, "would have." Do you have personal knowledge --
A No, sir.
Q Let me finish the question.
Do you have personal knowledge of Chief Tortolano ever telling a captain to not allow Scott packs to be taken onto the ambulance?
A I've heard him say it after 2003.
Q Okay. After 2003 was the first time you heard him say it to a captain?
A Yes, sir.
Q You'd agree with me there are times that an ambulance, personnel assigned to the ambulance, could be in need of a Scott pack other than to fight a fire?
A Yes, sir.
Q Potentially you could be responding to a traffic

135

accident where hazardous fumes were present and you'd want to use a Scott pack?
A Yes, sir.
Q Who did you hear Chief Tortolano tell in 2004 not to allow Scott packs on the ambulance? Who did he tell?
A In 2004?
Q Yes.
A We started in June of 2003 telling people not to put them on. We talked to the EMS coordinator to get them off the ambulance.
Q Who did you talk to?
A Firefighter Larson.
Q And this was in 2003, June 2003?
A June 30, 2003.
Q How do you know that specifically?
A Because right after the ALS provider took over, we got a surprise inspection by the state; and when he opened the door, the Scott tank fell out, fell on the floor.
Q Opened the door of the ambulance?
A Yes. And he wrote us up for unsecured Scott tanks. So that report was handed to the chief because they discussed the problems with the

136

chief, and the chief saw the Scott tank fall out and hit the floor.
So he called down to the EMS coordinator and told him to get them off the rescue.
Q This was Firefighter --
A Larson.
Q Larson. Do you know if Firefighter Larson did that?
A They were off, they were off the next day. We went down and checked, and they were off.
Q Are you aware of them ever coming back onto the ambulance thereafter?
A Yes, sir.
Q How are you aware of that?
A We had another inspection, state came out to look at the new -- we purchased a new ambulance, and the state inspector wrote it up again that the Scott tanks were unsecured on the ambulance and let the chief be known that they were on there.
Q When was that, the new ambulance and the inspection?
A The inspection was in December.
Q 2003?
A Yes. And then we have so many days to rectify the

137

problems that are on the ambulance. During the time of us going over the slips, the chief had me call down to Station 3 and talk to the dispatcher.
When I did, I wanted to talk to the captain but he told me the captain was out of the building, and that would have been Firefighter Robishaw, and I told Firefighter Robishaw to have the captain take the tanks, Scott tanks off the rescue when they all came back to the building, at which time they were taken off.
Q You were aware at some point the four firefighters that had been assigned to the ambulance as a result of the November 2nd, 2003, order, at some point they were assigned elsewhere?
A They've been assigned other places.
Q Right?
A Yes, sir.
Q Do you know when that happened?
A No, I can just -- all I can say is that Captain Kenton came to me, I want to say maybe in March -- my time might be off a little -- around March and he told me Firefighter Hegarty he thought was getting close to being burned out in the

138

ambulance, and he asked me if there was any way that he could start moving Firefighter Hegarty around, you know, putting him in a different assignment.

And I says that, for safety's sake, if he thought that was reason, that I thought he could move him around. I spoke with the chief, and the chief said it was allowable for him to be moved around.

Q You think to the best of your knowledge this was around October 2004?

A No, no. This was in March, March of 2004, yeah, when this all started.

Q You think Firefighter Hegarty was moved out of the ambulance around that time?

A He could have been. He had the choice if he wanted to get off. I don't know if he did or -- there were times when I didn't hear him on the ambulance, so he was afforded the opportunity if he wanted to get off.

Q What about the other three?

A Kichton was taken off. He went to the chief and they talked it over, and the chief reassigned him to another position.

139

Q Do you know what he said to the chief?

A No, I don't. That was a private meeting between him and the chief. He didn't want me in the room.

Q When was that?

A I don't know. I think it was before Kenton came to me. I believe so. I just know that was the deal between the chief and Kichton. I wasn't part of that.

Q You think it was before March 2004?

A I really can't say. Probably in around that area.

Q What about the other two?

A Muller, Captain Gaye had just made captain, and he came to me and told me that Greg needed to get off the ambulance; would it be all right, he said, where I had already told Captain Kenton that he could move Firefighter Hegarty.

I said: Sure, if you feel it's for safety purposes and for his benefit to move him. Then immediately Firefighter Muller was moved off the ambulance and started taking other jobs.

Q Did he say there was a safety concern?

A He felt as though Muller was, needed to come off, that it was time. He just saw that his performance wasn't as good as it should be.

140

Q Did he say anything else other than he observed his performance not being as good?

A No, he didn't specifically. He just asked me if it would be all right. Muller felt he'd like to come off and he'd like to have him off.

Q Do you recall when that was?

A That would have been I would say probably around May.

Q Of 2004?

A Yes, all in the same year, yes.

Q What about Mulrenan?

A I was never approached because he never said he wanted to get off, and he still stays on there to this day.

Q Did you yourself ever have any conversations with Firefighters Hegarty, Mulrenan, Muller or Kichton about their assignments to the ambulance?

A No. Just that maybe they might have -- well, they don't speak to me much anyways, so --

Q You were going to say they might have what?

A They may have in passing said something to me, you know, if I went to the station for something, there might have been a remark made to me about what was going on or something.

141

Q Do you recall anything specifically that was said?

A Firefighter Hegarty said to me one time: You know, this is punishment and you can't deny it. I says: Don't get me in the middle of this. This is between you and the chief.

Q Do you recall when he said that?

A Probably a month after he was put upstairs, put onto the ambulance.

Q Do you recall anything else that was said in that conversation or any other conversation between you and the four firefighters?

A No, I don't recall.

Q Are you aware of any documents that, other than what we have already introduced, that reflect or relate to the chief's decision to assign those four firefighters to the ambulance?

A Not in my possession or anything I've seen.

Q Okay. Were you aware of any discussions between yourself, the chief, and anyone else and the mayor, mayor of Woburn, concerning the petition?

A I have no knowledge. I've never been with the mayor and I've never discussed this with the mayor.

Q Are you aware of anybody else ever discussing this