Gregory J. Muller
February 3, 2005
Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 1 of 18
Hegarty, et al. vs. Tortolano, et al
Exhibit B

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04 11668 RWZ

* * * * * * * * * * * * * * * * * * *

RICK HEGARTY, MICHAEL MULRENAN
AND GREG MULLER,
    Plaintiffs,

vs.

PAUL TORTOLANO, individually and in
his official capacity as Chief of
the City of Woburn Fire Department,
JOHN C. CURRAN, individually and in
his official capacity as Mayor of
the City of Woburn, and CITY OF
WOBURN, MASSACHUSETTS,
    Defendants.

* * * * * * * * * * * * * * * * * * *

DEPOSITION OF GREGORY J. MULLER, a witness called on behalf of the Defendants pursuant to the Massachusetts Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, LLP, One Exeter Plaza, Boston, Massachusetts, on Thursday, February 3, 2005, commencing at 10:19 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

## Page 2

APPEARANCES:

TERENCE E. COLES, ESQUIRE
  PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
  18 Tremont Street, Suite 500
  Boston, Massachusetts  02108
  (617) 367-7200
  for the Plaintiffs

LEONARD H. KESTEN, ESQUIRE
  BRODY, HARDOON, PERKINS & KESTEN, LLP
  One Exeter Plaza
  Boston, Massachusetts  02116
  (617) 880-7100
  for the Defendants

ALSO PRESENT:

  Richard S. Hegarty

## Page 3

          I N D E X

Deposition of:        Direct    Cross
GREGORY J. MULLER

By Mr. Kesten        4


          E X H I B I T S

| No. |   | Page |
|---|---|---|
| 1 | Petition | 30 |
| 2 | Order | 61 |

ALSO PRESENT:

  Richard S. Hegarty

## Page 4

      P R O C E E D I N G S

MR. KESTEN:  All right.  Shall we reserve all objections, except as to form, as well as motions to strike until time of trial?

MR. COLES:  That's fine.

MR. KESTEN:  What do you want to do about the reading and signing?

MR. COLES:  Thirty days, waive notary --

MR. KESTEN:  Done.

MR. COLES:  -- under pains and penalties of perjury.

(A brief discussion was held off the record.)

GREGORY J. MULLER, a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his driver's license and having been duly sworn, testified as follows:

          * * *

      DIRECT EXAMINATION

BY MR. KESTEN:

Q.  Would you state your name, please?

A.  Gregory James Muller.

gory J. Muller                                       Hegarty, et al. vs. Tortolano, et al.
bruary 3, 2005

Case 1:04-cv-11668-RWZ    Document 22-3    Filed 06/30/2005    Page 2 of 18

**Page 9**

```
1   A.  Oh, stop?
2   Q.  Yeah.
3   A.  Maybe a year ago.
4   Q.  And why did you stop?
5   A.  I got tired of the ambulance business.
6   Q.  How many hours did you work over the last few
7       years when you were working for Professional
8       Ambulance?
9   A.  I'd make my own schedule. So it would vary
10      from week to week.
11  Q.  About?
12  A.  Some weeks, it would be eight. Some weeks, it
13      would be sixty. So it would depend upon the
14      workload that I had.
15  Q.  Where did you work out of physically?
16  A.  349 Rindge Ave. I think it was 349. That's in
17      Cambridge.
18  Q.  And what were you paid?
19  A.  $19 an hour.
20  Q.  So you quit that and took up -- decided to try
21      to make -- try to make that income being a
22      realtor?
23  A.  That's correct.
24  Q.  What did you do for a living before you became
```

**Page 10**

```
1       a Woburn firefighter?
2   A.  EMT.
3   Q.  Where?
4   A.  Professional Ambulance.
5   Q.  Okay. So that was your full-time job before --
6   A.  That's correct.
7   Q.  -- you got the Woburn job?
8   A.  That's correct.
9   Q.  Since '87?
10  A.  Well, I -- there was a few other companies that
11      I had worked for.
12  Q.  After '87 -- between '87 and '99, did you work
13      for anybody else?
14  A.  Yes. I did.
15  Q.  Who did you work for?
16  A.  Action Ambulance.
17  Q.  Where are they out of?
18  A.  At that time, it was Melrose.
19  Q.  When did you start working for Action
20      Ambulance?
21  A.  Maybe 1989, 1990, part time.
22  Q.  You were an EMT --
23  A.  That's correct.
24  Q.  -- for them? When did you stop working for
```

**Page 11**

```
1       Action Ambulance?
2   A.  Maybe 1994.
3   Q.  And why did you stop working for them?
4   A.  I didn't agree with the way the company was
5       moving forward.
6   Q.  How so?
7   A.  I didn't like the direction they were going.
8       They were -- they were looking to expand in
9       areas that weren't contiguous with their
10      service area.
11  Q.  Their service area was what?
12  A.  Melrose, Stoneham, Lynn, Saugus.
13  Q.  And they were looking to expand where?
14  A.  Merrimack Valley.
15  Q.  And what effect would that have had on you?
16  A.  At the time, I was the operations supervisor.
17      It would have been, operationally, a nightmare
18      to try and schedule almost two different
19      companies, it would seem.
20  Q.  So you were the operations supervisor at
21      Action?
22  A.  That's correct.
23  Q.  From when to when?
24  A.  Roughly, 1992 to 1994.
```

**Page 12**

```
1   Q.  Who did you report to?
2   A.  David Portman.
3   Q.  And what -- who is he?
4   A.  Vice president.
5   Q.  So you -- you resigned?
6   A.  Yes. I did.
7   Q.  Did you tell them you were resigning --
8   A.  Yes.
9   Q.  -- and why you were resigning?
10  A.  Yes. I did. I don't know if I told them why I
11      was resigning. I may have. I don't recall.
12  Q.  How did you replace that income?
13  A.  I was hired back full time by Professional
14      Ambulance to work on a policies and procedures
15      manual because they were looking to become
16      accredited.
17  Q.  Who was it that hired you at Professional?
18  A.  Lawrence Stone.
19  Q.  Where did you work before Action?
20  A.  Before Action, Professional.
21  Q.  As?
22  A.  EMT and then to supervisor.
23  Q.  And when is the first time you worked for
24      Professional?
```

Case 1:04-cv-11668-RWZ    Document 22-3    Filed 06/30/2005    Page 3 of 18

Gregory J. Muller
February 3, 2005
Hegarty, et al., vs. Portolano, et al.

Page 13

```
 1  A. 1987, on or about.
 2  Q. Okay.
 3  A. It's not uncommon to be in that --
 4     MR. COLES: There's no --
 5  A. -- business.
 6     MR. COLES: -- outstanding question.
 7     THE WITNESS: Okay.
 8  Q. You were saying that it's not uncommon for
 9     people to be in the business and go back and
10     forth between companies?
11  A. Or work for the same -- work for two different
12     companies at the same time.
13  Q. When did you first get involved in working in
14     an ambulance business?
15  A. 1982.
16  Q. What did you do before that?
17  A. Medical supplies.
18  Q. And what did you do to get into the ambulance
19     business?
20  A. What did I do to get into the ambulance
21     business? Took an EMT course, took the state
22     exam.
23  Q. To be certified as an EMT?
24  A. That's correct.
```

Page 14

```
 1  Q. And then, what company did you go to work for
 2     first?
 3  A. Curtis Ambulance.
 4  Q. Out of where?
 5  A. Stoneham. Actually, no. It was Reading.
 6  Q. How long did you work for them?
 7  A. Approximately, two years.
 8  Q. And just as an EMT? You didn't get promoted
 9     there?
10  A. No. Just as an EMT.
11  Q. And was that the only company you worked for
12     for those two years?
13  A. That's correct.
14  Q. Then what?
15  A. I think I went to Florida for a year, came back
16     and went to work for Armstrong.
17  Q. I'm getting confused here. Armstrong.
18     Armstrong was when?
19  A. That would have to be probably late '85, maybe
20     '86.
21  Q. As an EMT?
22  A. That's correct. EMT chair car.
23  Q. What does that mean?
24  A. Handicapped van, picking up people in
```

Page 15

```
 1     wheelchairs, taking them to doctors'
 2     appointments.
 3  Q. How long did you work for Armstrong?
 4  A. About a year.
 5  Q. Was that the only company you worked for during
 6     that year?
 7  A. Yes.
 8  Q. And then you went to work for Professional?
 9  A. Then I went to work for Professional. That's
10     correct.
11  Q. Have you ever worked for any other ambulance
12     companies that you haven't told me about
13     today --
14  A. No.
15  Q. -- prior? All right. We got them all. And
16     what made you become a firefighter?
17  A. I took the test, the state test, passed, was
18     appointed.
19  Q. Any other towns or cities you wanted to work
20     for that you signed up for?
21  A. Just as part of the process of filling the
22     paperwork out, you -- you have to pick three
23     other towns or cities. I don't remember which
24     ones I picked. But Woburn was my resident
```

Page 16

```
 1     status city at that point. So that's, pretty
 2     much, where you figure you'll land.
 3  Q. And that gives you a preference, too, right, in
 4     Woburn --
 5  A. That's correct.
 6  Q. -- if you live there? At the time -- sorry.
 7     It was 1999. Right?
 8  A. Yes. The test -- the test I took to get on, I
 9     believe, was in 1988 or '87.
10  Q. That test was good till '99?
11  A. Each test is good for two years. But Woburn
12     has a reserve list, which, if you're appointed
13     to that reserve list, you're guaranteed a job
14     as it comes up. It took 11 years to get a job.
15  Q. And who was the chief, the fire chief, when you
16     were appointed?
17  A. Doherty.
18  Q. First name?
19  A. Robert.
20  Q. And at the time you were appointed, was
21     Armstrong Ambulance the provider?
22  A. I don't know. You don't work. You just get
23     put on a list.
24  Q. What do you mean?
```

Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 4 of 18

Gregory J. Muller
February 3, 2005                                                   Gaudet, et al. v. Portofano, et al.

**Page 17**

```
 1  A.  You -- you -- you get on this reserve list, but
 2      you don't work.  You're not allowed to work as
 3      a firefighter.
 4  Q.  Let's back up.  In 1999, did you go to work as
 5      a firefighter?
 6  A.  Yes.
 7  Q.  Okay.  At the time you went to work as a
 8      firefighter in 1999, was Armstrong the ALS
 9      provider?
10  A.  Yes.
11  Q.  So the fire department does a BLS, and
12      Armstrong did ALS.  Is that how it works?
13  A.  That's correct.
14  Q.  So ALS would only be called on some occasions,
15      right --
16  A.  That's correct.
17  Q.  -- when you need an ALS?  Did -- at the time
18      you became a Woburn firefighter, which
19      ambulance company were you working for?
20  A.  Professional.
21  Q.  So the last time you worked for Armstrong was
22      in the -- in the mid-'80s?
23  A.  That's correct.
24  Q.  Okay.  What -- what was your assignment when
```

**Page 18**

```
 1      you first started in '99 as a firefighter?
 2  A.  I'm not sure I understand my -- a firefighter.
 3  Q.  Were you assigned to a station house?  How does
 4      it work?
 5  A.  Yes.  I was assigned as the float, Ladder 1.
 6  Q.  As the what?
 7  A.  Float.
 8  Q.  What does that mean?
 9  A.  If somebody's out sick, I would fill that spot.
10      I'd float from that station to wherever I was
11      needed.
12  Q.  How long did you have that assignment?
13  A.  Maybe seven or eight months.  I'm not sure.
14  Q.  And then, where did -- where were you assigned?
15  A.  Station 3.
16  Q.  Which is where?
17  A.  Central Square.
18  Q.  How long did you have that assignment?
19  A.  I still have that assignment.
20  Q.  So you've been there since 2000 or so?
21  A.  Approximately.
22  Q.  How often -- strike that.  Does -- does Woburn
23      have its own ambulance?
24  A.  Yes.
```

**Page 19**

```
 1  Q.  And in each station house?
 2  A.  No.
 3  Q.  How many -- how many are there?
 4  A.  Two.
 5  Q.  Where are they stationed?
 6  A.  Station 3.
 7  Q.  And what causes a Woburn ambulance to go out?
 8  A.  A response to 911.
 9  Q.  So it's anytime anybody calls when -- when they
10      request an ambulance?
11  A.  That's correct.
12  Q.  When somebody calls in a fire, does an
13      ambulance always go out?
14  A.  Yes.  It does.
15  Q.  So to every call?
16  A.  No.
17  Q.  What calls do not end up with an ambulance
18      going out?
19  A.  Service calls.
20  Q.  Such as?
21  A.  Smoke detector inspections, box plug outs.
22  Q.  But any 911 call results in an ambulance going
23      out if it's an emergency?  A fire?
24  A.  Yes.
```

**Page 20**

```
 1  Q.  So -- so if I call in and say there's a fire in
 2      my house, the equipment goes out; and an
 3      ambulance goes out?
 4  A.  That's correct.
 5  Q.  How many people go on the ambulance?
 6  A.  Two.
 7  Q.  And how is it decided who goes?
 8  A.  It's decided between groups.
 9  Q.  Meaning?
10  A.  There's four groups.  And it's up to the
11      individual captain what he does with the men
12      assigned to that station.
13  Q.  So in your stat- -- in Station 3, how does it
14      work?
15      MR. COLES:  You're asking presently --
16      MR. KESTEN:  Yeah.
17      MR. COLES:  -- or for at all times?
18      MR. KESTEN:  Present.
19  A.  With my group or other --
20  Q.  Yeah.
21  A.  -- groups?
22  Q.  In your group.
23  A.  In my group, it's based by seniority.
24  Q.  Would you explain that, please?
```

Case 1:04-cv-11668-RWZ    Document 22-3    Filed 06/30/2005    Page 5 of 18

Gregory J. Muller
February 3, 2005                                                      Hegarty vs. City of Boston, et al.

Page 25

```
 1     companies.
 2  Q. How -- how long had Armstrong been providing
 3     ALS service to the City?
 4  A. I don't -- I don't know.
 5  Q. The switch was made in April of '02?
 6  A. The switch?
 7  Q. From Armstrong to Action.
 8  A. I -- I'm not sure of the date.  Perhaps.
 9  Q. Was it controversial?
10     MR. COLES:  Objection.  You're asking him
11     if it was controversial to him?  To who?
12  Q. That's my -- my question.
13     MR. COLES:  If you understand the question,
14     you can answer.
15  A. I don't understand the question.
16  Q. Was it -- was it -- was there firehouse talk
17     about it?
18  A. Not right away.
19  Q. Were any firefighters that you knew working for
20     Armstrong?
21  A. Yes.
22  Q. How many in your -- in Station 3?
23  A. On my group?
24  Q. Yeah.
```

Page 26

```
 1  A. I don't believe, any.
 2  Q. And you weren't?
 3  A. No.
 4  Q. Did you understand who made the decision?
 5  A. No.
 6  Q. Were you concerned at the time the decision was
 7     made that it was a bad decision?
 8  A. No.
 9  Q. Do you have any opinion on it at all?
10     MR. COLES:  At that time?
11     MR. KESTEN:  Yeah.
12  Q. When the change was made.
13  A. I -- I don't recall if I had any opinion at
14     all.
15  Q. Okay.  When did you first start developing any
16     concerns?
17  A. Within a month.
18  Q. What happened to cause you to do that?
19  A. They weren't showing up at calls.  They were
20     getting lost.  They weren't getting IV's,
21     having problem with intubations.
22  Q. How did you learn of that?
23  A. I was on calls with them.
24  Q. Do you remember any -- any of those specific
```

Page 27

```
 1     calls?
 2  A. No.
 3  Q. Do you remember any specific incidents where
 4     any of this happened?
 5     MR. COLES:  I'm -- I'm just -- I want a
 6     clarification 'cause you've been asking
 7     questions about when he first learned about it,
 8     and he gave you.  So your question goes to the
 9     first learning?  Or are we going up to today?
10     When you ask, do you recall any specific
11     occasions, does your question go up to the
12     present?
13     MR. KESTEN:  No.  I'm back -- he said --
14     he -- he testified that he became concerned
15     because some incidents had happened, and that's
16     why he became concerned.  I'm asking about
17     those incidents.
18     MR. COLES:  Okay.
19  Q. Do you understand -- do you understand what
20     we're talk- -- do you understand the gibberish
21     we just engaged in?  It's not really gibberish.
22     But the question is, what I'm asking you is,
23     you -- you said that, at some point, you became
24     concerned because some things had happened.
```

Page 28

```
 1  A. That's correct.
 2  Q. They had intubations; they got lost.  And what
 3     I'm asking you is, at that time that -- that
 4     caused you the concern, do you remember any of
 5     the incidents specifically --
 6  A. No.
 7  Q. -- that caused you any concern?
 8  A. Not particularly, no.
 9  Q. Do you remember when -- the time frame as to
10     when you became concerned?
11  A. Within a month.
12  Q. Within a month.  So within the first month of
13     them taking over, some of these incidents had
14     happened?
15  A. I'm sorry.  I didn't --
16  Q. Within a month of them taking over, Action
17     taking over, some of these incidents had
18     happened?
19  A. That's correct.
20  Q. Were the incidents affiliated -- and these were
21     incidents you -- that you saw --
22  A. That's correct.
23  Q. -- on your calls?  Did you tell anyone?
24  A. Yes.
```

Page 29

```
 1  Q. Who did you tell?
 2  A. Firehouse banter.
 3  Q. Tell me the organization of your -- of your
 4     group. How many firefighters?
 5  A. Six.
 6  Q. Okay. And who supervises the six firefighters?
 7  A. The captain, which is included.
 8  Q. The captain's one of the six?
 9  A. That's correct.
10  Q. The captain and five firefighters?
11  A. That's correct.
12  Q. Who was the captain?
13  A. At that time, it was Dennis Devine.
14  Q. And who's over the captain?
15  A. The chief.
16  Q. Okay. Did you discuss with Dennis Devine your
17     concerns about the new ambulance company?
18  A. As a group, just idle conversations.
19  Q. Did you ever talk to him?
20  A. Not one-on-one.
21  Q. Did you ever -- were you ever in a group where
22     you ta- -- where anyone -- not just
23     one-on-one -- did you ever hear anyone talk to
24     him and say, Captain, there's a problem with
```

Page 30

```
 1     Action?
 2  A. Not that I recall.
 3     MR. KESTEN: Mark this exhibit, please.
 4     (Petition marked as Muller Exhibit No. 1.)
 5  Q. Were you an officer in the union in 2002 and
 6     2003, if you know?
 7  A. No.
 8  Q. Have you had a chance to review the Complaint
 9     filed in this case?
10  A. Yes.
11  Q. Did you participate in the -- in the meeting
12     described of September 25th, 2003 -- this is in
13     the Complaint -- that the Woburn firefighters'
14     union, Local 971, held a meeting between the
15     bargaining unit and then resident mayoral
16     candidate? Did you go to that meeting?
17  A. No. I did not.
18  Q. Did you know about the meeting?
19  A. Yes. I did.
20  Q. Who was the candidate?
21  A. I think, Brian Melanson; but I'm not a hundred
22     percent sure.
23  Q. When was the election scheduled for?
24  A. November.
```

Page 31

```
 1  Q. Who was Melanson running against?
 2  A. I -- I don't know all the candidates he was
 3     running against. I do know that John Curran
 4     was one of them.
 5  Q. I'm going to show you Exhibit 1. When's the
 6     first time you saw Exhibit 1?
 7  A. I'm not sure when it was.
 8  Q. Was it before it was put on the bulletin board?
 9  A. No.
10  Q. The first time you saw it was when it was
11     posted up?
12  A. Yes.
13  Q. Do you know who -- who drafted it?
14  A. No.
15  Q. Had you heard any conversation about that this
16     was going to have -- something like this was
17     going to happen?
18  A. No.
19  Q. So as far as you were concerned, it just
20     appeared on the bulletin board?
21  A. That's correct.
22  Q. Now, you're the -- you're the second name.
23     Right?
24  A. That's correct.
```

Page 32

```
 1  Q. The pope didn't sign. Did you ever find out --
 2  A. Inside --
 3  Q. Say what?
 4  A. -- papal privilege.
 5  Q. Is that what it is? Who's the bottom name?
 6  A. It looks like it says Frank Rizzo to me.
 7  Q. And who's he?
 8  A. A jerky boy.
 9  Q. What does that mean? What is a jerky boy?
10  A. There's two comedians that make prank phone
11     calls, and one of them is always Frank Rizzo.
12  Q. Oh, I see. And on the right of Frank Rizzo,
13     what does that say?
14  A. It looks like a signature of Frank Rizzo to me.
15     I . . .
16  Q. Oh, I see. Who's Stephen McDonough?
17  A. He's a lieutenant.
18  Q. Who can't follow directions. Oh, I see. He
19     did it on page 2. And who is Mark -- how do
20     you pronounce the last name?
21  A. Kichton.
22  Q. Who's that?
23  A. He's a firefighter.
24  Q. He can't follow directions on page 2 either.
```

**Page 33**

```
1      On one side, it says "print"; on the other
2      side, it says "sign." Did you ever find out
3      who -- who put down "Red Buttons"?
4   A. No.
5   Q. Nelson Mandela?
6   A. No.
7   Q. None of those?
8   A. No.
9   Q. See, I'm getting old. I didn't know who Frank
10     Rizzo was. Maybe he -- maybe he was a
11     dispatcher.
12  A. Jerky boy.
13  Q. Jerky boy. Got it. I'll look it up. All
14     right. So at the time -- if you see on the top
15     of Exhibit 1, it -- Exhibit 1 says that "We've
16     worked closely with our new ALS provider since
17     June 1, 2003." Is that when Action took over?
18  A. I -- I -- I don't know. I'm assuming so.
19     MR. KESTEN: Can we go off the record,
20     Terry, for a moment?
21     MR. COLES: Sure.
22     (A brief discussion was held off the
23      record.)
24     MR. KESTEN: Back on the record.
```

**Page 34**

```
1   Q. Do you have any idea how long Action was the
2      ALS provider for the City of Woburn at the time
3      the petition was signed? Was it -- was it just
4      a few months? Or was it a year?
5   A. I'm not -- it -- I'm not sure. It could have
6      been.
7   Q. It could have been either?
8   A. Could -- it could have been months to a year.
9   Q. So it could have been that they took over in
10     April of 2002?
11  A. Yeah. That's correct.
12  Q. Okay. What had you done prior to signing the
13     petition to express your concerns about the ALS
14     provider?
15  A. Nothing.
16  Q. And you have, this day, no idea who prepared
17     the petition?
18  A. No.
19  Q. Or what was going to happen with it?
20  A. No. I would -- I assumed it was going to the
21     mayor.
22  Q. Who, at that time, was Jack Curran?
23  A. That's correct.
24  Q. How many people worked -- how many firefighters
```

**Page 35**

```
1      worked at Station 3 in -- in June of '03?
2   A. Six.
3   Q. Six total?
4   A. Including the captain.
5      MR. COLES: Are you talking about just in
6      his --
7   Q. No, no. Total. How many people worked in that
8      building?
9      MR. COLES: At any one -- like during the
10     course of an eight-day --
11     MR. KESTEN: Yeah.
12     MR. COLES: -- period?
13  Q. Not just the time -- the 24 hours -- let --
14     let's start over. In the 24 hours that your
15     group was on was the six of you?
16  A. That's correct.
17  Q. And how many -- how many groups worked out of
18     Station 3?
19  A. Four.
20  Q. Each group had six people?
21  A. That's correct.
22  Q. So there's a total of 24 firefighters and
23     captains -- including captains -- who would
24     work in that building at any one week?
```

**Page 36**

```
1   A. That's correct.
2   Q. Was Firefighter Hegarty in your group?
3   A. Yes. He was.
4   Q. How about Firefighter Mulren- -- Mulrenan?
5   A. I -- I'm -- I'm not sure if he was or not. I
6      don't remember if he was on my group. I -- I
7      think he was.
8   Q. And how about Lieutenant McDonough?
9   A. No.
10  Q. What group was he in?
11  A. I don't know.
12  Q. And how about Ki- -- Kichton?
13  A. No.
14  Q. Do you know how long -- do you remember how
15     long this petition was up on the bulletin
16     board?
17  A. Less than a week.
18  Q. It was more than one day?
19  A. Yes.
20  Q. And when was the first time anybody asked you
21     any questions about the petition after you
22     signed it?
23  A. Within two weeks.
24  Q. What happened?
```

Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 8 of 18

Gregory J. Muller
February 3, 2005
Hegarty vs. Tortolano, et al.

Page 49

```
1   A. No.
2   Q. What was his role at the meeting?
3   A. He's a firefighter and a paramedic.
4   Q. And you understood that he had suggested that
5      the Wo- -- the City of Woburn have its own ALS
6      service?
7   A. That's correct.
8   Q. What if -- if that happens, what if -- what
9      financial effect would that have on you, for
10     example?
11  A. On me, none.
12  Q. Would it have a financial effect on anyone
13     in -- in the Woburn Fire Department?
14  A. It would, to someone being hired as a
15     paramedic.
16  Q. Are all -- all the firefighters are EMTs.
17     Right?
18  A. Not all.
19  Q. Not all?
20  A. No.
21  Q. Can only EMTs ride in the ambulance?
22  A. That's correct.
23  Q. So if a junior person is on duty, but he's
24     not -- he or she is not an EMT, they wouldn't
```

Page 50

```
1      go in the ambulance?
2   A. No. Someone who's not an EMT, according to
3      state law, can drive the ambulance to an EMT;
4      but they can't participate in patient care or
5      transportation.
6   Q. So the Woburn firefighters who are not EMTs, do
7      they still ride the ambulance -- drive the
8      ambulance?
9   A. They can drive the ambulance to the scene, but
10     can't treat and transport.
11  Q. But does that happen? If you have a group on
12     duty --
13  A. I've heard it has happened.
14  Q. What percentage of the firefighters are EMTs?
15  A. Ninety-nine.
16  Q. And what percentage of the firefighters are
17     paramedics?
18  A. Two.
19  Q. Who are they? Do you know?
20  A. Kenneth Robishaw and Tom Graham.
21  Q. And does Robishaw work for another ambulance
22     company?
23  A. I don't -- I don't know about at the time.
24  Q. Does he now?
```

Page 51

```
1   A. I think he did. Yeah. I believe he does.
2   Q. Who does he work for now? Do you know?
3   A. I believe he's worked for Action.
4   Q. Did he used to work for Armstrong?
5   A. I don't know.
6   Q. If Woburn gets an own -- its own ALS, what
7      financial effect would that have on Robishaw?
8   A. Most of the towns that bring in their own ALS
9      to the fire departments pay a stipend to be a
10     paramedic over and above.
11  Q. So getting back, you -- you were then
12     reassigned to Group 3?
13  A. That's correct.
14  Q. And is it true that the ambulance assignments
15     were not changed right away at the same time?
16  A. That's correct.
17  Q. So when you were first assigned to Group 3, you
18     still didn't ride the ambulance?
19  A. I did.
20  Q. You did?
21  A. Based on seniority.
22  Q. And so, in Group 3, you were less senior?
23  A. That's correct.
24  Q. When you were in Group 2, you did not ride the
```

Page 52

```
1      ambulance?
2   A. I did ride the ambulance.
3   Q. How often?
4   A. I remember I was -- the captain made a decision
5      to rotate people so everybody would have a
6      break. And I was just coming off a six-month
7      rotation where I was promised engine time for
8      six months right after that.
9   Q. All right. So at -- prior to your transfer --
10  A. Yeah.
11  Q. -- immediately prior to your transfer, it was
12     not being done through seniority in Group 2?
13  A. No.
14  Q. The captain had changed that?
15  A. That's correct.
16  Q. For how long before your transfer had the
17     system been changed in Group 2 from seniority
18     to a rotation?
19  A. I think it was six months prior to that,
20     because we were the first to go through the
21     rotation.
22  Q. So you think, about six months before that, the
23     captain had unilaterally decided, we're not
24     going to do it by seniority; we're going to
```

Page 53

```
1   make people do it?
2   A. Right.
3   Q. Any -- any -- any protest about that?
4   A. No. It was fair.
5   Q. So did you think the seniority thing wasn't
6      fair?
7   A. I thought that was right. It was just.
8   Q. Which was just?
9   A. Seniority.
10  Q. But you thought that the change to eliminate
11     seniority was fair?
12  A. We all agreed to it.
13  Q. So did he ask if people wanted to do it that
14     way, and then he did it?
15  A. Absolutely.
16  Q. Which captain was that?
17  A. Dennis Devine.
18  Q. Was that done in all the groups?
19  A. No.
20  Q. Just Group 3?
21  A. Group 2.
22  Q. Group 2. Just Group 2?
23  A. As far as I know.
24  Q. And the other groups remained that the junior
```

Page 54

```
1      people had to ride the ambulance?
2   A. As far as I know.
3   Q. All right. When did your six months finish?
4   A. I think it was right before I transferred.
5   Q. Well, no wonder you were particularly upset.
6      Who else was riding the ambulance with you?
7   A. John Fuchs.
8   Q. And who -- who -- who took over? I take it, it
9      was right before you left that you were off the
10     ambulance; and two others were assigned to it
11     in your group?
12  A. That is correct.
13  Q. Who were the two?
14  A. I don't recall. I got transferred.
15  Q. You think it was at -- at the exact same time?
16  A. Yeah.
17  Q. Okay. When you got transferred to Group 3,
18     they were doing it on seniority?
19  A. That's correct.
20  Q. And were you the -- one of the junior people
21     that had to do the ambulance?
22  A. Yes. I was.
23  Q. Who else did it with you?
24  A. It was either Roy Cudmore, David Doherty. And,
```

Page 55

```
1      every once in a while, someone would just pick
2      up an ambulance shift. So my most working
3      relationship of any one of those guys was Roy
4      Cudmore.
5   Q. How long did you anticipate you'd have to drive
6      the ambulance or ride the ambulance?
7   A. Till less senior people in the group came under
8      me.
9   Q. How often did that, typically, happen?
10  A. My wait was 11 years. And in five years, I had
11     14 men under me. So it's cyclic. There's no
12     way to determine that.
13  Q. Okay. So when you were first assigned to Group
14     3, the only change was, you're working with
15     different people?
16  A. That's correct.
17  Q. And you had less seniority in -- within that
18     group than you had in Group 2?
19  A. Maybe the same.
20  Q. So in Group 2, if ambulances had been done by
21     seniority, you still would have been riding an
22     ambulance?
23  A. Yes.
24  Q. So the rotation didn't change much. Actually,
```

Page 56

```
1      the rotation was good for you in Group 2?
2   A. Exactly.
3   Q. The 20 bucks didn't make a difference, huh?
4   A. No.
5   Q. So when you first -- so you transferred to 3.
6      And how soon after you transferred to 3 did the
7      chief change the policy on ambulance
8      assignments?
9   A. Maybe a week.
10  Q. What happened? How did you find out about it?
11  A. I'm not sure if someone called me at home or if
12     I had come in and -- and saw the notice. I
13     don't remember exactly how I found out about
14     it.
15  Q. It was a written notice?
16  A. Yes. It was.
17  Q. Which said what?
18  A. I can't be sure. I'd have to see the -- the
19     notice. I'm not sure exactly what it says.
20  Q. But --
21  A. It says that we're assigned to the ambulance,
22     with extra duties assigned to us, and -- and
23     reporting. And I'm -- I'm -- I'm just
24     generalizing at this point.
```

Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 10 of 18

Hegarty, et al., vs. Tortolano, et al.
Gregory C. Muller
February 3, 2005

Page 57

```
 1  Q.  What extra duties do you recall you were
 2      assigned to?
 3  A.  Reporting on quality concerns of ALS, filling
 4      out paperwork, bringing them to the captain,
 5      bringing them to the chief, bringing them to
 6      another lieutenant on department letterhead, by
 7      e-mail.
 8  Q.  All right.  I am backing up.  I'm looking at --
 9      it appears to be a copy of the transfer order.
10  A.  Uh-huh.
11  Q.  Who is Firefighter Mearls, M-e-a-r-l-s?
12  A.  The fire inspector.
13  Q.  Did Firefighter Mearls have anything to do with
14      the petition that you know of?
15  A.  Not that I'm aware of.
16  Q.  How about Firefighter McDonald?
17  A.  Not that I'm aware of.
18  Q.  How about Firefighter Poole?
19  A.  No.
20  Q.  Firefighter Lynch?
21  A.  No.
22  Q.  Firefighter Dooley?
23  A.  No.
24  Q.  Dowd?
```

Page 58

```
 1  A.  No.
 2  Q.  Gray?
 3  A.  No.
 4  Q.  Masotta?
 5  A.  No.
 6  Q.  Patterson?
 7  A.  No.
 8  Q.  Benenate?
 9  A.  Benenate.  No.
10  Q.  All the generations begin to mix.  Do you have
11      any idea why those people were transferred?
12  A.  None.
13  Q.  Let's see.  Hegarty, Muller, Kichton, and
14      Robishaw were involved in the petition.
15      Actually, just Hegarty, Muller, and Kichton?
16  A.  That's correct.
17  Q.  And Robishaw spoke up at the union meeting?
18  A.  He was the one who presented the ALS idea to
19      the mayoral candidate.
20  Q.  His idea was different than the petition?
21  A.  I believe he -- he wanted to take over ALS and
22      the City take it over itself.
23  Q.  Have you -- have you ever heard from any source
24      why these other firefighters were transferred?
```

Page 59

```
 1  A.  None at all.
 2  Q.  And you're saying this had never happened
 3      before in the time that you were on the
 4      department?
 5  A.  Like that, no.
 6  Q.  What do you mean, "like that"?
 7  A.  Every once in a while, you'd see one guy
 8      transferred, due to an injury, from an engine
 9      to a desk assignment.
10  Q.  When did Chief Tortolano become chief?
11  A.  I -- I think it was '99.  He was chief when I
12      was hired.  So I'm not exactly sure.
13  Q.  Do you know why Dooley's and Robishaw's
14      transfers were revoked?
15  A.  I have no idea.
16  Q.  Did you know that they were?
17  A.  I did know they were.
18  Q.  You've never heard from any source as to why
19      they were?
20  A.  Not that I recall.
21  Q.  Did you ever ask anyone to revoke your
22      transfer?
23  A.  No.  Well, through a grievance.
24  Q.  Right.  Which is still pending.  Right?  Then
```

Page 60

```
 1      you saw the order which put you, among others,
 2      in the ambulance and asked for reports?
 3  A.  That's correct.
 4  Q.  Other than a grievance, did you protest that to
 5      anyone?
 6  A.  I was furious.
 7  Q.  You were furious?
 8  A.  Furious.
 9  Q.  How come?
10  A.  Because why was I singled out for that duty,
11      and no one else.
12  Q.  You were the only one?
13  A.  There was a couple of guys, petition signers.
14      That's what -- that's what stood out to me.
15  Q.  Did you fill out any of the -- any of these
16      reports?
17  A.  No.
18  Q.  Why not?
19  A.  'Cause we grieved it.
20  Q.  And what happened?  Was this order revoked?
21  A.  Recently.
22  Q.  How recently?
23  A.  Within -- within 60 days, I believe.  I'm not
24      sure.
```

Gregory J. Muller
February 3, 2005
Case 1:04-cv-11668-RWZ    Document 22-3    Filed 06/30/2005    Page 11 of 18
Hegarty, et al. v. Tisano, et al.

Page 61:

```
1   Q. You mean, 60 days ago?
2   A. Within 60 days, yeah.
3   Q. So -- but it was in effect for over a year?
4   A. That's correct.
5   Q. And you never filled out any reports?
6   A. Patient care reports.
7   Q. What are those?
8   A. Every time you transport someone to the
9      hospital, you need to document what was done to
10     that patient. It's a legal document.
11  Q. Also known as a run report?
12  A. That's correct.
13  Q. So -- but tho- -- but those, you've always
14     done?
15  A. I added.
16  Q. What did you add?
17  A. I'd add IV attempts on ALS calls. That's the
18     only thing I was qualified to report on.
19  Q. So -- so prior to this order --
20     MR. KESTEN: Let's mark this Exhibit 2.
21     (Order marked as Muller Exhibit No. 2.)
22  Q. Does that look like the order that you saw?
23     MR. COLES: Do you have an extra copy of
24     that, Len?
```

Page 62:

```
1      MR. KESTEN: I don't. I'll get it for you
2      after the deposition.
3   A. Yes.
4   Q. You think that's the order that we're talking
5      about?
6   A. Yes.
7   Q. Prior to this order being issued, whenever --
8      is it fair to say, whenever you went on an
9      ambulance run, you'd file -- you'd -- you'd
10     prepare a run report?
11  A. That's correct.
12  Q. Had you ever documented, in one of your prior
13     run reports, any instance of problems with the
14     ALS --
15  A. Not --
16  Q. -- response?
17  A. -- that I recall.
18  Q. But you had seen them?
19  A. Yes.
20  Q. After this order, is -- are you're saying
21     that's what you changed? You started putting
22     in -- documenting ALS problems?
23  A. Yes.
24  Q. And did you then turn those in as -- as
```

Page 63:

```
1      ordered?
2   A. They were turned in nightly.
3   Q. The --
4      MR. COLES: Could I borrow it?
5   A. Not -- not in that fashion.
6   Q. Why not?
7   A. Fear of retaliation.
8   Q. So you're saying that you would see the
9      problems that you were concerned about, but you
10     did not fill out a report on it?
11  A. That's correct.
12  Q. Because you were afraid of retaliation?
13  A. That's correct.
14  Q. Did you put those problems into the run report?
15  A. Only IV attempts.
16  Q. Not late response?
17  A. No.
18  Q. If I were to find out whether there was a
19     longer response time between the new ambulance
20     service and the old one, how would I do it?
21  A. You'd have to file a public records request to
22     the chief.
23  Q. And get what?
24  A. ALS response times.
```

Page 64:

```
1   Q. Have you ever done that?
2   A. Yes. I have.
3   Q. Did you get them?
4   A. No. I haven't.
5   Q. What did you ask for? Did you yourself ask for
6      it, or did the union ask for it?
7   A. The union.
8   Q. What did they ask for?
9   A. ALS response times. I'm not sure exactly what
10     the letter said.
11  Q. And who -- who prepared that letter?
12  A. I believe it was John Nee.
13  Q. Spell it.
14  A. He was the --
15  Q. Spell it, please.
16  A. N-e-e. He was the union president at the time.
17  Q. And was that letter sent, I take it, after
18     Exhibit 2 came out?
19     MR. COLES: If you know. Don't speculate.
20  Q. Exhibit 2 is this one.
21  A. Yes.
22  Q. Well, in the Complaint, it says that there
23     are -- if -- if the ALS provider is late
24     arriving, then, sometimes, the BLS has to take
```

Case 1:04-cv-11668-RWZ  Document 22-3  Filed 06/30/2005  Page 12 of 18
Gregory J. Muller vs. Hegarty, et al.
February 3, 2005

Page 65

1   the patient to the hospital.
2   A. That's correct.
3   Q. Were you aware of -- of that ever happening?
4   A. Yes.
5   Q. When?
6   A. Specifically, I -- I couldn't tell you on
7       individual calls.
8   Q. Did it ever happen on your call --
9   A. Yes. It did.
10  Q. -- on one of your calls?
11  A. Yes.
12  Q. Did it ever happen before you signed the
13      petition?
14  A. Yes.
15  Q. How could I possibly find out -- what would I
16      have to look at to find out when that happened
17      on one of your calls?
18  A. Whenever the swap-over to the new provider was,
19      you'd have to request ALS response times and go
20      through them individually.
21  Q. So if I went through -- strike that. What
22      percentage of the times on -- on calls that you
23      responded to as a BLS ambulance has ALS been
24      called?

Page 66

1   A. I -- I couldn't tell you.
2   Q. More than half?
3   A. Yes.
4   Q. Did it ever happen under the old provider, that
5       the ALS didn't get there in time after they
6       were called; and BLS had to take the patient to
7       the hospital?
8   A. Probably.
9   Q. Is it your belief that it happened more
10      frequently under the new provider?
11  A. Yes.
12  Q. Did it happen more than once prior to the time
13      that you signed the petition with the new
14      provider?
15  A. Yes.
16  Q. So if I looked at the log, I'd see -- what I
17      would look at is, if I saw a call to ALS, and
18      then ALS doesn't make it --
19  A. Uh-huh.
20  Q. -- that's the call -- that's how I could find
21      it. Right?
22  A. That's correct.
23  Q. Do you know -- do you know if anyone's ever
24      done that; that is, check?

Page 67

1   A. No. I don't know if anyone's ever done that.
2   Q. Is it your understanding that's the purpose of
3       a public records request?
4   A. That's correct.
5   Q. What is your understanding what happened with
6       the public records request?
7   A. I don't know what happened to the public
8       records request. I know that the chief was
9       calling people down to retract information on
10      run sheets.
11  Q. Redact.
12  A. Redact. And I don't know where it went from
13      there. But we never got the information.
14  Q. Are you aware of any instances where a
15      patient's health was harmed by a late response
16      by the new ALS company?
17  A. I -- I have no idea of knowing that.
18  Q. Well, was there any call that you felt that you
19      went on where you felt that the patient's
20      health was harmed, something actually --
21      something that actually happened?
22  A. I -- I don't recall.
23  Q. If you had felt that happened, would you have
24      written that down in your run report?

Page 68

1   A. No.
2   Q. Why not?
3   A. Fear of retaliation.
4   Q. How's it been for the last year in terms of the
5       ALS response times of the -- of Action?
6   A. I -- I -- I couldn't tell you. On my group --
7   Q. Yeah.
8   A. -- or overall?
9   Q. Your -- well, you can only tell me what you
10      know.
11  A. Exactly. They've been okay, it seems to me.
12  Q. Did it get better since you wrote the -- signed
13      the petition or worse or the same?
14  A. It's gotten better.
15  Q. When did you first perceive that it got better?
16  A. Maybe within six months.
17  Q. Six months of them taking over or six months of
18      you signing the petition?
19  A. Six months of them -- probably -- probably six
20      months within me signing the petition, roughly.
21      I'm not exactly sure, but in around that time.
22  Q. What was it that happened that made you believe
23      that it was better?
24  A. They were actually showing up on most of the

69

1  calls.
2  Q. Where are they dispatched out of?
3  A. I don't know.
4  Q. You don't know?
5  A. Their base?
6  Q. Yeah.
7  A. I believe it's Wilmington.
8  Q. And where was the -- the previous was
9     Professional? What was the previous -- I'm
10    having trouble because you confused me with all
11    those names -- what was the name of the
12    previous provider?
13 A. Armstrong.
14 Q. Armstrong. Where was Armstrong based out of?
15 A. Arlington.
16 Q. What's closer to Woburn? Wilmington or
17    Arlington?
18 A. Well, their truck covered, I want to say, 11
19    communities from the Lahey Clinic.
20 Q. Whose truck?
21 A. Armstrong's.
22 Q. Okay. And what about Action?
23 A. Action is a -- a system status plan.
24 Q. Which means?

70

1  A. They alternate positions of ambulances near or
2     around the city according to call demand.
3  Q. Near or around what city?
4  A. Woburn.
5  Q. Was it your opinion that the way they ran their
6     operation caused longer response time?
7  A. Who?
8  Q. Action.
9  A. Sometimes.
10 Q. How so?
11 A. There was a Medicare regulation that came out
12    that Armstrong was dealing with. He panicked.
13    He panicked. The surrounding communities that
14    he covered, 11 communities dropped him to go to
15    Action, except Woburn and Burlington. So we,
16    actually, had better response times from
17    Armstrong 'cause now they're only servicing two
18    communities. Woburn being the busier
19    community, they were sometimes beating us to
20    calls.
21 Q. But there were 11 communities that had dropped
22    him?
23 A. That's correct.
24 Q. How come? Do you know?

71

1  A. Some type of Medicare regulation for being
2     reimbursed ALS fees.
3  Q. And how many communities did Action serve?
4  A. I don't know. At the time, I have no idea.
5  Q. But more than two?
6  A. Yes.
7  Q. So was -- that led to why -- I mean, is that
8     part of the reason why you based your opinion
9     that they -- they took longer? They had more
10    communities to cover?
11 A. That's correct.
12 Q. But things have improved?
13 A. That's correct.
14 Q. Do you still feel that the City should go back
15    to the old provider, as you did when you signed
16    Exhibit 1?
17 A. Yes.
18 Q. How come?
19 A. They serve less communities. Better responses.
20 Q. How about if the City does its own ALS, would
21    that be better?
22 A. Absolutely.
23 Q. Do you know why they don't?
24 A. I have no idea.

72

1  Q. I'll find out.
2  A. Okay.
3  Q. What harm did you suffer as a result of the --
4     your transfer to Group 3?
5  A. Besides the humiliation and embarrassment?
6  Q. Well, being transferred. We'll get to the
7     assignment. But just being transferred caused
8     you humiliation and embarrassment?
9  A. Absolutely.
10 Q. How come?
11 A. Because everybody was making fun of it.
12 Q. Okay. Was -- was everybody making fun of the
13    other fellows who were transferred?
14 A. Absolutely.
15 Q. Even the ones that had nothing to do with the
16    petition?
17 A. I don't know about them.
18 Q. But the -- the four involved in the petition
19    were being made fun of?
20 A. Yes.
21 Q. Okay. And any other harm?
22 A. Immediately?
23 Q. Yeah.
24 A. No.

Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 14 of 18
Gregory J. Mulvey — Hegarty, et al. vs. Tortolano, et al.
February 3, 2005

**Page 73**

1  Q. Did it affect you financially in any way?
2  A. No.
3  Q. Did you have more problems getting along with
4     Group 3 than Group 2?
5  A. No.
6  Q. Now, when you were -- when Exhibit 2 was
7     issued --
8  A. Okay.
9  Q. -- what harm did that cause you?
10 A. The same thing. What am I, stuck on the
11    ambulance for the rest of my career and
12    everybody laughing at you, thinking it's a big
13    joke; you shouldn't have signed the petition.
14    That's what it came down to. Everyone knew.
15 Q. Everyone knew what?
16 A. It was a result of us signing this. This is
17    why this came out.
18 Q. Did -- financially, you were better off.
19    Right?
20 A. No. The same.
21 Q. The extra 20 bucks a round?
22 A. I was getting that in the last group.
23 Q. Well, that's, actually, the next question. If
24    it's still being done by seniority in Group 3,

**Page 74**

1     would you still be on the ambulance?
2  A. Yes.
3  Q. So Exhibit 2 didn't change anything in terms of
4     how often you'd have to be on the ambulance,
5     right, for you?
6  A. It changed a lot.
7  Q. What?
8  A. I wasn't -- I wasn't ab- -- able to swap my
9     assignment with anybody that entire year or
10    more.
11 Q. Okay.
12 A. I was denied the rights the other firefighters
13    had.
14 Q. Okay. What -- what -- so everybody --
15    everybody could always swap?
16 A. Absolutely.
17 Q. Wa- -- was it done routinely?
18 A. Yes.
19 Q. So you were forced to make an extra 20 bucks a
20    shift for what?
21    MR. COLES: Objection.
22 Q. You would agree, all right, that it is an extra
23    20 bucks --
24    MR. COLES: That's been --

**Page 75**

1  Q. -- a shift?
2     MR. COLES: -- asked and answered. But go
3     ahead. An- -- answer it again.
4  Q. No. You don't have to. So you -- you still
5     would have had -- so what this change is the
6     swap?
7  A. That's correct.
8  Q. But other than swapping, you still would have
9     been on the ambulance?
10 A. That's correct.
11 Q. And your -- you did not change your report; you
12    did not write the reports as ordered other than
13    documenting things in the run reports?
14 A. That's correct.
15 Q. Would that cause you any harm to do that, to
16    document the intubations on run reports?
17 A. It caused me to con- -- kind of look over my
18    shoulder 'cause I never knew when somebody was
19    going to ask me for something.
20 Q. Ask you like -- what do you mean?
21 A. Like, what's going on? How's the service been?
22 Q. Did anybody ask you?
23 A. Never.
24 Q. Did you report any concerns about ALS service

**Page 76**

1     to anyone since Exhibit 2 came out?
2     MR. COLES: You're asking him -- you've
3     already asked him questions about reporting it
4     on the form. So I assume your -- your question
5     excludes that.
6     MR. KESTEN: It does.
7     MR. COLES: Okay.
8  Q. Other than your -- what you put in your run
9     report, did you ever report any concerns to
10    anyone about ALS service since Exhibit 2 came
11    out?
12 A. Other members.
13 Q. What concerns did you report to other members?
14 A. They can't get an IV in. It took them three
15    intubations. The monitor didn't work.
16    Whatever.
17 Q. The people that respond on ALS are paramedics.
18    Right?
19 A. Correct.
20 Q. Is it your opinion that the paramedics for
21    Action are less competent than the paramedics
22    for Armstrong?
23 A. Yes.
24 Q. To this day?

Case 1:04-cv-11668-RWZ    Document 22-3    Filed 06/30/2005    Page 15 of 19
Gregory J. Muller                                              Hegarty, et al., vs. Fortunato, et al.
February 3, 2005

## Page 77

1  A. There are guys that are very good at what they
2     do, and there are guys that are mediocre.  And
3     then there are guys that aren't very good at
4     all.
5  Q. And you think that the mix -- the mix of those
6     three groups are different at Action than in
7     Armstrong?
8  A. Yes.
9  Q. Do you have any thoughts as to why?
10 A. No idea.
11 Q. Have you -- since -- since Exhibit 2 was
12    issued, have you become aware of any incidents
13    which might be extreme in nature or pose an
14    immediate threat to the provision of quality of
15    service of ALS service?
16 A. Yes.
17 Q. Did you report those to anyone?
18 A. No.
19 Q. How come?
20 A. Fear of retaliation.
21 Q. And Exhibit 2 was revoked within the last 60
22    days?
23 A. I believe so.
24 Q. Was it done in writing?

## Page 78

1  A. I don't recall if it was through the captain or
2     through an order.
3  Q. Have you been harmed in any other way by either
4     your transfer or Exhibit 2?
5  A. I believe so.
6  Q. How so?
7  A. Stress.
8  Q. Have you sought any treatment for the stress?
9  A. Yes.  I have.
10 Q. Where?
11 A. My -- my private physician.
12 Q. And who's that?
13 A. Paul Mazur, M-a-z-u-r.
14 Q. Where is Dr. Mazur?
15 A. He's on Centre Street in Jamaica Plain.
16 Q. How long have you been seeing Dr. Mazur?
17 A. Maybe six months.
18 Q. What did you start seeing him for?
19 A. Anxiety attacks.
20 Q. He's what?
21 A. Anxiety attacks.
22 Q. What kind of doctor is he?
23 A. General-practitioner.
24 Q. How -- who's your regular doctor?

## Page 79

1  A. Paul Mazur.
2  Q. Who was your regular doctor before Paul Mazur?
3  A. My insurance had changed a few times.  So I
4     don't even remember their names.  It was months
5     that I had had people.  And that was it.
6  Q. So you liv- -- you lived -- how long have you
7     lived in Dedham?
8  A. Ten years.
9  Q. Prior to seeing Dr. Mazur, who had done your
10    last physical?
11 A. Probably Dr. Fitzpatrick, Woburn Medical
12    Associates.
13 Q. Is that through the job?
14 A. It may have.  I'm not -- I'm not sure.
15 Q. Dr. Mazur is your primary care physician?
16 A. Correct.
17 Q. And who was your primary care physician right
18    before that?
19 A. I -- I don't remember.  It was somebody that
20    was only with me for months.
21 Q. And how were you referred to Dr. Mazur?
22 A. The book that they give you to pick a doctor on
23    a health plan.
24 Q. Which health plan do you have?

## Page 80

1  A. Blue Cross/Blue Shield, HMO Blue.  I made a few
2     calls, and he was the first one that I -- was
3     accepting new patients.  So . . .
4  Q. Is he any good?
5  A. I like him.
6  Q. I need one.  And you went to see him for what
7     reason?
8  A. Anxiety.
9  Q. When did you first starting having anxiety
10    attacks?
11 A. Maybe nine months ago.
12      MR. KESTEN:  I don't like the sound of
13    that.
14 Q. Last spring?
15 A. Perhaps.  I don't recall because, you know,
16    you'd get anxious; you wouldn't know why.  And
17    you'd calm yourself down and go on with what
18    you were doing.
19 Q. Did you ever see any kind of therapist or
20    counselor?
21 A. They sent me to one.
22 Q. Who was "they"?
23 A. My primary care physician.
24 Q. Okay.  So you went to see Mazur first.  When?

**Page 81**

```
    Do you think, this summer?
A.  It may have been.  It might have been right
    after the summer.  I'm -- I'm not quite sure of
    the dates.  I'd have to look at my medical
    records.
Q.  What's the address on Centre Street?
    MR. KESTEN:  I ta- -- I take it, Terry, you
    don't have those records?
    MR. COLES:  I don't.
    (A brief discussion was held off the
    record.)
A.  I don't have his address.  I just have his
    phone number.  It's Urban Medical Group.
Q.  Urban Medical Group?
A.  That's correct.  Do you want the phone number
    or --
Q.  Sure.
A.  (617) 522-5464.
Q.  Okay.  So Dr. Mazur then referred you to
    counseling?
A.  That's correct.
Q.  And where -- where did you go for counseling?
A.  West Roxbury.
Q.  Name?
```

**Page 82**

```
A.  Martin Zafran, Z-a-f-r-a-n.
Q.  Z-a-f-r-a-n?
A.  Correct.
Q.  Psychiatrist?  Psychologist?  Licensed social
    worker?
A.  Yes.
Q.  LICW?
A.  LICSW.
Q.  LICSW.  Does Mr. Zafran practice with a group?
A.  No.
Q.  Is there a business name?
A.  Just him.
Q.  Just him.  What's the address?
A.  1895 Centre Street, Suite 11, West Roxbury.
Q.  When did you first start seeing Martin Zafran?
A.  A couple of months ago.
Q.  Are you still seeing Martin Zafran?
A.  No.
Q.  How many times did you go?
A.  Probably seven or eight.
Q.  How often did you go?
A.  Weekly.
Q.  Did you tell Mr. Zafran that you -- what did
    you tell Mr. Zafran your stress was caused by?
```

**Page 83**

```
A.  I wasn't sure.  I wasn't sure what it was
    caused by.  They were trying to rule out
    depression, which he did.  He said, It's
    stress-related.
Q.  Do you believe it's job-related stress?
A.  Yes.  I do.
Q.  Did you tell that to Mr. Zafran?
A.  Yes.  I did.
Q.  Were there any other causes of stress you
    discussed?
A.  No.
Q.  And what is it about the job that stresses you
    out?
A.  What was it?
Q.  Yeah.
A.  The constant going, the constant -- this --
    this hanging over my head.  I've never sued
    anybody I worked with.  That's crazy.  That's
    how I look at it.
Q.  Oh, you mean, the lawsuit?
A.  Yeah.  That hanging over my head, the -- the
    fact that I never knew if I was coming off the
    rescue again.  I was burning out.
Q.  Is it a lot more work?
```

**Page 84**

```
A.  It's a ton more work.  The fact I wasn't able
    to swap with anybody made it even worse.
Q.  Now that the order has been revoked, do you
    swap?
A.  As a matter of fact, the EMS coordinator, who's
    senior to me, I believe he went to the captain
    and came to me and said, He needs to come off
    the rescue; there's a problem.
Q.  What do you mean?
A.  I was so stressed out that he volunteered to
    take the ambulance for six months while I got
    on the engine just for some mental health time.
Q.  Who's that?
A.  Lawrence Larsen, L-a-r-s-e-n.
Q.  When did that happen?
A.  As soon as I was able to swap.
Q.  Did you tell --
A.  Maybe before that.  It may have been before
    that.
Q.  Did you tell anyone that -- that being on the
    ambulance all the time was stressing you out?
A.  Absolutely.
Q.  Who did you tell?
A.  Everybody.
```

**Page 85**

```
1   Q.  Did -- did you tell the captain?
2   A.  He knew it.
3   Q.  Who was the captain?
4   A.  David Gay.
5   Q.  Other than the grievance or the lawsuit, did
6       you make any requests to get off the ambulance?
7   A.  No.
8   Q.  Have you been damaged in any other way by
9       Exhibit 2?
10  A.  No.
11      MR. KESTEN:  Want to give me that?  I think
12      we'll wrap up.
13  Q.  Now, let me ask you.  Have you seen any other
14      health care providers besides Dr. Mazur and --
15  A.  No.  Mr. Zafran.
16  Q.  -- Mr. Zafran?
17  A.  No.
18  Q.  Had you ever seen a counselor before, a
19      counselor or mental health professional, before
20      Mr. Zafran?
21  A.  I don't recall.  Yeah.  I'd say yeah.  Yes.
22  Q.  You did?
23  A.  Yeah.
24  Q.  When?
```

**Page 86**

```
1   A.  Critical incident stress debriefing.
2   Q.  How many times?
3   A.  A couple.
4   Q.  Any -- any other aside from that?  That's
5       job-related.  Right?
6   A.  Yeah.
7   Q.  Any other times you had seen a counselor --
8   A.  No.
9   Q.  -- or medical professional?
10  A.  No.
11  Q.  In the Complaint, it says that, by assigning
12      you to the ambulance, you respond to eight to
13      ten calls a day.  Does that sound right?
14  A.  That's accurate.
15  Q.  What about the removal of the Scott packs, do
16      you remember when that happened?
17  A.  I'm not sure exactly when it happened.  I just
18      saw it as more retaliation.  That's -- that's,
19      personally, how I felt.
20  Q.  How so?
21  A.  They -- you're putting my life in jeopardy now
22      and anybody else's life within that city.
23  Q.  Now, Exhibit 2, the order putting you guys in
24      the ambulance, was issued sometime in October.
```

**Page 87**

```
1       Does that sound right?
2   A.  It sounds right.  Yeah.
3   Q.  And Scott packs were removed in February?
4   A.  I'm not sure exactly when they were removed.
5   Q.  Well, that's what the Complaint says.
6   A.  Okay.
7   Q.  That's how we know.
8       (A brief discussion was held off the
9        record.)
10  Q.  What makes you think that this was retaliation,
11      the removal of Scott packs?
12  A.  I just felt like he wasn't getting enough of us
13      and wanted more --
14  Q.  Are you aware --
15  A.  -- personally.
16  Q.  Okay.  Other than your personal belief that
17      this was designed to get -- to get the guys who
18      signed the petition, do you have any basis to
19      think that the removal of the Scott packs was
20      retaliation by the chief for signing the
21      petition?
22  A.  Could you rephrase that?
23  Q.  I don't know.  I don't know.  It's a pretty
24      good question though.  Other than you just
```

**Page 88**

```
1       thinking that --
2   A.  Yes.
3   Q.  -- that this must be related, do you have any
4       facts to support your thought?
5   A.  No.
6   Q.  Did anyone ever tell you why the decision was
7       made to remove the Scott packs?
8   A.  No.
9   Q.  Are you aware of any incidents where the -- the
10      Scott packs not being present on the ambulance
11      has resulted in any danger to anyone?
12  A.  Yes.
13  Q.  When?
14  A.  It's a week ago.
15  Q.  What happened?
16  A.  The rescue and a ladder company were --
17      responded to an arsine gas leak, and the ladder
18      company was in an accident going to that call.
19      The rescue was there first.  They would not
20      pull up to the scene.
21  Q.  Because of --
22  A.  If it had been very serious, they would have
23      been at -- at a great vantage point of watching
24      people drop dead in front of them while they
```

Case 1:04-cv-11668-RWZ   Document 22-3   Filed 06/30/2005   Page 18 of 18

Hegarty, et al., vs. Tortolano, et al.
Gregory J. Muller
February 3, 2005

**Page 89**

1  were able to do nothing.
2  Q. Were you in that rescue?
3  A. No. I was not.
4  Q. Who was?
5  A. Tommy Graham is the only one I know who was
6     working. And Mike. I forget which Mike. I
7     know, shortly thereafter, there was a fire
8     where the rescue was the first on scene. No
9     Scott packs.
10 Q. So since Exhibit 2, which is the order --
11 A. Uh-huh.
12 Q. -- was rescinded, you no longer ride in an
13    ambulance?
14 A. Right now, I'm off for six months. April 1st,
15    I go right back on.
16 Q. That's not related to Exhibit 2. That's just
17    because of seniority?
18 A. That's correct.
19 Q. So this group has now gone to six months on,
20    six months off?
21 A. Just with me.
22 Q. Just with you?
23 A. That's correct.
24 Q. I see. Because Firefighter Gray volunteered to

**Page 90**

1     do it?
2  A. No. Firefighter Larsen volunteered --
3  Q. Larsen.
4  A. -- to do it.
5  Q. For six months?
6  A. That's correct.
7  Q. Well, that could also change if somebody more
8     junior comes into the group. Right?
9  A. Possibly.
10 Q. Was that the only way to get off the ambulance?
11 A. Yeah. Junior men.
12 Q. 'Cause after these six months, you're going to
13    be on the ambulance until somebody more junior
14    comes in. Right? But you'll be able to swap?
15 A. That's correct.
16 Q. How often did you swap before Exhibit 2 came
17    out?
18 A. Depended how stressed or burnt out you were.
19    It was often.
20 Q. Is that documented somewhere?
21 A. It would be documented on the captain's log.
22 Q. Do you see all the paper I'm going to have to
23    look at?
24 A. I see.

**Page 91**

1  Q. 'Cause we'll know.
2  A. You will.
3     MR. KESTEN: All right. I have no other
4  questions at this time.
5     MR. COLES: I don't have any questions.
6  (Whereupon the deposition was concluded at
7  12:10 p.m.)
                    *****

**Page 92**

<u>SIGNATURE PAGE</u>

    I, GREGORY J. MULLER, do hereby certify
that I have read the foregoing transcript of my
testimony, and I further certify that said
transcript is a true and accurate record of
said testimony.
    Dated at _____, this ___
day of _____, 2005.


                    _____
                    GREGORY J. MULLER