```
 1                                          Volume I
                                            Pages 1-52
 2
                UNITED STATE DISTRICT COURT
 3            FOR THE DISTRICT OF MASSACHUSETTS
 4                              C.A. NO. 04 11668 RWZ
 5    Rick Hegarty; Michael Mulrenan;    :
      and Greg Muller,                   :
 6              Plaintiffs,              :
                                         :
 7    vs.                                :
                                         :
 8    Paul Tortolano, Individually       :
      and in his Official Capacity as    :
 9    Woburn Fire Department;            :
      John C. Curran, Individually       :
10    and in his official capacity as    :
      Mayor of the City of Woburn;       :
11    And the City of Woburn, MA,        :
                Defendants.              :
12
13
14          DEPOSITION of MICHAEL MULRENAN, taken on behalf
      of the Defendants, pursuant to the applicable
15    provisions of the Massachusetts Rules of Federal
      Procedure, before Barbara M. Montijo, a Registered
16    Professional Reporter and Notary Public within and
      for the Commonwealth of Massachusetts, at the offices
17    of Brody, Hardoon Perkins & Kesten, One Exeter Plaza,
      Boston, Massachusetts, on February 15, 2005,
18    commencing at 10:00 a.m.
19
20
21
                        DUNN & GOUDREAU
22              COURT REPORTING SERVICE, INC.
                        One State Street
23                    Boston, MA   02109
                        (617) 742-6900
24
```

Page 10

1   A. Yes, he is. He or she is.
2   Q. Who's the Chair now?
3   A. Mr. Dennis Russell.
4   Q. What kind of a time commitment is the School
5       Committee?
6   A. It varies. Meetings weekly. The regular -- with
7       subcommittees and the regular Board meets twice a
8       month.
9   Q. Are you compensated for being on the School
10      Committee?
11  A. Yes, I am.
12  Q. What do you get?
13  A. 2,7 -- $2,700, I believe.
14  Q. I might represent you some day. School Committees
15      get sued all the time. What's your current
16      assignment in the Fire Department?
17  A. I'm assigned to Woburn Fire Department, Group Number
18      2, Station Number 3.
19  Q. How long have you had this assignment?
20  A. I'm guessing four years.
21  Q. What was your assignment before?
22  A. I was on Group 2, Station 4.
23  Q. For how long?
24  A. Two years, I believe.

Page 11

1   Q. How did the transfer happen?
2   A. Posting from the Fire Chief's Office. Firefighter
3       Mulrenan from Group 2, Station 4 to Group 2,
4       Station 3.
5   Q. So, just a transfer by the Fire Chief?
6   A. Yes.
7   Q. Do you remember when that occurred?
8   A. Not exactly, no.
9   Q. Do you have any idea why it occurred?
10  A. No, I do not.
11  Q. Which Fire Chief?
12  A. Chief Paul Tortolano.
13  Q. How did that affect your work?
14  A. It didn't affect my work at all.
15  Q. Were you happy about it, unhappy about it?
16  A. Unhappy.
17  Q. How come?
18  A. I got used to being at Station 4. It was kind of a
19      routine and now my routine was going to be changed a
20      little bit.
21  Q. Was anybody else changed?
22  A. I believe so, yes.
23  Q. How many?
24  A. I don't recall.

Page 12

1   Q. Did it just come out of the blue as far as you knew?
2   A. Yes, as a matter of fact it did.
3   Q. Before Group 2, Station 4 where were you? Where were
4       you assigned?
5   A. Before Station 4 I was Group 3, I believe, Station 4.
6   Q. For how long?
7   A. Again, three to four years, approximately.
8   Q. How did that change come about, from Group 3, Station
9       4 to Group 2, Station 4?
10  A. Same way, posted transfer from the Fire Chief.
11  Q. Which Fire Chief?
12  A. Chief Tortolano as well.
13  Q. How long has Chief Tortolano been Chief?
14  A. I'll have to refer to Terry for that. I don't know
15      the exact date. It might be seven or eight years by
16      now.
17  Q. Any idea why that transfer happened from Group 3,
18      Station 4 to Group 2, Station 4?
19  A. No.
20  Q. Was it just you or were there others changed?
21  A. Others as well.
22  Q. Again, out of the blue?
23  A. Yes.
24  Q. Were you unhappy about that one?

Page 13

1   A. No. It was still -- a change in my routine, but yet
2       still at the same location.
3   Q. Where is Station 4?
4   A. It's on Central Street in Woburn.
5   Q. How about Station 3?
6   A. Main Street in Woburn.
7   Q. And before Group 3, Station 4? This gets to be this
8       is your life.
9   A. I guess so. I think Group 1, Station 3.
10  Q. For how long?
11  A. That was from the start of my career, I believe. So,
12      we went...
13  Q. You've been a Firefighter for 17 years. You've given
14      us, it looks like, 11 years. So, you were there
15      about five, six years; was it that long?
16  A. That would be a good estimation.
17  Q. How were you changed from Group 1, Station 3 to Group
18      3, Station 4?
19  A. The same thing. A posting from the Fire Chief.
20  Q. Which Fire Chief was that?
21  A. I think that was still under Chief Tortolano.
22  Q. Under Chief Tortolano how often did you see these
23      changes in assignment coming from the Chief's Office
24      for the Firefighters?

Page 14

1  A.  Transfers varied.
2  Q.  Who was the Chief before Tortolano?
3  A.  Chief Robert Doherty.
4  Q.  Under Chief Doherty, how were transfers handled?
5  A.  Often once a year, around January.
6  Q.  What would happen?
7  A.  The same similar situation. Members would be moved
8      and reassigned.
9  Q.  Did the members of the union have input into that
10     under Chief Doherty?
11 A.  Oftentimes, yes, they would.
12 Q.  How about under Chief Tortolano, how did it change?
13 A.  Chief Tortolano would allow some from year to year,
14     may allow input. Other years, he would not.
15 Q.  Was it annually he would change assignments for some
16     people?
17 A.  Again, it varied.
18 Q.  How was it different from the way Chief Doherty did
19     it?
20 A.  Chief Doherty you sort of knew come January there was
21     going to be movement or transfers sometimes in-house
22     and it was a routine practice of Chief Doherty's.
23 Q.  And under Chief Tortolano there's no regularity, is
24     that what you're saying?

Page 15

1  A.  Yes, that's correct.
2  Q.  Who was the ALS provider when you started for Woburn?
3  A.  I believe it was Armstrong Ambulance.
4  Q.  Do you know when that was changed?
5  A.  The exact date, no, I do not.
6  Q.  The year?
7  A.  No, I do not.
8  Q.  Did you have any -- strike that. Did you ever work
9      as an EMT or a paramedic for any ambulance service?
10 A.  No, I have not.
11 Q.  Did you hear any rumors about an impending change
12     before it happened?
13 A.  No, I did not.
14 Q.  So, was it a surprise?
15 A.  Yes.
16 Q.  How did you learn about the change?
17 A.  I believe I read it in the local newspaper.
18 Q.  Was it the subject of any talk among firemen when
19     that became public, that there was a change coming,
20     or change made?
21 A.  Yes.
22 Q.  What do you remember about that topic?
23 A.  Just members that read the article in the newspaper
24     and were discussing it.

Page 16

1  Q.  Were any firemen telling you that they were unhappy?
2  A.  There were both pros and cons to the article. Some
3      in favor, some against. Some happy, some unhappy.
4          MR. KESTEN: Off the record.
5          (OFF THE RECORD)
6  Q.  I suggest the change -- I don't suggest. June 1st,
7      2003, does that sound like the time it was changed?
8  A.  This is 2005.
9  Q.  It is. If that date is right, then it's been about a
10     year and eight months?
11 A.  I recollect it to be pretty accurate then.
12 Q.  Once the change was made -- strike that. At the time
13     the change was made, you were in Group 2, Station 3?
14 A.  Yes.
15 Q.  In that group who was on the ambulance?
16 A.  I believe it was myself and Firefighter Ken Robishaw.
17 Q.  How was that decided?
18 A.  Just in-house by Captain Devine at Station 3.
19 Q.  So, did you or the other Firefighters have input into
20     the decision as to who was going to be on the
21     ambulance?
22 A.  No, we did not at that time.
23 Q.  So, the Captain put you on it?
24 A.  Captain Devine, yes.

Page 17

1  Q.  When were you first put on the ambulance in Group 2,
2      Station 3?
3  A.  When the transfer from Station 4 to Station 3 took
4      effect. I don't recollect the exact date.
5  Q.  But from the time you went to Group 2, Station 3,
6      your assignment was in ambulance?
7  A.  Yes.
8  Q.  How about when you were in Group 2, Station 4?
9  A.  I was assigned to Engine 4, Fire Pump Engine 4.
10 Q.  Did anybody in your group have ambulance duty?
11         THE WITNESS: While I was at Engine 4?
12         MR. KESTEN: Yes.
13 A.  Yes, they did.
14         (BRIEF RECESS)
15 Q.  While you were at Station 4?
16 A.  Yes.
17         MR. COLES: Lenny, just so it's clear,
18     because it was unclear to me the scope of the
19     question as to whether he had input. I think his
20     answer as to whether he had input on the assignment
21     dealt with when he was originally assigned there. It
22     didn't cover the entire time that he was assigned to
23     that station.
24         MR. KESTEN: I understand. You mean

Page 18

1   because of this lawsuit? Are you talking about the
2   facts relating to this case?
3           MR. COLES: Not just this lawsuit. He'll
4   testify to what he'll testify to, but I think his
5   answer went to when he was originally assigned there
6   and his lack of input.
7   Q. Group 2, Station 4 you were not on the ambulance?
8   A. No.
9   Q. Were there people in your group assigned to the
10  ambulance?
11  A. Yes.
12  Q. How were assignments to ambulance handled from Group
13  2, Station 4?
14  A. Station 4 there is no ambulance.
15  Q. Right.
16  A. So, there is no ambulance to be assigned out of
17  Station 4.
18  Q. So, the people in Group 2, Station 4 nobody had to do
19  ambulance?
20  A. There is no ambulance at Station 4. To answer your
21  question, no.
22  Q. When you were at Group 1, Station 3, when you
23  started, were you on the ambulance?
24  A. Yes.

Page 19

1   Q. The whole time?
2   A. No.
3   Q. How were the assignments handled at that time?
4   A. At the beginning of my career there were assignments
5   by Chief Doherty and I'm trying to think when I left
6   Station 3 to go to Station 4. Can you ask the
7   question again?
8   Q. When you were at Group 1, Station 3, within that
9   group in that station, how was it handled as to who's
10  going to have the ambulance assignment?
11  A. From the beginning of my career it would be under
12  Chief Doherty.
13  Q. Did Chief Doherty assign it?
14  A. Yes.
15  Q. Was it done according to seniority or was there any
16  criteria that you knew of?
17  A. There was no criteria I was aware of. Nor was it
18  always by seniority.
19  Q. For how long would one be assigned to the ambulance?
20  A. Approximately 1 year, 13 months.
21  Q. And for about how many years did you have ambulance
22  duty in Group 1, Station 3?
23  A. Oftentimes, I would volunteer to remain on the
24  ambulance, but it was an option each year.

Page 20

1   Q. Why would you volunteer?
2   A. I was with a good partner and he also may volunteer.
3   Q. Why did you guys want to do that?
4   A. Other options would be what we call a floating
5   position, where you would go to an outside station as
6   opposed to being assigned a permanent station.
7   Q. So, in the beginning of your career, if you
8   volunteered for the ambulance, you'd be guaranteed to
9   stay in your station?
10  A. That's correct.
11  Q. Who was your partner?
12  A. Allen Jensen was one. Arthur McLenny was another
13  and we kind of rotated from there.
14  Q. When you came back to Station 3 about four years ago,
15  did you volunteer to be on the ambulance?
16  A. Initially, no.
17  Q. But did the Captain put you on the ambulance?
18  A. Yes, he did.
19  Q. After that, did you volunteer to stay?
20  A. Yes, I did.
21  Q. How come?
22  A. I had personal issues with Captain Devine.
23  Q. Bad issues, I take it? When you say "issues," hard
24  feelings?

Page 21

1           (PAUSE)
2   Q. I don't want to get too deeply, but I take it there
3   was some negative connotation to the word "issues"?
4   A. Yes.
5   Q. How would being on the ambulance help?
6   A. I would not be on the same apparatus as Captain
7   Devine.
8   Q. And you've been in ambulance the whole time that
9   you've been at Group 2, Station 3?
10  A. Yes.
11  Q. Have you had a steady partner?
12  A. Yes.
13  Q. Who is that?
14  A. Firefighter Ken Robishaw.
15  Q. Once the change was made from Armstrong Ambulance as
16  the ALS provider to the City of Woburn -- well, let
17  me show you what's been marked as Exhibit 1 in
18  Firefighter Muller's deposition. Have you seen that
19  before?
20  A. (Witness perusing document) Yes. This obviously is a
21  copy, but I've seen this document.
22  Q. When did you first see it?
23  A. Shortly after Action became the ALS provider.
24  Q. Where was it when you first saw it?

Page 22

```
 1   A.  I believe it was on the bulletin board of Station 3
 2       at the Main Street station.
 3   Q.  Had you heard anything about it before it appeared?
 4   A.  No, I hadn't.
 5   Q.  Do you have any idea who prepared it?
 6   A.  No, I don't.
 7   Q.  And you signed it, right?
 8   A.  That's correct.
 9   Q.  Why did you sign it?
10   A.  Basically, after seeing it and reading it, I thought,
11       I agree with it and placed my name on it.
12   Q.  Did you sign it at the same time as anyone else?
13   A.  I don't recall.
14   Q.  At the time you signed it, were there any names below
15       yours?
16   A.  No, I think -- (Witness perusing document) No, there
17       were not.
18   Q.  Do you have any idea who signed the joke names?
19   A.  No, I don't. Maybe the signees signed them.
20   Q.  Did you discuss the contents of Exhibit 1, that is,
21       the typing, the actual contents above it with anyone
22       before you signed it?
23   A.  Yes.
24   Q.  Who did you talk to about it?
```

Page 23

```
 1   A.  Firefighters around the station.
 2   Q.  In your group?
 3   A.  My group and other groups.
 4   Q.  Do you see it says -- well, do you see the
 5       handwriting in the upper left, it appears to say, "We
 6       want our own"?
 7   A.  Yes.
 8   Q.  Was that on there when you signed it?
 9   A.  I don't believe it was on there.
10   Q.  Do you have any idea whose writing that might be?
11   A.  No idea.
12   Q.  Do you have any idea what that means?
13   A.  No idea.
14   Q.  In the -- strike that. It says in the second
15       paragraph, "We are waiting longer for the ALS units
16       to arrive." Had that been your experience?
17   A.  Yes.
18   Q.  Were there any other issues or problems with the new
19       ambulance company besides arriving late, that you
20       were aware of, at the time you signed this petition?
21   A.  No. Again, since that is the statement being made
22       there, that was my opinion. So, I agreed to it.
23   Q.  I understand you agree what was typed there. What
24       I'm asking is, are you aware of any other issues? It
```

Page 24

```
 1       says, the next phrase, "We feel the quality of care
 2       is less than what the City has been accustomed to
 3       over the past many years." What was the quality of
 4       the new ambulance service that concerned you?
 5   A.  The fact of waiting longer as well as what we call
 6       intercepting with ALS. Oftentimes, en route to the
 7       hospital, the ALS truck would catch up to the Woburn
 8       Fire Department ambulance and they actually seemed to
 9       not provide that level, if you would, when they first
10       took over.
11   Q.  Could you explain that to me?
12   A.  On a medical call where ALS may be needed, they would
13       have been dispatched. Depending on the proximity to
14       a hospital, the Woburn ambulance would a) wait for
15       ALS or b) continue to transport to the hospital in
16       hopes of intercepting, connecting up with the Action
17       ALS unit. And wherever they were coming from,
18       whatever direction, they may or may not intercept the
19       Woburn Fire Department ambulance, and they would
20       continue on to the local hospital without ALS care on
21       board the ambulance. I hope that...
22   Q.  Let me see if I got it. Before the change, let's
23       say Woburn -- you go out in your ambulance to a
24       call. When would you determine that ALS was needed?
```

Page 25

```
 1   A.  Through the dispatch and the 911 call itself. The
 2       dispatcher had a criteria he would follow to dispatch
 3       an ALS provider.
 4   Q.  So, if a 911 call came in, which fit the criteria for
 5       ALS, you guys would still go, but you would expect
 6       ALS to be dispatched at the same time?
 7   A.  That's correct.
 8   Q.  Would you normally -- before the change, would you
 9       usually get there first?
10       THE WITNESS: Get to the scene first?
11       MR. KESTEN: Yes.
12   A.  Most likely, yes. Excuse me, or the fire apparatus
13       may have arrived prior to ambulance arrival.
14   Q.  But in terms of the ambulance, in the usual course on
15       every 911 call, the Woburn Fire Ambulance would
16       usually arrive before any ALS provider; is that fair?
17   A.  Fair, yes.
18   Q.  But there were times when ALS would get there first?
19   A.  They could have.
20   Q.  And if the patient -- do you call them patients?
21   A.  Yes.
22   Q.  Needed ALS on the scene, and ALS was there, then how
23       would the patient be transported?
24   A.  They would be transported in the Woburn Fire
```

Page 26

1  Department Ambulance with ALS personnel in the Woburn
2  Ambulance and transported to the hospital.
3  Q. What could the ALS -- the ALS person is a paramedic,
4     right?
5  A. Yes.
6  Q. Versus an EMT?
7  A. Versus an EMT.
8  Q. What do they add to the mix?
9  A. They, if need be, could begin intravenous, IVs. They
10    also had access and capabilities of EKG heart
11    monitoring and administering medicines per their
12    protocols.
13 Q. So, they could take a heart monitor onto your
14    ambulance?
15 A. Yes.
16 Q. And they could intubate; whereas, you couldn't?
17 A. Yes.
18 Q. And you're saying there are times, if you had to
19    leave in your Woburn Fire Ambulance to go to the
20    hospital, that ALS could intercept you and they could
21    join you en route?
22 A. Yes.
23 Q. And you found under Action that wasn't happening when
24    Action started?

Page 27

1  A. Yes.
2  Q. They weren't intercepting?
3  A. Not as often as the previous provider had done so.
4  Q. Did you have any idea why?
5  A. No idea.
6  Q. Had you been aware of a meeting with a mayoral
7     candidate before Exhibit 1 was signed?
8  A. I heard something about that, yes.
9  Q. What did you hear?
10 A. That there was a meeting and a mayoral candidate was
11    present.
12 Q. Who was that candidate?
13 A. I believe his name was Brian Melanson.
14 Q. And who went to the meeting?
15 A. I did not attend the meeting; so therefore, I don't
16    know who attended.
17 Q. Did your partner go?
18 A. I don't know if he attended either.
19 Q. What did you hear that happened at the meeting?
20 A. It was a question-and-answer period to the candidate.
21 Q. Was there any talk about the ambulance change?
22 A. Not that I recall. Again, I was not present at that
23    meeting.
24 Q. Do you remember the date as to when you signed

Page 28

1     Exhibit 1?
2  A. The exact date, no.
3  Q. Does October of '03 ring any bells, the fall of
4     '03?
5  A. Possibly the fall of '03.
6  Q. At the time you signed Exhibit 1, did you think it
7     would achieve its purpose?
8       MR. COLES: I'm going to object. You're
9     asking him if it would achieve its purpose. Are you
10    asking him its purpose as he understood it?
11    Obviously, the document speaks for itself, but his
12    interpretation may be different than others. So, are
13    you asking him what its purpose was? What he thought
14    its purpose was?
15 Q. Let me tell you what I'm asking. It's a good point.
16    The question I'm asking is, Exhibit 1 calls for a
17    return, right, from Action to Armstrong? My question
18    is: At the time you signed it, did you think that it
19    might be effective in persuading the City to go back,
20    from Action to Armstrong?
21 A. I don't understand the question.
22 Q. Did you think that by signing it, you would be --
23    that it would work, that the City would go back to
24    the old ambulance provider because you and at least

Page 29

1     two others had signed this petition?
2  A. Well, I thought by at least expressing my opinion, it
3     may have carried some weight, but from the other
4     signees, obviously, it didn't really go anywhere.
5  Q. Are you talking about because of the joke signatures;
6     is that what you're referring to?
7  A. Yes.
8  Q. Red Buttons, Gray Little League, Nelson Mandela, and
9     so on?
10 A. Yes.
11 Q. Did you suggest to any other Firefighters that they
12    should sign it?
13 A. No.
14 Q. How long was Exhibit 1 on the bulletin board?
15 A. I'm unsure. Possibly, one week.
16 Q. What happened next with regard to Exhibit 1 with
17    regard to the ambulance service as you remember it?
18 A. You mean what happened next to this document?
19 Q. Well, the document at some point went off the
20    bulletin board, right?
21 A. Yes, it did.
22 Q. Did you have any idea who took it off the bulletin
23    board?
24 A. No, I don't.

Page 34

1  Q. How about Firefighter Muller?
2  A. The same response. It was his opinion that he agreed
3     with those statements; and therefore, signed the
4     document.
5  Q. And how about you?
6  A. The same response, yes. In my opinion, I agree with
7     these statements; therefore, I have signed this
8     document.
9  Q. And then what happened?
10 A. Then the Chief was asking us a few points about what
11    we meant -- the same as you have done this morning,
12    by waiting longer, and some of us indicated the
13    intercept situation awaiting Action's unit to meet
14    the Woburn Ambulance.
15        I believe Firefighter Hegarty had a situation
16    with a family member of his; that he really wanted to
17    express again dissatisfaction with Action Ambulance
18    Services.
19        So, the Chief listened to our comments and
20    remarks. At the end of the meeting, he indicated to
21    us that he would have to see what he's going to do
22    about this and, we assumed, what he was going to do
23    about the document or the remarks given to him.
24 Q. Did he seem angry? What was his demeanor?

Page 35

1  A. I would say he was angry and perplexed at the same
2     time.
3  Q. Did he ask for a specific example of problems?
4  A. I believe he did and that's when Firefighter Hegarty
5     had the situation with his family. We didn't have
6     exact times and dates of intercept problems that we
7     could give to the Fire Chief.
8  Q. Tell me how the intercept problem -- you mean, you
9     guys would see the Action Ambulance going by without
10    intercepting with you?
11 A. The best way to describe it would be we would ask for
12    a location or update on Action's unit. Through our
13    dispatch radio they would say Action P-1 is at, and
14    they would give a location within our City. And
15    based on where they were at, we could make a
16    determination, wait for them or try to intercept.
17        In some instances, they might be heading towards
18    us. As far as their response, they would not go past
19    us, we would meet up. Had they been beyond us and we
20    were closer to the hospital, we would transport and
21    not await the Action unit.
22 Q. So, I'm trying to get it. You guys are on the radio
23    trying to find out whether it's possible to hookup
24    with the ALS, to hookup with the paramedic, right?

Page 36

1  A. To get a paramedic onto our vehicle, yes.
2  Q. And you're saying that with Armstrong, you were more
3     successful in doing that than with Action at this
4     time?
5  A. Yes.
6  Q. Was it because Action wasn't in the area or was it
7     because they weren't communicating with you? Do you
8     have any idea what the cause was?
9  A. No, I don't. It just seemed Action -- I mean,
10    Armstrong was there in more cases than Action.
11 Q. Did you observe any other problems besides the
12    intercept issue and the late response issue?
13 A. There may have been difficulties with establishing IV
14    units with the patients and I think we've covered the
15    other two issues.
16 Q. From your perception, was it because the paramedics
17    at Action weren't as good, or well trained, or as
18    experienced?
19 A. All of the above.
20 Q. So, chronologically -- let me show you Exhibit 2 in
21    the Muller deposition. Did Exhibit 2 come out after
22    Exhibit 3 came out?
23 A. 2 came out after 3, yes.
24 Q. How long after 3, do you have any idea?

Page 37

1  A. Probably a week to ten days.
2  Q. Did you have any inkling it was coming?
3  A. No. Other than the comments given to us by the Fire
4     Chief as to what I'm going to do about this.
5  Q. Once Exhibit 2 came out, how did it change your life?
6  A. Well, it now assigned me to the ambulance; whereas
7     before, it was my choice to be on it. That's what
8     it's done is now assigned me to the ambulance.
9  Q. Was Exhibit 2 ever rescinded?
10 A. Not to my knowledge, no.
11 Q. So, is it your understanding now that you still have
12    to be on ambulance?
13 A. Not now. I believe -- where are we, February?
14    Perhaps two months ago the Chief indicated that
15    Exhibit 2 --
16 Q. Was no longer in effect?
17 A. Your words, his words, I don't want to quote, but
18    yes.
19 Q. Have you stayed on the ambulance?
20 A. I have, yes.
21 Q. So, other than you being assigned to the ambulance as
22    opposed to volunteering for the ambulance, how did it
23    change anything about your job?
24 A. Well, the ability of what we call in the fire service

Page 46

1    regarding quality of patient care?
2  A. Similar occurrences. As I stated previously, on some
3    occasions unable to establish an IV. We've indicated
4    the response times.
5  Q. So, in terms of that inability to establish an IV,
6    would those be noted on the run report?
7  A. On occasion, yes.
8  Q. What would you write?
9  A. ALS IV attempt not established, arrive at hospital.
10 Q. Were you one of the people asked to redact some
11   documents in response to a document request?
12 A. Yes, I was.
13 Q. Who else?
14 A. I was responsible for my stack. I know Firefighter
15   John Nee had done some. I'm not sure if Firefighter
16   Ken Robishaw had a stack to do. There were probably
17   six or eight Firefighters. I don't recall their
18   names at this time.
19 Q. What do you mean your stack, you were given a stack
20   of what?
21 A. The reports. I was more or less responsible to
22   blacken out information because my name was attached
23   to that run report; therefore, I was on the run and
24   to the best of my recollection, the Chief didn't want

Page 47

1    anyone else to see these reports; so therefore, the
2    Firefighters who were responsible for them were in
3    turn the individuals that were asked to blacken them
4    over.
5  Q. So, were given a stack of run reports that you had
6    prepared?
7  A. Yes.
8  Q. And what did you have to blacken out?
9  A. Basically, I believe it was patients' information,
10   personal health information.
11 Q. Any other kinds of documents or just run reports?
12 A. Just those individual ambulance run reports.
13          (BRIEF RECESS)
14 Q. At some point there was a meeting with the Mayor
15   about this issue. Did you attend that meeting with
16   Mayor Curran?
17 A. No, I did not.
18 Q. Did you suffer in any other way, besides what you've
19   told me already, as a result of Exhibit 2?
20 A. Did I suffer? I suffered some humiliation. As I
21   indicated, I'm presently on the Woburn School
22   Committee; and yes, this was a case brought forward
23   by the Firefighters against the City and the Chief
24   and the Mayor. It's been my stance all along that

Page 48

1    basically I have expressed my opinion and we're at,
2    you know, the junction where we are today for
3    something that, to me, was expressing my opinion.
4        This office may not be aware of it, but the
5    local newspaper got ahold of the filings of this case
6    and presented it in a local newspaper. The only
7    photograph in the article happened to be Firefighter
8    Michael Mulrenan, also School Committee member.
9        So, the humiliation, the frustration, the
10   embarrassment. I think I've indicated previously
11   this morning that I was angered by the fact that
12   this happened to me. And as the record shows, I had
13   volunteered to be on the ambulance for many years.
14   It didn't bother me because I had options available
15   to me and I enjoyed it.
16       To have this occur after what I feel to be a
17   good record, it was unfair, unjust; and again, to
18   reiterate, I expressed my opinion. I'm frustrated by
19   the whole matter, angry by the whole matter,
20   embarrassed somewhat by the whole matter to the
21   extent I've seen people out on the street that have
22   seen the article out in town. I would be in my own
23   private vehicle and they would jokingly say to me,
24   "What, are you on ambulance today?" because they were

Page 49

1    aware of the assignment of myself to the ambulance
2    because of this situation. I think that pretty much
3    sums up my feelings towards the whole thing.
4  Q. Let me ask you this: What was publicized, the
5    assignment itself, the grievance, or the lawsuit?
6  A. I believe it was the entire -- the lawsuit itself,
7    perhaps. I don't know.
8  Q. Do you have any understanding as to whether -- before
9    the lawsuit was filed, was the fact that some
10   Firefighters were assigned to the ambulance public
11   knowledge in the City of Woburn?
12 A. Probably not. Not to the citizens. They just assume
13   that the ambulance was there and it would come when
14   you call 911.
15 Q. Just so I'm clear. This humiliation that you're
16   talking about happened as a result of the publicity,
17   this article was publicizing the lawsuit that was
18   filed, right?
19 A. Yes.
20 Q. But as far as you know, when exhibit -- from the time
21   Exhibit 2 came out until the time that the lawsuit
22   was filed, this was not public knowledge? The issue
23   was not public knowledge to the citizens of Woburn?
24 A. No.