Richard Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 1 of 9
February 3, 2005                              Hegarty, et al., vs. Tortolano, et al.

Exhibit E

---

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04 1668 RWZ

* * * * * * * * * * * * * * * * *

RICK HEGARTY, MICHAEL MULRENAN )
AND GREG MULLER,              )
           Plaintiffs,        )
                              )
vs.                           )
                              )
PAUL TORTOLANO, individually and )
in his official capacity as Chief )
of the City of Woburn Fire    )
Department, JOHN C. CURRAN,   )
individually and in his official )
capacity as Mayor of the City of )
Woburn, and CITY OF WOBURN,   )
MASSACHUSETTS,                )
           Defendants.        )

* * * * * * * * * * * * * * * * *

DEPOSITION OF RICHARD S. HEGARTY, a witness called on behalf of the Defendants pursuant to the Federal Rules of Civil Procedure before Jo Anne M. Shields, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Brody, Hardoon, Perkins & Kesten, LLP, One Exeter Plaza, Boston, Massachusetts, on Thursday, February 3, 2005, commencing at 12:47 p.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts 02109
Telephone (617) 742-6900

---

**Page 2**

APPEARANCES:

TERENCE E. COLES, ESQUIRE
    PYLE, ROME, LICHTEN, EHRENBERG &
    LISS-RIORDAN, P.C.
    18 Tremont Street, Suite 500
    Boston, Massachusetts 02108
    (617) 367-7200
    for the Plaintiffs

LEONARD H. KESTEN, ESQUIRE
    BRODY, HARDOON, PERKINS & KESTEN, LLP
    One Exeter Plaza
    Boston, Massachusetts 02116
    (617) 880-7100
    for the Defendants

---

**Page 3**

I N D E X

Deposition of:          Direct      Cross
RICHARD S. HEGARTY

  By Mr. Kesten            4

E X H I B I T S

No.                                   Page

              None

---

**Page 4**

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved to the time of trial.

P R O C E E D I N G S

MR. KESTEN: Same stipulations?
MR. COLES: Sure.
MR. KESTEN: Would you swear the witness, please.

RICHARD S. HEGARTY, a witness called for examination by counsel for the Defendants, having been satisfactorily identified by the production of his driver's license and duly sworn by the Notary Public, was examined and testified as follows:
* * *

DIRECT EXAMINATION
BY MR. KESTEN:
Q. Would you state your name for the record?

---

Richard S. Hegarty  
February 1, 2005  
Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 2 of 9  
Hegarty, et al. vs. Tortolano, et al.

Page 5

1 A. Richard S. Hegarty, H-e-g-a-r-t-y. You were
2    going to spell it wrong.
3 Q. I was going to, but I have it on the caption.
4    The lead plaintiff.
5 A. Would that be me?
6 Q. That'd be you. You're No. 1. You're it. You
7    were here before. So you understand how it
8    works?
9 A. Yes.
10 Q. Have you ever been deposed before?
11 A. No.
12 Q. After today, you won't be able to say that
13    again.
14 A. No.
15 Q. What's your date of birth?
16 A. 8/21/58.
17 Q. Where were you born?
18 A. Boston.
19 Q. What's the highest grade at school that you
20    completed?
21 A. Three and a half years of college.
22 Q. Did you graduate high school?
23 A. Yes.
24 Q. Which high school?

Page 6

1 A. Stoneham High.
2 Q. What year?
3 A. '76.
4 Q. Did you go right to college?
5 A. Yes.
6 Q. Where did you go?
7 A. Boston College.
8 Q. And you made it to your first semester of your
9    senior year?
10 A. I went three years full time. Because I had to
11    work through school and finances, I had to drop
12    a couple of classes. It was deficit. So I
13    took a few years off, went to work, and went
14    back nights with them about five years after
15    that to a time. I need one-half semester to
16    graduate.
17 Q. So you left college in '79?
18 A. Yes.
19 Q. To go to work?
20 A. Correct.
21 Q. What did you do?
22 A. I went to work for a place called Woodcraft
23    Supply in Woburn.
24 Q. What did you do there?

Page 7

1 A. I worked in a woodworking building where I
2    would stock inventory and took care of
3    customers, service, a little bit of everything.
4 Q. And how long did you do that?
5 A. I was in the store for maybe a year. And they
6    had a warehouse in another part of Woburn.
7    Actually, I left there and joined the National
8    Guard, went to basic training, came back six
9    month- -- three months later. And then I
10    went -- transferred to the warehouse branch,
11    which was also in Woburn at Woodcraft.
12 Q. How long did you do that?
13 A. Total time Woodcraft was about 2, 2 1/2 years.
14 Q. Till about '82 or so?
15 A. '79, '80, '81. Yeah, right around there.
16 Q. And then what did you do?
17 A. I went to work for Bay State Ambulance.
18 Q. And where are they based?
19 A. They were in Malden. I don't think -- they're
20    no longer a company, I don't think.
21 Q. Before you went to work for Bay State, did you
22    become an EMT?
23 A. Correct.
24 Q. When did you become an EMT?

Page 8

1 A. Probably six months before I went to Bay State.
2    I -- while I was working at Woodcraft, I went
3    nights for my EMT.
4 Q. How long does it take you -- how long did it
5    take to get your EMT?
6 A. Maybe three to six months. I don't recall how
7    long it was.
8 Q. How long does it take to become a paramedic?
9 A. There's different programs. Some are intense.
10    Some aren't. Anywhere from a year to two
11    years.
12 Q. How long did you work for Bay State?
13 A. I left Bay State beginning of '84.
14 Q. From '82 or thereabouts to '84, was Bay State
15    your only job?
16 A. Correct. Thereabouts. I'm not exact on these
17    dates.
18 Q. What happened in '84?
19 A. I went to work for Armstrong Ambulance.
20 Q. Out of where?
21 A. Out of Arlington.
22 Q. How long did you work for Armstrong?
23 A. Into early 1990.
24 Q. Was that your only job?

Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 3 of 9

Richard S. Hegarty                                    Hegarty, et al., vs. Portolano, et al.
February 3, 2005

Page 9

```
1   A.  Pardon me?
2   Q.  From '84 to '90, was that your only job?
3   A.  Full-time job, yeah.
4   Q.  Did you have part-time jobs from '84 to '90?
5   A.  Sometimes.
6   Q.  Like what?
7   A.  Tree work, carpentry.
8   Q.  But no steady part-time job?
9   A.  No.
10  Q.  Okay. What happened in 1990?
11  A.  I got -- ac- -- actually got on the Woburn Fire
12      Department in 19- -- September of 1989. I left
13      full time from Armstrong, and I worked there
14      part time into early 1990.
15  Q.  So --
16  A.  I was full time for the fire department,
17      working part time for Armstrong.
18  Q.  For a few months?
19  A.  Correct.
20  Q.  And then what happened?
21  A.  I actually blew my knee out in May of 1990.
22      And when I went back to the fire, I just never
23      went back to Armstrong.
24  Q.  What did you do to your knee?
```

Page 10

```
1   A.  I hurt it playing softball.
2   Q.  What did you hurt?
3   A.  My knee.
4   Q.  I know. I'm just curious. What -- what
5       happened?
6   A.  I ruptured my ACL, fractured the top of my --
7       where the femur meets the tibia, ripped my
8       cartilage and a few other things. It was quite
9       intense.
10  Q.  Oh --
11  A.  Yes.
12  Q.  -- that's a bad injury.
13  A.  Yes. It was.
14  Q.  How long were you out of work?
15  A.  Three months.
16  Q.  When you came back, you just -- you were
17      just -- you just kept the firefighting job?
18  A.  Correct.
19  Q.  Okay. Have you worked anywhere else since?
20  A.  Yes.
21  Q.  Where?
22  A.  For myself.
23  Q.  What do you do?
24  A.  Tree work, carpentry, roofs, decks.
```

Page 11

```
1   Q.  Do you have a business name?
2   A.  No.
3   Q.  And -- and you've been doing that since when?
4   A.  Pretty much, since I got on the fire. I work
5       for my friends. They work for me. Just jobs
6       that come up.
7   Q.  Did you ever work for any other ambulance
8       companies after that?
9   A.  Negative.
10  Q.  What was your assignment in '90 in the fire
11      department?
12  A.  I was a -- 1990. That was -- before I hurt my
13      knee, I was assigned to Ladder 2, which is now
14      disfunct (sic), up in East Woburn. I was a
15      driver of the ladder company.
16  Q.  And after you came back?
17  A.  Where did I go? I believe -- let me think.
18      Thinking back, I went to -- I think I went to
19      Group 1, Engine -- Station 3, on the ambulance,
20      I think. I'm not sure. I mean, this is a long
21      time ago.
22  Q.  What was your next assignment?
23  A.  I have no idea. I've been on so many years.
24      I'm in my 16th year.
```

Page 12

```
1   Q.  I'll tell you what.
2   A.  So . . .
3   Q.  At the time of the petition, where --
4   A.  That's what you want to know?
5   Q.  -- where were you working?
6   A.  I was working on Group 2, Station 3.
7   Q.  How long had you been at that assignment as of
8       the time of the petition?
9   A.  A number of years.
10  Q.  More than three?
11  A.  I'd say, it could be more than three, a little
12      less. It's -- like I said, I've been almost
13      every position at the fire department. I've
14      been at outside stations, inside stations. So
15      it's -- there's a record kept --
16  Q.  Yeah.
17  A.  -- somewhere where I was every time.
18  Q.  I understand. But for some years before the
19      petition, before all this happened, you were at
20      Group 2, Station 3?
21  A.  Correct.
22  Q.  Were you senior enough not to be in the
23      ambulance?
24  A.  Actually, I was second senior person on my
```

Richard S. Casey
Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 4 of 9
Hegarty, et al. vs. Tortolano, et al.
February 3, 2005

13

1  group. Mike Mulrenan was the most senior. He
2  chose to be on the ambulance. So I was back
3  step of Engine 3 by choice.
4  Q. What do you mean, "by choice"?
5  A. I could have drove it if I wanted to or take
6     the back step or take the ambulance or take the
7     desk.
8  Q. So you weren't out on the ambulance?
9  A. I had just -- when the petition came out, I was
10    on the engine. Correct.
11 Q. How long had it been since you were on the
12    ambulance?
13 A. Probably six months or so. Dennis Devine, my
14    captain at the time, he had started rotating
15    people. When Chief Tortolano became chief, he
16    stopped doing transfers and let things be as
17    they may, which means the captains had control
18    of the men at Station 3.
19       I was on the ambulance prior to Tortolano
20    becoming chief as -- we had one-year rotations
21    under Chief Doherty. You'd do a year on the
22    job; you'd get off for three or four years,
23    rotate back through the whole personnel.
24       When Tortolano became chief, he said,

14

1  Nothing changes. No switches; no rotations.
2  So I spent two or three straight years on the
3  ambulance when Tortolano came in power.
4  Q. Okay. So I -- okay. Got it. Prior to
5     Tortolano, under Doherty, you guys would rotate
6     one year on a job?
7  A. One year on and two or three years off, outside
8     station, perhaps, or Engine 3, perhaps. He
9     usually would give you your request where you
10    wanted to go if it was reasonable.
11 Q. And Tortolano said, No more changes?
12 A. Correct.
13 Q. So everybody was frozen in the positions they
14    were in?
15 A. Correct.
16 Q. Were people happy with that?
17 A. No. Well, guys who were outside stations or
18    were on the pump were happy.
19 Q. Did you ever hear any reason why he did that?
20 A. No.
21 Q. So at the time then -- and Tortolano came in in
22    '99; is that true?
23 A. I don't know the year.
24 Q. Does that sound right?

15

1  A. Approximately. Yeah.
2  Q. And, at that time, you were back step on -- on
3     the engine when Tortolano came in?
4  A. No. I was on the ambulance.
5  Q. I'm sorry. You were on the ambulance. How
6     long did -- how did you get off the ambulance?
7  A. My captain, Dennis Devine, after seeing no
8     response or delegation from the chief, took it
9     upon himself to rotate his men to the
10    ambulance.
11 Q. And how long before the petition did he do
12    that?
13 A. I have no recollection.
14 Q. And was it six-months' rotations?
15 A. Yes.
16 Q. So everybody in the group would get six months?
17 A. Correct. Well, except the dispatcher. I don't
18    think the dispatcher was included in that
19    rotation. He was the most junior man. And,
20    therefore, he stayed on the desk.
21 Q. So the junior man in the group stayed on the
22    desk, and the other five -- you had four aside
23    from the captain -- would rotate --
24 A. Correct.

16

1  Q. -- to the engine or the ambulance --
2  A. Correct.
3  Q. -- regardless of seniority?
4  A. Correct.
5  Q. So the concept described in the previous
6     deposition about the next two junior men being
7     in the ambulance had not been true since
8     Tortolano came in?
9  A. Say that again, please.
10 Q. Yeah. When Tor- -- once Tortolano came in, if
11    you were on the ambulance when Tortolano came
12    in, you stayed on the ambulance even if
13    somebody more junior came into the group?
14 A. I don't know, because I don't know if anybody
15    came to our group that was -- since he came in,
16    I don't think we had any new personnel on our
17    group.
18 Q. All right. And under -- under Doherty, you
19    would have been off the ambulance after a year?
20 A. Correct.
21 Q. Okay. Was there any firehouse scuttlebutt as
22    to why they were changing ambulance companies?
23 A. I don't understand your question.
24 Q. Was there any talk in the fire department as to

**Page 21**

1  change?
2  A. Not that I'm aware of.
3  Q. Do you remember when the change was made?
4  A. The change when Action took over?
5  Q. Yeah.
6  A. The date, no, I don't.
7  Q. Take a look at Exhibit 1. Exhibit 1 says it
8     was June of -- of '03. Does that sound right?
9  A. It could be. I'm not sure on the date. I'm
10    really, really not. I know one thing said
11    2002, 2003. I'm not sure. I'm sure there's
12    records somewhere that would say to the effect
13    when it actually did.
14 Q. We could make a call and do it. But that's
15    fine. But how did you learn that the change
16    was going to happen?
17 A. Which change?
18 Q. That they were going to change ALS providers.
19 A. I don't recall how I heard it.
20 Q. Okay. And at the time the change was made,
21    your assignment was the back step?
22 A. The back step of Engine 3.
23 Q. Okay. When did you first perceive any problems
24    with Action?

**Page 22**

1  A. Pretty much, immediately.
2  Q. How did you perceive problems with Action?
3  A. Being late for calls, unable to get IV's in.
4  Q. How did you know about that?
5  A. I probably would have been on the ambulance. I
6     wouldn't say anything that I didn't directly
7     see myself.
8  Q. But that wasn't your assignment.
9  A. On our group, 'cause we went by seniority, we
10    were allowed to swap and wanted to. So if I
11    thought Kenny wanted a day off the ambulance,
12    I'd take it for him. I got somebody off the
13    dispatch desk if he wanted a day on the pump.
14    'Cause burnout is a very huge concern in this
15    field. And I would freely, if a guy said,
16    Rick, can you take an ambulance call for me,
17    I'll take the calls for you, Kenny. If you
18    want to take the pump, go ahead.
19 Q. How often would that happen?
20 A. Weekly.
21 Q. Swap weekly? Swap for the whole shift or just
22    for --
23 A. Sometimes, part of a shift; sometimes, the
24    whole shift.

**Page 23**

1  MR. COLES: Just for clarification, when
2  you said how long that happened -- how often
3  would that happen, are you asking how many
4  times would swaps happen or swaps that Mr.
5  Hegarty himself was involved in?
6  Q. To encompass both. But, with -- with you, how
7     often would you swap with someone?
8  A. Pretty much, weekly. Not one tour would go by
9     in a week that I would either take a few runs
10    in the ambulance or cover the desk for a few
11    hours and give a guy a break. 'Cause I had
12    been on the job a long time, and I know what
13    it's like to be stuck on something.
14 Q. And are those the two busiest jobs, the
15    ambulance and the desk?
16 A. Absolutely.
17 Q. Okay. And you personally saw a difference in
18    the quality of service?
19 A. Absolutely.
20 Q. Okay. So what did you do about it?
21 A. Pretty much, nothing. I mean, if you were the
22    tech in the back, you'd have to write report.
23    And if I noticed they missed an IV, I would.
24    If I was at a call where they never showed up,

**Page 24**

1  I'd document that they -- we had to leave to
2  the hospital because they weren't there in
3  time. Things of that nature.
4  Q. Would that be in the run report?
5  A. Yes. It would.
6  Q. So if I reviewed the run reports, I would see
7     that?
8  A. Absolutely.
9  Q. Okay. Had -- had those problems ever occurred
10    with Armstrong?
11 A. They may have, but not to -- not -- actually,
12    maybe a couple of times, yeah, but not as
13    nearly as frequent as with Action.
14 Q. How long was Action providing the service
15    before you saw the petition?
16 A. That, I don't know.
17 Q. Our choi- -- our choices are three months or
18    fifteen months. What do you think is more
19    likely?
20 A. I think it's three months. Like I said, I'm
21    not sure of the dates.
22 Q. Okay. Did you know anything about any petition
23    before you saw it?
24 A. No. I did not.

Richard S. Hegarty
February 3, 2005
Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 6 of 9
Hegarty, et al., vs. Tortolano, et al.

**Page 29**

1  Q. Do you have any idea who -- who signed the --
2     the joke signatures?
3  A. No. I don't.
4  Q. You don't recognize the handwriting or the
5     printing?
6  A. I couldn't recognize anybody's handwriting. I
7     don't study that.
8  Q. Where was the petition physically? Where was
9     it?
10 A. If you walked into the dispatch room, there's a
11    huge bulletin board bigger than that picture
12    out there. It was right there on the
13    right-hand side.
14 Q. Inside the dispatch room?
15 A. Correct.
16 Q. So it was not an area open to the public?
17 A. At that time, it was.
18 Q. It was?
19 A. Absolutely.
20 Q. Were there -- on what occasions would the
21    public come into that room?
22 A. Daily. Walk in, looking for directions; people
23    coming in and trying to sell things for Girl
24    Scout, Boy Scouts; people coming in, looking to

**Page 30**

1     go to the bathroom.
2  Q. And has that changed?
3  A. It has changed.
4  Q. How so?
5  A. I believe there was an order put out that no
6     public's allowed in there. I haven't seen it,
7     but that's what I've heard.
8  Q. Is that what's happened? No public's allowed
9     in there?
10 A. I -- I believe so.
11 Q. Do you do -- we know you talked about the
12    petition to Greg. Did you talk about the
13    petition to anyone else?
14 A. Not that I can recall at this time.
15 Q. Okay. So what's the next thing that happened
16    with regard to the petition after you signed
17    it?
18 A. I don't know the time frame, but I know it was
19    a day we were working. And Mike Mulrenan --
20    no -- Greg was working in North Woburn on the
21    tower of a ladder, whatever piece is up there.
22    Tim Ring was acting captain that day. He got a
23    call from either the chief or the personnel
24    officer that the chief wanted to see us. Greg

**Page 31**

1     was ordered down to pick us up at Engine 3 and
2     take myself, Greg, and Michael to see the chief
3     down at Station 1.
4  Q. And then what happened?
5  A. We were brought upstairs into the chief's
6     office.
7  Q. Who was there?
8  A. Myself, Greg, and Michael; the chief and
9     Captain Mills, a personnel officer.
10 Q. And what happened?
11 A. He asked us, did we sign it. And we all said
12    yes. Those are our signatures.
13 Q. And what else did he ask you?
14 A. He -- I think he asked Michael first and said,
15    Michael, why did you sign it? Michael gave his
16    reasons.
17 Q. What reason did Michael give?
18 A. I don't know what -- I can't quote him. It was
19    to the effect, in his opinion, this was true;
20    and that's why he signed the petition.
21 Q. Did -- then -- then, who else?
22 A. Then he asked me why I signed it.
23 Q. And what did you say?
24 A. And I told him I agreed also, in my opinion,

**Page 32**

1     that this is correct; and that is why I signed
2     it.
3  Q. Did he ask you for any specifics, anything more
4     than that? Or --
5  A. Yes. He did.
6  Q. What did he ask you?
7  A. He said, Do you have any specific instances
8     of -- of what -- why you would sign that? And
9     I said, Yes, I did. And I happen to have a
10    person, a relative of my wife's, who actually
11    got killed in a motorcycle accident. And I --
12    the paramedics could not get an IV in -- in
13    him. They couldn't get a airway down his
14    throat.
15    He coded on the way to the hospital. And
16    they passed three hospitals, and he died. He
17    had a wife and two young children. And, to me,
18    that was -- can I take a minute, please?
19    (Brief recess taken.)
20 BY MR. KESTEN:
21 Q. This -- this incident, what was the relation?
22 A. He was my wife's cousin. He was --
23 Q. A motorcycle accident, wasn't it?
24 A. Correct.

Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 7 of 9
Richard S. Hegarty                          Hegarty, et al., vs. Tortolano, et al.
February 3, 2005

33

1   Q. And you -- you believe that the ambulance
2      response was responsible for --
3   A. Whether he would have died or not, we're not
4      sure. We'll never know. The truth remains
5      documented: no IV's, no airways, too long on
6      the accident scene time. And according to
7      state protocols, when someone codes, you go to
8      the nearest hospital. They bypassed three
9      hospitals to bring him to Mass. General.
10  Q. And this was Action?
11  A. Correct.
12  Q. Other than that incident, did you provide any
13     details to the chief?
14  A. I just told him I've been on other calls that
15     they did not get IV's in. Or what they're
16     supposed to do is do an IV en route to the
17     hospital. They would say, No, wait, wait,
18     wait, sometimes five or ten minutes to do a job
19     they're supposed to do en route to a hospital.
20  Q. Would you guys ride with them?
21  A. In the ambulance, we're always in the
22     ambulance. One paramedic goes in the back of
23     the -- our rescue; the other paramedic drives
24     their truck. We have our other driver, and

34

1      they follow us to the hospital.
2   Q. How long did the meeting with the chief last?
3   A. No more than ten minutes.
4   Q. And then what happened?
5   A. And then he said, Let's see what we're going to
6      do about this. To me, it was -- he kind of
7      glared at us in kind of like a vengeful tone in
8      his voice.
9   Q. Had you had any issues or problems with the
10     chief before?
11  A. No. I don't think so, not specifically. I
12     mean, I've known him a long time, but nothing I
13     can recall we had problems with.
14  Q. Okay. But you felt it was a threatening tone?
15  A. Absolutely.
16  Q. Then what happened?
17  A. And then we left.
18  Q. How long after that did Exhibit -- were you --
19     how long after the meeting were you
20     transferred?
21  A. I don't know the dates. I'm sure they're out
22     there. But I believe, probably within a couple
23     of weeks.
24  Q. Okay. This is the -- had anything like this --

35

1      was this unusual, to have this many transfers?
2   A. Under Chief Tortolano, yes.
3   Q. How about under Chief Doherty?
4   A. Under Chief Doherty, every -- between January,
5      February, right around there, he would put a
6      petition out or request, Anybody want a
7      transfer, put in for it. He then would
8      reassign the rescue duties from the eight
9      people on it to get off it, put eight new
10     people on. And then, sometimes, he did other
11     transfers at the same time.
12  Q. And once Tortolano come in, how did that
13     change?
14  A. He stopped transfers altogether except if a new
15     man came in or somebody was injured, but there
16     was no regular transfers or requests to be
17     transferred any longer.
18  Q. I take it that most of the firefighters didn't
19     like that?
20  A. Correct.
21  Q. All right. So did you believe that the
22     transfer order of October 25th, as it's dated,
23     was related to the petition?
24  A. Absolutely.

36

1   Q. Why do you think so?
2   A. Wha- -- what are the first four names there?
3      Myself, Muller, Kichton, and the people who
4      signed that petition. Correct?
5   Q. And Robishaw.
6   A. Robishaw.
7   Q. What did Robishaw have to do with the petition?
8   A. Nothing with the petition. Kenny Robishaw's
9      the one that spoke about starting our own ALS
10     service at that meeting with Melanson, and the
11     chief was present at that meeting.
12  Q. Do you have any information that the chief has
13     any -- any ties to Action Ambulance or any
14     relation to Action Ambulance?
15  A. None, to my knowledge.
16  Q. Is it your understanding it was his decision to
17     switch ALS providers?
18  A. I don't know whose decision it was.
19  Q. Okay. How about the other people transferred,
20     do you have any knowledge as to why they were
21     transferred or what their relationship to
22     anything was?
23  A. No.
24  Q. What was the practical effect of your being

Richard S. Hegarty
February 3, 2005
Case 1:04-cv-11668-RWZ   Document 22-7   Filed 06/30/2005   Page 8 of 9
Hegarty, et al. vs. Tortolano, et al.

Page 45

```
 1  A. Okay. Repeat the question. It's confusing.
 2  Q. Well, if you'd let me finish, it wouldn't be.
 3  A. I'm sorry.
 4  Q. When you stop -- no, not you. Him.
 5       MR. COLES: I just want the record to be
 6     clear, Lennie.
 7       MR. KESTEN: I was slowly getting there.
 8       MR. COLES: Well --
 9  Q. Okay. Here's the question.
10       MR. COLES: -- it sounded compound to me.
11       MR. KESTEN: Everybody's a critic.
12     Everybody's a critic. Just wait till you take
13     his deposition. I think it needs a semicolon
14     in it.
15  Q. You ready?
16  A. I'm ready.
17  Q. Here we go. Now, backing up so we're all clear
18     and on the same page here, you have always done
19     in the past, and always will do in the past --
20     you -- this -- what -- what you always do is,
21     you fill out a run report which has patient
22     care information and whatever else.
23  A. Correct.
24  Q. You have documented that if there's a problem
```

Page 46

```
 1     in intubation or IV's; you -- you put them in
 2     your run report whether Exhibit 2 exists or
 3     not. You always have done that?
 4  A. Correct.
 5  Q. How did you find out about Exhibit 2? Was it
 6     posted?
 7  A. It was either posted -- oh, actually, I think
 8     the captain was ordered to read it to us.
 9  Q. Okay. When he read this paragraph, the third
10     paragraph about concerns being documented in
11     writing, what did you understand that to mean?
12  A. Exactly what it says.
13  Q. Which is?
14  A. Post a report.
15  Q. Okay. Did you understand that to mean that you
16     were supposed to put that on your run report or
17     that you were supposed to prepare a second
18     report?
19  A. It -- it looked like a second report.
20  Q. Okay. Now, did you ever do that?
21  A. No.
22  Q. Okay. Why didn't you prepare the second
23     report?
24       MR. COLES: Why did you?
```

Page 47

```
 1  Q. Why didn't you?
 2  A. Fear of retaliation.
 3  Q. Was that the only reason?
 4  A. Absolutely.
 5  Q. Did you, in fact, after Exhibit 2, this order,
 6     come out, did you -- were you on calls where
 7     you had concerns about ALS response times?
 8  A. There were some.
 9  Q. Did you respond to calls where you had concerns
10     about quality of care?
11  A. Yes.
12  Q. Did you report those in any way, shape, or form
13     to anyone, those concerns?
14  A. To the committee that he wanted us to?
15  Q. No, no. Did you report them to anybody?
16     We're -- just so we're clear, you've already
17     said you didn't write the second report.
18  A. Correct.
19  Q. Did you do anything else to report these
20     concerns to anyone?
21  A. We would talk in-house.
22  Q. Did you tell the captain?
23  A. I'm sure he was present.
24  Q. Was there any record kept anywhere of any of
```

Page 48

```
 1     these concerns?
 2  A. Not to my knowledge, unless it was documented
 3     on one of my run sheets.
 4  Q. Okay. But if I review your run sheets, would I
 5     ever see a reference to a late response by ALS?
 6  A. If you reviewed all my run sheets at the --
 7  Q. Yeah.
 8  A. -- time I -- this was implemented or before
 9     that was implemented, if I had been on the
10     ambulance and the paramedics did not show up
11     and I went to the hospital, it was documented.
12     If they did not get an IV attempt in, it was
13     documented.
14  Q. Okay. Did you ever note any incidents that you
15     "believed to be extreme in qua- -- nature or
16     pose an immediate threat to the provision of
17     quality of service" after Exhibit 2 came out?
18  A. Can I read that --
19  Q. Sure.
20  A. -- what you read from so I understand a little
21     better? Which line there?
22  Q. It's down towards the end of the paragraph.
23  A. No.
24  Q. So whatever problems that --
```

Case 1:04-cv-11668-RWZ    Document 22-7    Filed 06/30/2005    Page 9 of 9

Hegarty, et al. vs. Tortolano, et al.
February 3, 2005

Page 49

1   A. Not that I recall.
2   Q. Whatever problems that you saw weren't as
3      serious as this one described here?
4   A. I -- see, I don't know how he writes. But it
5      looks like he's saying immediate danger.
6      That's how I would interpret that as.
7   Q. Now, the committee you're talking about is
8      Lieutenant McDonough, the personnel officer,
9      and the chief. Now, you did talk about a
10     committee earlier. Did you talk about what's
11     contained in the next to last paragraph?
12  A. If that's what he assigned. Yes.
13  Q. Okay. So after Exhibit 2 came out, grievances
14     were filed. Right?
15  A. Yes.
16  Q. What harm did you suffer as a result of
17     Exhibit 2?
18  A. This being Exhibit 2? Well, it's the order.
19     Correct.
20  Q. Exhibit 2 of Muller's deposition, which is the
21     order, the undated order of the chief --
22  A. Yes.
23  Q. -- about reports.
24  A. I lost my seniority by being on the ambulance.

Page 50

1      I couldn't bump anybody off. No longer able to
2      make swaps.
3   Q. Hang on. What do you mean, you lost your
4      seniority?
5   A. Because if people came on my group that were on
6      my group and less senior to me, I'm still on
7      the ambulance; and they're not.
8   Q. But that didn't happen, in fact. Right?
9   A. Yes. It, most certainly, did happen.
10  Q. People came on to the group that were not
11     senior?
12  A. Who were already on my group. I'm now assigned
13     permanently to the ambulance for, as far as I'm
14     concerned, my entire career. There's men under
15     me on my group who are now not on the ambulance
16     'cause I'm assigned to it.
17  Q. Okay. Okay. What else?
18  A. Burnout, stress. Twenty-four/seven, that
19     ambulance is running most of the time. Seeing
20     sick people, people puking on you, crapping on
21     you day in and day out, knowing you're never
22     getting off that thing.
23  Q. Anything else?
24  A. I can give you a whole list. I mean -- if you

Page 51

1      want to give me time to think, I'll think of
2      more. But how that thing can -- what it can do
3      to you.
4   Q. Well, you get to do nice things too.
5   A. Occasionally.
6   Q. Now, any financial harm?
7   A. Yes.
8   Q. What?
9   A. When you're on the ambulance and you have a
10     very busy night, you get off the next day;
11     you're not fit to go to work anywhere else.
12     And if I'd have a carpenter job or if I had an
13     overtime to take per se, I might have to refuse
14     it 'cause I'm too burnt out and tired to do
15     anything else. I can't do anything. Some
16     days, you have to go home and sleep all day
17     'cause you've been up 24 straight hours,
18     running around.
19  Q. Now, if both the senior men in your group are
20     at work with you, then you're going to be in
21     the ambulance anyway. Right? Ambulance or
22     desk?
23  A. No, not necessarily.
24  Q. Why not?

Page 52

1   A. I could opt to take the dispatch desk if I
2      chose to. If somebody's out sick on an outside
3      station, I can float to that outside station.
4         MR. COLES: And just so it's clear for the
5      record, you're talking about if they decide not
6      to swap, right --
7         MR. KESTEN: Right. Swapping --
8         MR. COLES: -- if they didn't pick it?
9         THE WITNESS: Right.
10        MR. KESTEN: Swapping is -- aside from
11     swapping.
12        MR. COLES: Okay.
13  Q. So those options -- those -- those options were
14     foreclosed to you because of Exhibit 2 in
15     Muller's deposition?
16  A. Correct.
17  Q. Any other harm that you can think of?
18  A. The stress. You know, if -- things were
19     tougher at home. It's just -- hated going to
20     work, didn't know what he was going to do next
21     to us. Did not want to be there at all.
22  Q. How long was the order in place?
23  A. A little over a year.
24  Q. Are you married?