UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
:
RICK HEGARTY, MICHAEL MULRENAN, and  :
GREG MULLER,                         :
                        Plaintiffs   :
                                     :
v.                                   :          C.A. No. 04 11668 RWZ
                                     :
PAUL TORTOLANO, Individually and in his :
official capacity as Chief of the City of Woburn :
Fire Department, JOHN C. CURRAN, Individually :
and in his official capacity as Mayor of the City of :
Woburn, and CITY OF WOBURN,          :
MASSACHUSETTS,                       :
                        Defendants   :
_____:

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Pursuant to this Court's May 5, 2005 Order, Plaintiffs submit this reply brief in response

to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants'

Opposition"). The reply brief is necessary to respond to a number of legal and factual

inaccuracies contained in Defendants' Opposition. As such, the instant reply brief will aid the

Court in reaching a decision on Plaintiffs' motion for summary judgment.

**A.     PLAINTIFFS WERE SPEAKING ABOUT A MATTER OF PUBLIC CONCERN
        WHEN THEY SIGNED THE PETITION TO THE MAYOR THAT WAS
        CRITICAL OF THE CITY'S ALS SERVICE.**

At the core of this case is the petition that Plaintiffs signed which was addressed to the

Mayor of the City of Woburn and complained about the quality of service provided by the

current ALS provider and sought a return to the former ALS provider. Although Defendants

maintain that Plaintiffs' conduct was not public speech about a matter of public concern, they

submit no facts or applicable case law to substantiate their position.

Defendants' contention, that Plaintiffs did not engage in protected speech when they signed a petition addressed to the Mayor criticizing the ALS quality of service and calling for a return to the former ALS provider, is contradicted by the undisputed facts and well settled law.

First, Defendants erroneously claim that Plaintiffs' signatures on a petition addressed to the Mayor are not protected speech. Defendants erroneously claim that only the "circulation," rather than the "signing," of a petition is protected by the First Amendment. However, Defendants offer no legal precedent to support such a view and offer no rationale why signing a petition addressed to a public official does not constitute First Amendment speech.

Defendants ignore that the fundamental protection afforded by the First Amendment is an employee's right to comment upon matters of public concern. See *Pickering v. Board of Education*, 391 U.S. 563 (1968). Although there does not appear to be any prior case law concerning the exact factual circumstances at issue here -- public employees signing a petition addressed to a public official – the act of signing the petition is no different than signing a letter addressed to a public official– a form of communication that is clearly public speech. *See, e.g., Latham v. Office of Attorney General of State of Ohio*, 395 F.3d 261, 265-266 (6th Cir. 2005) (assistant attorney general's letter to attorney general constitutes public speech); *Buzek v. County of Saunders*, 972 F.2d 992, 995 (8th Cir. 1992) (letter written by deputy sheriff to judge concerning sentencing of convicted criminal was public speech on matter of public concern); *Rosado v. Santiago*, 562 F.2d 114, 117 (1st Cir. 1977) (letter submitted by social worker to superior criticizing administration of food stamp distribution program public speech). In both cases, the public employee is communicating his/her endorsement of a particular viewpoint on an issue of public concern. The fact that the communication takes the form of a petition or a letter is irrelevant to the issue of First Amendment protection. Indeed, the First Circuit's opinion in

*Rosada, supra*, is particularly applicable to the instant case. There, the employee's letter was addressed only to her superior, not a public official, like the instant petition to the Mayor. However, the Court found that the letter still constituted public speech because, "the letter, while not publicized, was circulated among a number of members of the department, and the [lower] court found that the Secretary "was concerned with the publication of the letter or its falling into the hands of the media."" 562 F.2d at 117.[1]

Defendants' claim, that Plaintiffs' identification of themselves as "firefighters" in the petition somehow removes them from First Amendment protection is also contradicted by well established law. See, *Brasslett v. Cota*, 761 F.2d 827, 843 (1st Cir. 1985) (statements by fire chief, identified as such and appearing in dress uniform in television interview, protected by First Amendment); *Biggs v. City of Dupo*, 892 F.2d 1298, 1301 (7th Cir. 1990) (police officer's statements in local newspaper criticizing inadequate funding in police department, where he reviewed his background and qualifications as officer, protected by First Amendment); *Bates v. Mackay*, 321 F. Supp.2d 173, 181 (D. Mass. 2004). Nor do Defendants cite to any legal precedent to the contrary.

Defendants' other contention, that Plaintiffs are not entitled to First Amendment protection because they failed to supplement their petition-signing with other acts of public expression such as speaking at public meetings or raise their concerns with the Chief or the

---

[1]    Defendants' claim, that Plaintiffs must show that their signing of the petition involved a "type of interactive or persuasive communication" to be public speech completely distorts the holding in *Meyer v. Grant*, 486 U.S. 414 (1988) and the broad coverage of the First Amendment law in general. *Meyer* concerns the issue of whether a Colorado statute's prohibition against paying circulators of initiative petitions violated the First Amendment, it did not address the issue of whether the signing of a petition would constitute public speech. Although it did hold that the act of getting the public to sign a petition necessarily involved the exchange of ideas concerning issues of public concern. Nothing in the Court's holding suggests that the petition signers are not entitled to the same First Amendment coverage. The other cases cited by Defendant, *Shaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) and *Taxpayers United for Assessment Cuts v. Austin*, 944 F.2d 291, 296 (6th Cir. 1993) are similarly irrelevant to the issue of petition signing as public speech.

Mayor, is similarly devoid of any legal authority. Rather, as set forth in the case law cited above,

Plaintiffs' communication of their opinion by signing a petition criticizing the quality of ALS

service is sufficient public speech. None of the aforementioned case law suggests that further

action is required.[2]

Lacking any legal authority to claim that Plaintiffs' conduct was not public speech,

Defendants claim that the petition represents nothing more than an "internal controversy or

gripe," rather than a statement about an issue of public concern. However, Defendants do not

present a scintilla of evidence to support this claim. Defendants' Opposition, p. 23. Thus, the

contents of the petition speak only about the signers' observations concerning the poor quality of

service provided by the new ALS provider and the need to return to the former ALS provider, a

matter of broad public importance. Further, this was a matter to which the opinion of fire

fighters was of great value to the community. *Cf. Waters v. Churchhill*, 511 U.S. 661, 674

(1994) ("Government employees are often in the best position to know what ails the agencies for

which they work; public debate may gain much from their informed opinions); *Bates, supra*, 321

F. Supp.2d at 179-180 (quoting *Churchhill*).Further, there is no evidence that any "internal

controversy or gripe" existed or that the quality of the new ALS service had been the subject of

dissension within the Department prior to the signing of the petition. There is no evidence that

the petition was intended as a "private communication" – it was addressed to the Mayor, not the

Fire Chief.   In sum, contrary to Defendants' bald claim, there is no evidence that the issue

addressed in the petition – the provision of ALS service – had anything to do with "fire fighting

---

[2]     Defendants' suggestion, that Plaintiffs are not entitled to First Amendment protection because they failed to
report their concerns about the ALS service to the Chief or ultimately present the petition to the Mayor, are
particularly bizarre, given the Chief's retaliatory response to their signing the petition and the fact that the Chief
took possession of the petition and never returned it to the bulletin board, thereby preventing the petition from being
delivered to the Mayor. Plaintiffs' Statement of Facts, ¶14.

policy and procedures" within the Fire Department.[3]    Rather, Plaintiffs' signing of the petition

represents core public speech concerning a matter of public concern.

Finally, Defendants argue that the petition should not be considered public speech about

an issue of public concern because "plaintiffs have not identified or documented any actual

instances in which the ALS services provided by Action Ambulance were inferior to those

previously provided by Armstrong Ambulance."  However, as set forth in Plaintiffs' Statement

of Undisputed Facts, ¶13, Plaintiffs have consistently stated that they personally observed

problems with Action's quality of service, including slower response times, not showing up at

emergencies, and difficulties with emergency medical procedures, such as putting in IVs and

intubations.  There is no requirement that speech only rises to an issue of public concern if the

public employee "investigates" or "documents" the issue and Defendants do not point to any

case law even remotely suggesting such a litmus test.  In essence, Defendants argument amounts

to contending that petition is not addressing an issue of public concern because Defendants

disagree with the contents.  That disagreement, of course, goes to the very heart and purpose of

First Amendment protection.

**B.    DEFENDANTS HAVE NOT SUBMITTED ANY EVIDENCE THAT
        PLAINTIFFS' PETITION-SIGNING DISRUPTED FIRE DEPARTMENT
        OPERATIONS.**

Although Defendants claim that Plaintiffs' petition signing somehow hindered the Fire

Department's operations, they do not offer even a shred of evidence to support their allegation.

Instead, they only offer pure speculation that the petition "might" have impeded the "harmony"

---

[3]    Defendants' suggestion that Plaintiffs considered the petition to be a "joke" is similarly bereft of any factual support.  The "joke signatures" were made at the bottom of the petition and after Plaintiffs had already signed the petition.  Contrary to Defendants' claim, Plaintiff Mulrenan testified at his deposition that he was very concerned about the ALS service provided by Action and he signed the petition in the belief that "by at least expressing my opinion, it may have carried some weight, but from the other signees [the joke signatures], obviously, it didn't really go anywhere."  Ex. 2, Mulrenan Dep., p. 29.  As such, he was commenting on his belief that the joke signatures demonstrated his lack of authority within the Department.

between co-workers, supervisors, and Action Ambulance. Defendants' Opposition, pp. 26-27.

However, they offer no evidence of any disruption. Such *beliefs*, standing alone, are not

sufficient evidence of the Fire Department's interests. Defendants have offered no evidence that

Plaintiffs' public speech has had a detrimental effect on departmental morale or discipline.

Defendants present the same vague "speculation about the pernicious effects" of

Plaintiffs' speech that the Supreme Court and the First Circuit have explicitly rejected. *NTEU*,

513 U.S. at 475-76 (reasonable burden on expression requires a justification far stronger than

mere speculation about serious harms); *Providence Firefighters Local 799 v. City of Providence*,

26 F. Supp.2d 350, 356 (1st Cir. 1998). In *Providence Firefighters*, Defendant City of

Providence maintained that fire department rules restricting a firefighter's ability to speak to the

public on matters concerning the fire department were necessary because the department: had to

speak with "one voice"; was a "paramilitary organization"; and said speech would compromise

the "efficiency, integrity and discipline" of the department. The First Circuit firmly rejected

these speculative arguments:

> None of these assertions amounts to an ounce on the *NTEU* scale.
> Although operational efficiency is undoubtedly a vital government interest . . . the
> government must demonstrate that the harms are real and that the regulation will
> in fact alleviate those harms in a direct and material way. . . .

Similarly, in *Braslette v. Cota*, 761 F.2d 827, 845 (1985), the First Circuit stressed that

evidence of disruption to the efficient operation of the public employer must be objectively

reasonable:

> We stress the third factor [detrimental impact objectively sufficient] because,
> where First Amendment rights are concerned, "operational efficiency objections
> must be real and important before they can serve as a basis for discipline or
> discharge of a public employee." *Key v. Rutherford*, 645 F.2d 880, 885 (10th Cir.
> 1981). Unless we require that the employer's alleged loss of confidence and trust
> in his employee be objectively reasonable, public employers could promiscuously
> offer a subjective justification that could almost never effectively be rebutted.

The public statements at issue in *Braslette* were far more critical and potentially disruptive than anything contained in Plaintiffs' petition.[4]  In *Braslette*, the town's fire chief appeared in dress uniform in a television interview to a local station and made statements suggesting that the town's fire equipment was inadequate and that the town was buying inferior equipment.  The town's manager claimed that these statements eroded the confidence of the department heads with the town manager.  The court rejected the town's claim, finding that the "argument that the [fire chief's] interview had a detrimental effect on [the town manager] to be contrived.  The court concluded, "[i]n sum, we think it clear that the defendants' proffered justifications are merely artful attempts to conceal the fact that [the fire chief] was fired because he raised questions as to the adequacy of the [town's] fire protection to the public, thereby embarrassing the Manager and the Council.  But under *Pickering*, an employee's First Amendment rights to comment on and criticize his employer's actions shall not yield to an employer's interests in averting embarrassment."  761 F.2d at 846.

Indeed, there is nothing in the petition that can be construed as critical of the Fire Department.  Plaintiffs' petition is addressed to the *Mayor* and only criticizes the *City's* decision to switch ALS providers.  Absolutely nothing is said about the Fire Department's policies, procedures or operations.  Further, *even if*  Defendants could somehow demonstrate that the petition was critical of the Fire Department, such criticism would not strip the petition of First Amendment protection.  *Brasslett v. Cota*, 761 F.2d 827, 844 (1985) (fire chief's critical statement critical of the department's fire fighting capabilities "hardly strips it of First Amendment sanction.  The Amendment was calculated to protect precisely this type of speech, since it is likely that the government would be motivated to stifle only critical, revealing, or

---

[4]  Defendants' specious claim, that Plaintiffs' conduct was "recklessly false" (Defendants' Opposition, pp. 27-28), is bereft of any evidentiary support as set forth in Plaintiffs' Memorandum, p. 30, and above.

embarrassing remarks.")  To the extent the petition questions the quality of care provided by

Action and the City's decision to use this provider, such speech goes to the very heart of First

Amendment protection.  In sum, Defendants' claim as to the alleged disruption to the

Department's operations is meritless.

**C.     PLAINTIFFS WERE SUBJECT TO ADVERSE EMPLOYMENT ACTIONS
         WHEN THEY WERE PERMANENTLY REASSIGNED TO THE AMBULANCE
         AND BARRED FROM SWAPPING THEIR AMBULANCE ASSIGNMENT WITH
         OTHER FIREFIGHTERS.**

Although Defendants claim that Plaintiffs' assignment to the ambulance and prohibition

on swapping their ambulance assignment did not constitute adverse employment actions, they

offer no evidence to support this claim.

First, Defendants' claim, that Plaintiffs' permanent assignment to the ambulance was not

an adverse employment action, is baseless.   Defendants argue that because most of the

Department's firefighters, including the Plaintiffs, have been assigned to the ambulance at one

time or another, Plaintiffs' assignment in November, 2003 was not "unreasonably inferior and

adverse."  Defendants' Opposition, pp. 29-30.  However, Defendants' claim ignores the

uncontested fact that Chief Tortolano took action *only* against the petition signers (and no other

members of the Department) and permanently assigned them to the ambulance.  Thus, it is

uncontested that every other firefighter in the Department was assigned to the ambulance only:

(1) if they were assigned to Station 3; and (2) if they received that assignment pursuant to their

Captain's assignment system (either by six-month rotation or by seniority).  It is uncontested that

only Plaintiffs (and the other petition-signer, Firefighter Kichton) were excluded from their

Captain's assignment method and, instead, permanently assigned to the ambulance by Chief

Tortolano.[5]  In sum, it is undisputed that only the petition-signers were subject to the adverse employment action of being permanently assigned to the ambulance by Chief Tortolano.

Further, although Defendants claim that there is a dispute of fact as to whether the ambulance assignment is generally considered a less desirable assignment, they do not offer a scintilla of evidence to support this alleged dispute.  Defendants' Opposition, p. 9, ¶32.  All of the uncontroverted testimony from the Plaintiffs and Captain Mills, the Department's personnel officer, demonstrates that the ambulance is generally less preferred than the engine assignments. Chief Tortolano offered nothing to contradict this fact but, rather, testified that he did not know where the ambulance assignment fell on the preferred order of assignments.  Plaintiffs' Statement of Facts, ¶32.

Finally, Defendants offer no evidence to dispute the fact that Plaintiffs Hegarty and Muller prefer the engine assignment to the rescue ambulance assignment (see, Plaintiffs' Statement of Facts, ¶33) and Plaintiff Mulrenan only chose to remain on the ambulance because of a personality conflict with his Captain (see, Plaintiffs' Statement of Fact, ¶34).  Instead, Defendants base their denial of these facts on their bizarre claim that these facts "are improper expressions of opinion or understandings and assertions for which no basis for personal knowledge has been established  or which are based on hearsay."  See, Defendants' Opposition, p. 9, ¶¶33, 34).  Indeed, Plaintiffs Hegarty and Muller *are* of the personal opinion that the ambulance is less desirable than the engine assignments and Plaintiff Mulrenan is of the personal

---

[5]    Defendants attempt to muddy the factual waters by claiming that there is a dispute of fact as to which particular assignment methods were used by which Captains as of November, 2003 is untrue.   However, even if Defendants' claim is accepted as true for the purposes of summary judgment only, it is *undisputed* that as of November, 2003, *all* of the Captains assigned firefighters to the ambulance  using either the six-month rotation method or the seniority system.  See, Plaintiffs' Statement of Fact, ¶30.  Only the petition-signers were excluded from their Captain's assignment method and, instead, permanently assigned to the ambulance.  Further, it is undisputed that Captains continued to exercise this assignment authority over all other firefighters assigned to Station 3 after Chief Tortolano's November 2, 2003 *except* for the petition signers, who were removed from the ambulance only after Chief Tortolano rescinded their assignments.  Statement of Fact, ¶30.

opinion that he wishes to remain on the ambulance only to avoid working on the same equipment

as Captain Devine.  Their opinions in this regard constitute entirely permissible evidence and

Defendants offer no evidence to suggest that Plaintiffs' opinions about the ambulance

assignment are not genuine.

Second, Defendants offer nothing to counter Plaintiffs' undisputed evidence that Chief

Tortolano prohibited only the petition-signers from swapping their ambulance assignments

during their shifts as either a part of his November 2, 2003 order or in subsequent

communication to Captains.  Plaintiffs' Statement of Fact, ¶26.  All other firefighters continued

to have the right to swap assignments during their shifts.  *Id.*  Although Defendants claim that

Chief Tortolano's deposition testimony contradicts this fact, his deposition testimony proves

otherwise:

> **Q.    *What kinds of assignments can be changed during a day?***
>
> **A.    *The captain has the discretion to change assignments within Station 3.***
>
> Q.    Okay, How long has that been in effect?
>
> A.    Since I started assigning a number of people to him rather than specific assignments within the building.
>
> Q.    Okay.  And we still don't know how long exactly that's been, correct?
>
> A.    No.
>
> **Q.    *And as a result of the November 2, 2003, order, the firefighters assigned to the ambulance were no longer allowed to do that, correct?***
>
> **A.    *Correct.***

Ex. 11, Tortolano Dep., pp. 95-96 (Emphasis supplied).  All of the Plaintiffs and Captain Mills

testified that all of the Captains allowed firefighters under their command to swap assignments.[6]

---

[6]    Chief Tortolano testified that he did not know one way or another whether Captains were allowing the
firefighters to swap shifts.  However, he offered no evidence to suggest they were not doing so.  Chief Tortolano's

Plaintiffs' Statement of Facts, ¶26.  In sum, it is undisputed that: (1) captains at Station 3 had the discretion to change assignments within Station 3; (2) captains allowed all of the firefighters under their command to swap assignments; and (3) as a result of the November 2, 2003 order, the petition-signers were no longer allowed to swap assignments during the day.   In sum, Chief Tortolano only deprived Plaintiffs and Firefighter Kichton of the benefit of swapping assignments during their shifts.  Clearly, that fact alone demonstrates that Chief Tortolano took an adverse employment action against Plaintiffs on the basis of their protected conduct.[7]

## CONCLUSION

For the reasons stated herein and in Plaintiffs' initial memorandum of law, this Court should grant Plaintiffs' motion for summary judgment.

Respectfully submitted,

RICK HEGARTY, MICHAEL MULRENAN, and
GREG MULLER,
By their attorneys,

Dated:  July 8, 2005                    _s/Terence E. Coles_____  _____
                                        Terence E. Coles, BBO #600084
                                        Nicole Horberg Decter, BBO #658268
                                        Pyle, Rome, Lichten, Ehrenberg &
                                             Liss-Riordan, PC.
                                        18 Tremont Street, Suite 500
                                        Boston, MA 02108
                                         (617) 367-7200

---

ignorance as to how Captains were treating the other firefighters does not amount to a dispute of fact.  All of evidence, including the deposition testimony of the Plaintiffs and Captain Mills, presents the unrebutted fact that all firefighters assigned to Station 3 except the petition signers continued to be permitted by their Captains to swap assignments during their shifts.  See, Plaintiffs' Statement of Facts, ¶26; Ex. 6, Mills Dep., 39-41, 125-126.

[7]      Plaintiffs' Memorandum (pp. 27-33) already sets forth a wealth of evidence demonstrating that Defendants took these adverse actions because Plaintiffs signed the petition.  Defendants' Opposition does not dispute this fact. Instead, Defendants claim that the petition raised the issue of whether the current ALS service was sufficient and, therefore, "action had to be taken." Defendants' Opposition, p. 35.  Defendants do not dispute that the action taken was to permanently assign the petition signers to the ambulance and deny them the right to swap assignments.  It bears noting that Defendants offer no reason why Chief Tortolano could not "take action" by monitoring the ALS service in one of the various non-discriminatory and non-retaliatory methods set forth in Plaintiffs' Memorandum (pp. 30-31), rather than subjecting Plaintiffs to the aforementioned adverse employment actions.

11

**CERTIFICATE OF SERVICE**

This is to certify that on July 8, 2005, a copy of the foregoing document was served upon all counsel of record in the above captioned matter by first class mail.


_s/Terence E. Coles___ _____
Terence E. Coles