UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11668-RWZ

RICK HEGARTY, et al.

v.

PAUL TORTOLANO, et al.

MEMORANDUM OF DECISION

March 17, 2006

ZOBEL, D.J.

Plaintiffs Rick Hegarty, Michael Mulrenan, and Greg Muller are firefighters employed by the City of Woburn. In addition to the City of Woburn, plaintiffs have named Paul Tortolano, Chief of the Woburn Fire Department, and John C. Curran, former Mayor of the City of Woburn, as defendants in both their individual and official capacities. The genesis of this case lies in the City's decision, in June 2003, to change Advance Life Support ("ALS") providers. The City terminated its relationship with Armstrong Ambulance and began using Action Ambulance ("Action") instead. Shortly after Action took over response services, Captain Robert Mills of the Fire Department noted problems with Action's response times; he also communicated with Renee Lake, an employee of the Lahey Clinic medical facility, about Action's response times.

In late September or early October of 2003, someone posted a petition on a bulletin board in the watch room, or dispatch room, of Station 3, one of Woburn's four

stations. (Pls.' App. Ex. 7). The petition was titled "Petition to Mayor: To change the ALS provider for the City of Woburn." It stated:

> As Firefighters to the City of Woburn we have worked closely with our new ALS provider since June 1st, 2003. While we were not part of this decision process, we feel the service provided by this new ALS provider has not been to the caliber and level of our previous ALS provider.
>
> We are waiting longer for the ALS units to arrive, and we feel the quality of care is less than what the City has been accustomed to over the past many years.
>
> As the EMT's and First Responder's to the City, the undersigned Firefighters respectfully request the City change back to our previous ALS Provider. We feel this change is in the best interest of the citizens of Woburn!

(Id.). Soon after it was posted, each of the plaintiffs signed the petition. They allege that in an order dated November 2, 2003, Chief Tortolano retaliated against them for exercising their First Amendment rights by taking various adverse employment actions against them. They filed suit in July 2004 under 42 U.S.C. § 1983, seeking damages as well as injunctive relief. Although the parties attempted mediation, it was ultimately unsuccessful and they have accordingly renewed their cross motions for summary judgment.

On a motion for summary judgment, the moving party must demonstrate that there is no dispute as to any material fact and that judgment is therefore appropriate as a matter of law. See Fed. R. Civ. P. 56(c). I view the record in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). If the moving party meets its burden and the nonmovant fails to set forth specific facts raising a factual dispute requiring resolution, summary judgment maybe granted. Id.

The parties agree that for plaintiffs to prevail, they must satisfy a three-part test that has been established when First Amendment claims are raised by public officials. First, they must show that the speech at issue involves a matter of public concern. See Mullin v. Town of Fairhaven, 284 F.3d 31, 36 (1st Cir. 2002). "Second, if the speech does pertain to matters of public concern . . . the strength of plaintiffs' and the public's First Amendment interests [must be balanced] against the strength of the countervailing governmental interest in promoting efficient performance of the public service [provided by] public officials." Id. (internal quotation marks omitted). This balancing test—known as the Pickering test—aims to mediate "the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." Id. (internal quotation marks omitted). "Third, and finally, if First Amendment interests outweigh a legitimate government interest in curtailing the speech under the Pickering balancing test, plaintiffs must then show that the protected expression was a substantial or motivating factor in the [adverse employment] decision." Id. If plaintiffs meet their burden under all three prongs, the burden then shifts to defendants, who must prove by a preponderance of the evidence that the same employment decisions would have been taken against plaintiffs "even in the absence of protected conduct." Id. (internal quotation marks omitted).

I.   Matter of Public Concern

Whether the speech at issue involved a matter of public concern is a question of law. See Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 233 (1st Cir. 2005). I must determine, given "the content, form, and context" of plaintiffs' statement, "as

3

revealed by the whole record," whether plaintiffs were speaking "as . . . citizen[s] upon matters of public concern," or as "an employee upon matters only of personal interest." Defendants argue (1) that plaintiffs' signing of the petition did not constitute "speech let alone protected speech" (Defs.' Opp. and Cross-Mot. for Summ. J. 22); and (2) that even if signing the petition can be considered speech, it did not involve a matter of public concern.

As to the first question, plaintiffs concede that "there does not appear to be any prior case law concerning . . . public employees signing a petition addressed to a public official," and whether the act of signing constitutes speech. (Pls.' Reply Mem. 2). They argue, however, that "the act of signing the petition is no different than signing a letter addressed to a public official—a form of communication that is clearly public speech." (Id.). Courts have previously found that circulating a petition or signing a letter addressed to a public official does constitute public speech. See, e.g., Meyer v. Grant, 486 U.S. 414, 421-22 (1988) (circulating a petition constitutes protected speech); Latham v. Office of Att'y Gen. of State of Ohio, 395 F.3d 261, 264-65 (6th Cir. 2005) (public employee's letter to public official). Assuming that the written communication involves a matter of public concern, little reason exists to distinguish between the above cases and a signatory to a petition. True, a person who initiates and circulates a petition may engage in more interactive and proactive communication than a person who listens, agrees, and signs the petition. See, e.g., Meyer, 486 U.S. at 421 ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."). And an

individual who writes and signs a letter to a public official may be more personally vested in that communication than a person who, along with many others, signs a petition addressed to such an official. Nevertheless, a petition signatory—like the petition circulator and like the letter writer—explicitly endorses and adopts the content expressed within the written communication.

In support of their argument that signing a petition does not constitute speech implicating the First Amendment, defendants cite <u>Taxpayers United for Assessment Cuts v. Austin</u>, 994 F.2d 291, 296 (6th Cir. 1993). In that case, a group that had initiated a petition as well as certain plaintiffs who had signed the petition but whose signatures had been removed under the state's technical rules sued under the First and Fourteenth Amendments. The court, as defendants note, found that signing a petition is not entitled to the same protection as exercising the right to vote, but that conclusion was drawn in the context of the plaintiffs' Fourteenth Amendment Equal Protection argument, not their First Amendment argument. <u>See</u> <u>id.</u> at 296. Indeed, <u>Taxpayers</u> actually provides support for plaintiffs' position, for when the court discussed the First Amendment claim, it implicitly assumed that plaintiffs (some of whom were petition signatories) had engaged in speech implicating the First Amendment. <u>See</u> <u>id.</u> (finding that state's initiative laws did "not limit <u>speech</u> on the basis of content" (emphasis added)). Defendants' citation of <u>Taxpayers</u> thus undermines their own argument. Plaintiffs' signing a petition, therefore, constitutes speech requiring further First Amendment analysis.

Defendants next argue that "[e]ven if the signing of a petition constituted speech," it did not involve a matter of public concern. (Defs.' Opp. and Cross-Mot. for Summ. J. 22). They contend that the speech in this case was not protected because (1) plaintiffs signed the petition as "firefighters," thus suggesting the speech was rendered as an employee, not as a citizen; (2) plaintiffs never complained about the City's ALS provider in other public forums or raised the issue at any other time; (3) the petition was posted in a room to which the public was not supposed to have access; and (4) although the petition was addressed to the mayor, it was never actually delivered to the mayor.

The fact that the petition identified the "undersigned" as "Firefighters," "EMT[s]," and "First Responder[s]" does not automatically mean that plaintiffs engaged in speech as employees rather than citizens. See, e.g., Brasslett v. Cota, 761 F.2d 827, 831, 846 (1st Cir. 1985) (where fire department chief gave interview about fire department practices while in dress uniform, court found speech raised matter of public concern and was therefore protected). Nor does my analysis of the petition turn on whether plaintiffs expressed concerns about the ALS provider in other fora.

Defendants' complaint about the placement of the petition in the Station 3 watch room requires more discussion. Defendants argue that because members of the public were not supposed to be in the watch room, the communication was private rather than public in nature. In essence, defendants argue that the "form" of plaintiffs' speech does not indicate an intent to "contribute to any . . . public discourse" on the issue of ALS provider safety. O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993). This

6

argument is unconvincing for a few reasons.  First, although members of the public were not <u>supposed</u> to be in the watch room, it is undisputed that the public nevertheless entered the watch room "[a]ll the time."  (<u>See</u> Mills Dep. 71-72).  Defendants' factual premise is thus faulty.

Second, to the extent that the watch room was more private than public, that fact does not automatically render the speech private rather than public in nature.  The First Circuit has stated that the degree to which courts should scrutinize the "form and context" of a particular statement depends on the degree to which its content raised "a legitimate matter of <u>inherent</u> public concern."  <u>O'Connor</u>, 994 F.2d at 913-14 (emphasis in original).  Thus, "[n]ot every First Amendment inquiry requires a full . . . inquiry into form and context . . .  There are some situations where public interest will be apparent from the content of speech alone."  <u>Baron</u>, 402 F.3d at 233.  In this case, the petition—which concerned the quality of ALS services provided to the City—clearly addressed a matter of inherent public concern.  E.g., <u>Beckwith v. City of Daytona Beach Shores</u>, 58 F.3d 1554, 1564 (11th Cir. 1995) ("Few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services.").  The record nowhere indicates that personal interest or personal gain motivated the petition.[1]  Because the subject matter of the speech alone resolves the public concern question, I give little weight to the form and context of the speech.  <u>See</u> <u>Jordan v.</u>

---

[1]Although one of the plaintiffs was related by marriage to someone who had died while being treated by the ALS provider at issue, all of the plaintiffs (and, allegedly, other firefighters) noticed and complained about problems with the provider.

7

Carter, 428 F.3d 67, 73 (1st Cir. 2005) (subject matter of speech may alone resolve public concern question).

Finally, it is inappropriate to lend much importance to the placement of the petition in the watch room because the petition was removed—at the direction of defendant Tortolano—shortly after it was posted. (Defs.' Opp. and Cross-Mot. for Summ. J. 5). We therefore cannot know whether plaintiffs would have made the petition more widely available to the public at some later point. The same factual gap minimizes the significance of plaintiffs' failure to actually deliver the petition to the Mayor. Defendants point out that several "joke" names were included on the petition—including "Red Buttons, Grady Little League, Nelson Mendella [sic] and the Pope"—and that plaintiffs therefore cannot have intended to share the petition more widely. (Defs.' Opp. and Cross-Mot. for Summ. J. 5 n.3; Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. 7). But these joke signatures were added only after plaintiffs signed the petition; they do not indicate that plaintiffs themselves regarded the petition with anything but sincerity.

Accordingly, plaintiffs' signing of the petition did constitute speech involving a matter of public concern and plaintiffs have satisfied the first prong of the three-part test.

II.  *Pickering* Balancing Test

The second inquiry requires me to conduct the so-called Pickering balancing test, which weighs the interest of plaintiffs, as citizens, "in commenting upon matters of public concern" again the interest of the State, as an employer, in promoting the

efficiency of the public services it performs through its employees." Pickering v. Bd. of Ed. of Tp. High School Dist. 205, 391 U.S. 563, 568 (1968). Among the factors to be considered are: "(1) whether [the speech] was directed against those with whom plaintiff is regularly in contact such that it might impede harmony among coworkers or the ability of supervisors to maintain discipline; (2) whether plaintiff's activity has a detrimental impact on those with whom he must maintain personal loyalty and confidence for the fulfillment of his job responsibilities; and (3) with regard to erroneous statements concerning matters of public concern, whether such statement impedes plaintiff's performance of his daily duties or the regular operation of the [public agency] generally." McDonough v. Trs. of the Univ. of N.H., 704 F.2d 780, 784 (1st Cir. 1983).

     Defendants have presented no evidence that the petition resulted in any harm to the operational efficiency of the fire department. Although Chief Tortolano apparently felt "caught off guard" by the petition (Mills Dep. 88-89), the petition was not addressed to him nor did it criticize him or the fire department. Rather, it was addressed to the Mayor and asked "the City [to] change back to our previous ALS provider." (Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. 7). Cf. Brasslett, 761 F.2d at 845 (where speech was not a "personal attack upon anyone with whom he was required to work on a daily basis," either in "content or tone," no showing that speech eroded harmony or discipline). Defendants contend that relations with the ALS provider, with whom firefighters work with closely, could have been harmed by the speech, but any potential harm to those relations did not outweigh plaintiffs' right to express their concerns about the ALS provider for the benefit of the public. Moreover, existing case law focuses on

the confidence and trust that exist between employer and employee, not between a third-party contractor and an employee.  E.g., id. (analyzing what defendant must show to prove "detrimental impact" on "trust relationship" between plaintiff and employer). Arguing that plaintiffs' speech might have interfered with relations with the ALS provider is insufficient to establish harm to operational efficiency arising out of the erosion of plaintiffs' relationship with their employer.  See id. at 845 ("employer's alleged loss of confidence and trust in his employee [must] be objectively reasonable").  Indeed, could it be that defendants' reaction to the speech, rather than the speech itself have contributed at least as much, if not more, to any internal erosion of trust?

Finally, defendants argue that plaintiffs' speech impeded the fire department's operations because it "required prompt action"—specifically, the formulation and implementation of a plan "to identify any problems with the ALS provider."  This action, which was without doubt a consequence of plaintiffs' speech, does not on its face constitute an obstacle to operational efficiency that would justify a restriction on plaintiffs' speech.  On the contrary, formulating and implementing a plan to identify problems with the ALS provider "so that the defendants could address and rectify the same" would presumably result in increased operational efficiency.

Accordingly, I rule that plaintiffs' interest in engaging in protected speech on a matter of public concern outweighed defendants' interest in promoting the efficiency of public services they provided.

III.    Adverse Employment Action

The final inquiry is whether plaintiffs' protected speech was a substantial or motivating factor in the alleged adverse employment actions. Mullin, 284 F.3d at 36. Defendants' first argument is that they are entitled to summary judgment because the actions about which plaintiffs complain do not, as a matter of law, constitute adverse employment actions. That assertion is, however, undermined by defendants' own opposition to plaintiffs' motion, in which they highlight several factual disputes precluding summary judgment. These disputes are sufficiently material to defeat both parties' motions.

The specific actions at issue are: (1) permanent assignment of plaintiffs, and only plaintiffs, to the rescue ambulance, rather than assignment according to the group captain's practice; (2) denying plaintiffs, and only plaintiffs, the right to swap their assignments during work shifts to alleviate stress and burnout; and (3) assignment of additional reporting duties to plaintiffs and only plaintiffs. The record is replete with factual disputes between the parties on these issues. For example, plaintiffs allege that firefighters regularly swapped work assignments during a shift to avoid stress and burnout, an assertion that defendants dispute. (Pls.' Mem. in Supp. of Mot for Summ. J. ¶ 27; Defs.' Opp. and Cross-Mot. for Summ. J. 7; Tortolano Dep. 100-01). Plaintiffs contend that assignment to the rescue ambulance was generally considered among the least desirable jobs, but defendant Tortolano denies that he had any knowledge of such a preference and in fact stated that several firefighters had told him they preferred being on the ambulance. (Pls.' Mem. in Supp. of Mot. for Summ. J. ¶ 32; Defs.' Opp.

and Cross-Mot. for Summ. J. 9; Tortolano Dep. 32-33).[2] Because this third inquiry on causation or motivation is generally deemed "a factfinding responsibility for the jury," both motions for summary judgment are denied. Nethersole v. Bulger, 287 F.3d 15, 18-19 (1st Cir. 2002).

IV.     Conclusion

Accordingly, plaintiffs' motion for summary judgment (#17 on the docket) is denied. Defendants' cross-motion for summary judgment (#23) is denied. Defendants' motion to strike certain affidavits (#21) is denied; to the extent that the affidavits contain any inappropriate assertions, I have not considered them in ruling on the parties' motions.

_____        /s/ Rya W. Zobel
      DATE                          RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE

---

[2]While it is undisputed that plaintiff Mulrenan had already decided to stay on the rescue ambulance before he was ordered to do so, plaintiffs argue that he still suffered adverse employment actions by being denied the ability to swap assignments and by being asked to perform additional duties.